No. 25-5975

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

LOS ANGELES PRESS CLUB; NEWSGUILD - COMMUNICATIONS
WORKERS OF AMERICA; SEAN BECKNER-CARMITCHEL; RYANNE
MENA; LEXIS-OLIVIER RAY; CHARLES XU; BENJAMIN ADAM CLIMER;
ABIGAIL OLMEDA,
*Plaintiffs-Appellees*,

v.

KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; UNITED
STATES DEPARTMENT OF HOMELAND SECURITY,
*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the Central District of California

————————————

**MOTION FOR STAY PENDING APPEAL**

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ........................................................................................... 1

STATEMENT .................................................................................................. 2

ARGUMENT .................................................................................................. 8

I.     The Government Is Likely To Succeed On The Merits. ..................................... 8

     A.     Plaintiffs Lack Standing. ............................................................... 8

     B.     Plaintiffs' First Amendment Claims Are Meritless. .................................. 12

II.     The Remaining Stay Factors Decisively Favor The Government. ..................... 21

CONCLUSION ............................................................................................... 22

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ................................................................. 15, 16

*California First Amend. Coal. v. Calderon,*
    150 F.3d 976 (9th Cir. 1998) ................................................... 15

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .............................................................. 8, 9, 10

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .................................................................. 8, 11

*East Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) ................................................... 11

*Felarca v. Birgeneau,*
    891 F.3d 809 (9th Cir. 2018) ................................................... 12

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ................................................................. 12

*Graham v. Connor,*
    490 U.S. 386 (1989) ................................................................. 21

*Index Newspapers LLC v. U.S. Marshals Serv.,*
    977 F.3d 817 (9th Cir. 2020) .............................................. 11, 16

*Laird v. Tatum,*
    408 U.S. 1 (1972) ....................................................................... 11

*Leigh v. Salazar,*
    677 F.3d 892 (9th Cir. 2012) ................................................... 14

*Mendocino Env't Ctr. v. Mendocino County,*
    192 F.3d 1283 (9th Cir. 1999) ................................................. 13

*Menotti v. City of Seattle,*
    409 F.3d 1113 (9th Cir. 2005) ............................................ 14, 16

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................. 8

*Noem v. Vasquez Perdomo*,
   No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025).................... 8

*Nordstrom v. Ryan*,
   762 F.3d 903 (9th Cir. 2014) ...................................................... 9

*Press-Enterprise Co. v. Superior Ct.*,
   478 U.S. 1 (1986) ........................................................14, 15, 16

*Ryburn v. Huff*,
   565 U.S. 469 (2012) ................................................................. 21

*Updike v. Multnomah County*,
   870 F.3d 939 (9th Cir. 2017) ................................................. 8, 10

*Wise v. City of Portland*,
   483 F. Supp. 3d 956 (D. Ore. 2020) ......................................... 15

## INTRODUCTION

The federal government respectfully requests that the Court stay the district court's preliminary injunction pending appeal. The case arises from violent protests targeting Department of Homeland Security (DHS) officers conducting immigration-enforcement operations in the Los Angeles region. Rioters attacked officers with Molotov cocktails, mortar-style fireworks, and other dangerous projectiles. Rioters also breached the perimeter of federal buildings, damaged federal vehicles, and injured many officers. During one protest, one rioter even appeared to fire a gun at officers executing criminal warrants at a marijuana grow site.

The court entered the injunction at the behest of journalists, a self-identified legal observer, protesters, and press organizations. Plaintiffs allege that, at certain protests over the summer, DHS officers targeted them with nonlethal crowd-control devices in retaliation for exercising their First Amendment rights. On that basis, the district court imposed an intrusive injunction on DHS and all DHS officers operating in the Los Angeles region. The injunction exempts any journalist or legal observer from obeying lawful orders to disperse from a violent protest. The injunction also substantially constrains officers' ability to use crowd-control devices to control violent protests, essentially permitting rioters to use the press as human shields. The injunction compounds these problems by defining "Journalist" and "Legal Observer" so broadly that it covers anyone standing an unspecified distance away from a protest,

anyone wearing unspecified distinctive clothing indicative of journalist status, and anyone wearing a certain kind of green hat or blue vest.

This injunction is legally untenable. Plaintiffs lack standing to seek prospective injunctive relief based on incidents that occurred in the past and that plaintiffs only speculate may recur. On the merits, the district court erroneously inferred that DHS officers were retaliating against plaintiffs' First Amendment activity based on alleged instances of excessive force, ignoring other plausible explanations and conflating a Fourth Amendment excessive-force claim with a First Amendment claim. The court further erred in crediting plaintiffs' right-of-access theory, granting preferential treatment to the press to ignore lawful crowd-control measures contrary to Supreme Court precedent. In all events, the injunction is overbroad and unworkable, placing the district court in the position of superintending officers' response to violent protests. The injunction irreparably injures the government and the public interest by impairing officers' ability to control protests that have turned violent and should therefore be stayed pending appeal.

## STATEMENT

**A.** This case concerns protests in the Los Angeles region. Declarations filed by DHS officials indicate that, when certain protests between June and July 2025 turned violent, federal officers responded by issuing dispersal orders and by deploying crowd-control devices.

2

From June 6 through June 9, rioters besieged the federal Metropolitan Detention Center and attacked the officers defending it with Molotov cocktails, fireworks, and other dangerous projectiles while chanting "Kill ICE!" Doc.47-3, at 6-8. "[M]any" officers were injured. Doc.47-3, at 7.

On June 7, 20 officers at a federal facility in Paramount were surrounded by an agitated crowd that eventually numbered in the hundreds. Doc.47-6, at 3-5. Rioters trapped officers in the area with roadblocks and large fires, attacked vehicles attempting to leave, and attacked officers with rocks, fireworks, cinderblocks, and bottles of human waste. Doc.47-6, at 4. One rioter punched an officer in the face and fled while the crowd covered his escape. *Id.* Many officers were injured, including one whose finger was broken by an object thrown through the window of his vehicle. Doc.47-6, at 6. The officer in command described the riot as "one of the most dangerous situations that [he] ha[s] been involved with" in 23 years of service. Doc.47-6, at 5.

On June 9, an "extremely violent demonstration" involving as many as 1,700 rioters occurred at the Santa Ana Federal Building. Doc.47-3, at 9-10. Rioters attempted to breach the building and attacked federal officers with dangerous objects. *Id.* Although initial crowd-dispersal efforts were successful, the crowd only grew throughout the day, "and the group began to throw" potentially lethal "mortar type fireworks at the officers, which would explode near the officers exposing them to loud concussive noise, fire[,] and ignited fireworks fragments." Doc.47-3, at 10.

3

On June 20, violent protesters attacked federal officers on a mission at a Maywood carwash. Doc.48-1, at 3. Rioters hurled metal objects and other projectiles at the officers. *Id.* One person crashed his car into a government vehicle, and another smashed a window on that vehicle with a crowbar. *Id.*

Finally, on July 10, federal officers executing criminal warrants at a marijuana grow site in Camarillo were met by over 500 protesters attempting to disrupt the operation. Doc.48-1, at 4-5. Rioters launched "commercial grade fireworks," rocks, glass bottles, and other projectiles. Doc.48-1, at 5. Rioters wielding baseball bats damaged dozens of government vehicles, Doc.47-2, at 3, while others dumped screws in the road to flatten the vehicles' tires, Doc.47-2, at 4. Rioters blocked vehicles attempting to leave, including one transporting a detainee who required immediate medical attention. Doc.48-1, at 5. One rioter ran a government vehicle off the road into a ditch. Doc.48-1, at 7. "In one case, a protester appears to have fired a handgun at officers." Doc.47-2, at 3.

DHS declarations also indicate that, when rioters obstructed or attacked federal officers on other occasions in June and July, officers were able to control the situation with limited application of crowd-control devices or without using such devices at all.

On June 23, protesters surrounded officers outside a Home Depot and blocked the officers' exit route with a truck. Doc.48-1, at 4. Officers dispersed the group using a single tear-gas canister. *Id.*

4

On July 4, hundreds of protesters attacked officers at the Metropolitan Detention Center. *See generally* Doc.47-3, at 11-14. One officer was struck by a flagpole, Doc.47-3, at 12, and another was kicked, Doc.47-7, at 5. Officers responded by issuing repeated dispersal orders, Doc.47-3, at 12, and by "relocating media personnel to an area from which they could safely observe the unlawful assembly," Doc.47-3, at 13. Officers did not deploy any crowd-control devices. Doc.47-3, at 14; Doc.47-7, at 5.

On July 7, officers conducted an operation at MacArthur Park, where protesters slashed one of the tires on a van. Doc.47-2, at 3. Plaintiffs allege that officers pointed "less-lethal guns" at a filmmaker on site. Doc.34-18, at 4. *But see* Doc.47-7, at 3 ("[O]fficers did not point their weapons at protestors to threaten them."). According to DHS officials, officers did not deploy any crowd-control devices. Doc.47-2, at 2-3; Doc.47-7, at 2-3; Doc.48-1, at 3.

On July 10, officers attempted to execute criminal warrants at a marijuana grow site in Carpinteria. One protester threw a water bottle at officers, Doc.47-7, at 4, and three or four others "were seen bending down to grab what was assumed to be rocks," *id.* Officers deployed a single crowd-control device to disperse the threat. *Id.* They also deployed four other devices during the protest, "none of which were used as direct impact" and which represented "the lowest level of force options applicable" "[u]nder the circumstances." *Id.*

5

**B.**     Plaintiffs are two press organizations, three journalists, one self-identified legal observer, and two protesters.  Doc.55, at 21.  Plaintiffs' complaint against DHS alleges "claims for First Amendment right of access and retaliation."  Doc.55, at 21.[1]  Plaintiffs sought a temporary restraining order based on injuries they allegedly sustained during the events of June 6 through June 9, which the district court denied because plaintiffs had failed to establish the "'substantial risk' of future harm required for standing."  Doc.19, at 4.  The court also concluded that, even if plaintiffs had meritorious claims, the "appropriate remedy" would be "a narrowly crafted" remedy barring DHS "from using excessive force to disperse crowds without warning," as opposed to a broad remedy that "would restrict lawful crowd control measures and potentially impede" the government's "legitimate law enforcement responsibilities."  Doc.19, at 5.  After the case was transferred to a different judge in the same court, plaintiffs moved for a preliminary injunction.

**C.**     On September 10, the district court entered a preliminary injunction that places extraordinary restrictions on DHS officers' ability to respond to violent protests in Los Angeles County and the surrounding area.  The injunction broadly regulates DHS's ability to disperse "journalists" and "legal observers," DHS's use of crowd-control devices that may incidentally affect those groups, and DHS's use of crowd-control devices generally.  Doc.55, at 43-44.

---

[1] The complaint also asserted excessive-force claims that were not the subject of the district court's preliminary injunction.  Doc.55, at 21, 27 n.17.

6

Many of the injunction's restrictions turn on DHS's ability to distinguish three categories of people: "Journalists," "Legal Observers," and "protesters." Doc.55, at 43-44. The injunction defines "Journalist" as anyone with a "press pass," anyone "carrying professional gear," anyone "wearing . . . official press credentials," or anyone wearing unspecified "distinctive clothing[] that identifies the wearer as a member of the press." Doc.55, at 44. The definition also covers anyone "standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, although these are not requirements." *Id.* "These indicia are not exclusive, and a person need not exhibit every indicium" to qualify. *Id.* The injunction's definition of "Legal Observer" covers anyone "wearing a green National Lawyers Guild-issued or authorized Legal Observer hat (typically a green hat) or wearing a blue ACLU-issued or authorized Legal Observer vest." *Id.* This definition likewise extends to anyone "standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, although these are not requirements." *Id.* The injunction does not define the term "protester."

**D.** On September 19, the government asked the district court to stay the injunction pending appeal. The court set a moderately expedited briefing schedule. The government's reply informed the court that, if a decision was not made by October 9, the government would seek a stay from this Court. As of the time of filing, the motion remains pending.

7

# ARGUMENT

The government is entitled to a stay because it is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

## I. The Government Is Likely To Succeed On The Merits.

### A. Plaintiffs Lack Standing.

Plaintiffs lack standing to seek prospective injunctive relief based on allegations that certain individual officers retaliated against them for their First Amendment activities in the past. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *2 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring in grant of stay application) (citing *Lyons*, 461 U.S. 95). Plaintiffs must instead demonstrate a "real and immediate threat of repeated injury," *Updike v. Multnomah County*, 870 F.3d 939, 947 (9th Cir. 2017) (quotation marks omitted), and may not rely on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). *Lyons* illustrates this principle. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part"—even though the

police department had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.*

These precedents foreclose plaintiffs' standing. The district court credited plaintiffs' allegations that, in June and July, DHS officers targeted them with excessive force for exercising their First Amendment rights. Doc.55, at 25 n.14. Those findings were clearly erroneous, as the government explained below. Doc.58, at 10-12. But even accepting them as true does not establish that plaintiffs will likely be subjected to retaliatory force in the future. Plaintiffs have failed even to show that DHS has a policy of retaliation. DHS expressly prohibits officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." Doc.47-4, at 130; *see* Doc.58-3, at 8 ("It is against [Federal Protective Service (FPS)] policy for officers to deliberately target individuals with crowd-control weapons in retaliation for exercising their First Amendment rights."). Officers who use retaliatory force have violated these policies and acted in a manner antithetical to the values DHS is committed to upholding. Moreover, as the court acknowledged, DHS's policies "correctly set out the bounds for the use of" crowd-control devices. Doc.55, at 33.

Nor have plaintiffs plausibly alleged an unwritten policy of "officially sanctioned" retaliation. *See Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014). The district court relied on declarations asserting that DHS officers targeted plaintiffs with crowd-control devices at certain protests between June 6 and July 10. Doc.55, at 30-

9

32. But for months, DHS officers have been faced with protests while conducting operations in the area. The record does not indicate that retaliatory force was used at all such protests, as presumably would have occurred if an unwritten DHS policy condoning retaliation existed. To the contrary, the record indicates that, during at least two other incidents during the same period, officers deployed *no* crowd-control devices despite being confronted by violent protesters. And the court's suggestion that Secretary Noem "ratified Defendants' practice of meeting First Amendment protected activities with force," Doc.55, at 34 & n.28, is not supported by the quoted statements.

Similarly, the record does not establish that plaintiffs would again be subjected to retaliatory force even if such a policy existed. *See Lyons*, 461 U.S. at 105. As explained, there were numerous protests in the Los Angeles region in June and July, yet plaintiffs have identified only a comparatively small number of allegedly retaliatory incidents involving them; most alleged incidents did not involve plaintiffs at all. *See* Doc.65, at 2 (explaining that 42 of plaintiffs' 53 declarants during motion briefing were nonparties). Thus, even if plaintiffs "intend to continue their activities as reporters, legal observers, and protestors," Doc.55, at 24, they have failed to establish that they will themselves be retaliated against in the future, *Lyons*, 461 U.S. at 105-06, 108; *see Updike*, 870 F.3d at 948 (rejecting plaintiff's argument that, because officers had denied him interpretive services during five prior arrests, he was at risk of being denied interpretive services in the future).

10

The district court suggested that *Lyons* does not apply because plaintiffs have also alleged a chilling effect under the First Amendment. Doc.55, at 25-26. But plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm," including by alleging a "subjective chill" on protected speech. *Clapper*, 568 U.S. at 416-18 (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)).

This Court's decision in *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020), does not change the analysis. That decision lacks precedential force because its "predictive analysis" turned on the "probabilistic" standard governing motions to stay a preliminary injunction pending appeal, not a "pure question[] of law" already settled by "binding authority." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 & n.3 (9th Cir. 2021). And the decision lacks persuasive force because it cannot be reconciled with the Supreme Court cases discussed above. The decision also involved different facts and a different record. As explained, this record undermines plaintiffs' assertions of future injury because DHS's declarations illustrate that officers did not uniformly deploy force when confronted by violence. And this injunction is broader than the injunction the stay panel in *Index Newspapers* concluded those plaintiffs had standing to seek.

For the same reasons, the district court erroneously concluded that the plaintiff organizations have standing due to their members' allegations of past retaliation. Doc.55, at 26. The court's alternative diversion-of-resources theory, Doc.55, at 27

11

n.16, is foreclosed by *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602

U.S. 367, 394-95 (2024) (holding that organizations cannot "spend [their] way into

standing simply by expending money to . . . advocate against the defendant's action").

**B.    Plaintiffs' First Amendment Claims Are Meritless.**

**1.**    With respect to plaintiffs' retaliation claims, the district court failed to

cite any direct evidence that DHS intentionally targeted plaintiffs for their First

Amendment activity.  Indeed, DHS expressly forbids such conduct.

The district court inferred retaliatory intent solely based on its view that DHS

officers' response to violent protests was "excessive and indiscriminate."  Doc.55, at

29.  That fails as a matter of law.  Even accepting the court's characterization of those

officers' conduct would show, at most, that those officers used too much force when

trying to restore order.  Such allegations would be tested against the Fourth

Amendment's excessive-force standards, or, where appropriate, other doctrines

applicable to individual officer misconduct.  *See, e.g., Felarca v. Birgeneau*, 891 F.3d 809,

818 (9th Cir. 2018).  But the court's findings do not show that plaintiffs were targeted

because of their speech, much less support an inference of an officially sanctioned

DHS policy of retaliation.  Accepting the court's contrary conclusion would convert

any allegation of excessive force in response to a violent protest into a First

Amendment retaliation claim as well.

Moreover, the court erroneously ignored an obvious alternative explanation for

officers' use of force: that plaintiffs' injuries inadvertently resulted from officers'

efforts to protect federal personnel, federal property, and the public from the chaos of violent protests. In such circumstances, officers may have difficulty "tell[ing] who a journalist was," particularly when "news crews set up their equipment in the middle of the violent rioters." Doc.47-6, at 6; *see, e.g.*, Doc.34-11, at 2, 4 (declaration indicating that journalist affected by tear gas during violent Camarillo protest had positioned herself "close to [a] truck, in the center of the road," that "was surrounded by protesters").

Finally, plaintiffs' allegations of misconduct by individual officers must be evaluated against the backdrop of the many interactions between DHS officers and protesters in the region that did not result in allegations of retaliation. Plaintiffs' allegations, seen in their proper context, are unlikely to prove that their First Amendment activity was a "substantial or motivating factor" in DHS's conduct. *See Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999).

**2.** The district court also justified the injunction on the alternative theory that DHS violated plaintiffs' First Amendment "right of access to protests." Doc.55, at 34-36. The court appeared to base this theory on the allegations of retaliatory force discussed above, Doc.55, at 36, and it therefore fails on standing grounds, *supra* pp. 7-11.

In any event, plaintiffs' claim of a right of access to violent protests lacks merit. There is no reasonable dispute that, when a protest turns violent and threatens federal personnel and property, officers may respond by issuing general dispersal orders and

13

by using appropriate force. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1155-56 (9th Cir. 2005). The district court emphasized plaintiffs' allegations that DHS officers "lack[ed] any . . . justification for targeting journalists" with crowd-control devices. Doc.55, at 36. As explained, however, the court's inference of retaliatory intent was erroneous. And such allegations are properly analyzed not under the First Amendment but under the Fourth Amendment or other doctrines applicable to individual officer misconduct.

The nature of the right-of-access doctrine confirms this conclusion. The doctrine was developed to evaluate claims of access to certain "government proceeding[s] or activit[ies]." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012); *see Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8-9 (1986) (applying doctrine to "governmental processes"). The district court failed to explain how officers' attempts to control a violent protest—which the government did not organize—is a government proceeding to which a right of access could ever attach.

Applying the right-of-access framework to violent protests is especially inapt because it grants the press a special First Amendment immunity to dispersal orders and the use of crowd-control devices that the public does not possess. Indeed, plaintiffs argued below that, due to the press's right of access, officers must respond to violent protests without dispersing journalists and legal observers. Doc.34-1, at

14

12.[2]  The court incorporated that argument into the injunction, which prohibits officers from "[d]ispersing . . . Journalist[s] or Legal Observer[s]" during a violent protest and permits officers only to request, with caveats, that such individuals "change location to avoid disrupting law enforcement."  Doc.55, at 43.  It is black-letter law, however, that the press lacks a "constitutional right of special access to information not available to the public generally."  *California First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972)) (discussing other cases).  Members of the public have no First Amendment right to disregard dispersal orders or to be exempted from the use of crowd-control devices.

Even if violent protests are governmental proceedings subject to the right-of-access doctrine, the district court erred by concluding that such a right attaches.  The doctrine applies only when the "place and process [in question] have historically been open to the press and general public" and when "public access plays a significant positive role in the functioning of the particular process" at issue.  *Press-Enterprise*, 478 U.S. at 8.  The court concluded that the second prong was met due to the public's interest in press coverage of protests in Los Angeles.  Doc.55, at 35.  But that cannot

---

[2] Plaintiffs have not cited, and we are not aware of, any decision of this Court holding that the First Amendment extends a special right of access to legal observers beyond whatever rights the public may possess.  *Cf. Wise v. City of Portland*, 483 F. Supp. 3d 956, 967 (D. Ore. 2020) (concluding that self-styled "protest medics . . . have no unique status under the First Amendment that allows them to disregard lawful orders").

overcome the reality that there is no tradition of public access to violent protests. *Branzburg*, 408 U.S. at 684-85 ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded . . . ."). The existence of such a tradition is a prerequisite for a right-of-access claim to proceed. *Press-Enterprise*, 478 U.S. at 9.

Even if a right of access attached to violent protests, officers would not transgress that right by responding to violence with dispersal orders and crowd-control devices. "[O]nce a pattern of chaotic violence ha[s] been established, it [i]s unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions." *Menotti*, 409 F.3d at 1134. When "law-breaking and law-abiding protestors [a]re often indistinguishable, and where those abiding the law might [be] interfer[ing] indirectly with enforcement" against those who are not, *id.* at 1135, officers may lawfully respond to "a small group of violent protestors . . . determined to cause chaos" even if their response affects peaceful protesters or innocent bystanders too, *id.* at 1134; *see id.* at 1126-28.

**3.** The district court emphasized that, in *Index Newspapers*, a majority of the stay panel held that a different set of plaintiffs was likely to prevail on similar First Amendment claims. *E.g.*, Doc.55, at 31, 33, 36. But that decision lacks precedential force, *see* p. 11, and lacks persuasive force for the reasons set forth in Judge O'Scannlain's dissent, 977 F.3d at 844-52 (O'Scannlain, J., dissenting).

## C.  The Injunction Is Overbroad And Unworkable.

The government also has a strong likelihood of demonstrating that the district court abused its discretion in granting an overbroad and unworkable injunction that constrains officers' response to protests throughout the Los Angeles region.  Even assuming the merits of plaintiffs' claims, that would justify—at most—a narrow injunction instructing DHS to stop targeting plaintiffs who could establish their Article III standing to sue for prospective relief, not the extraordinary injunction entered here.

To begin, the injunction severely restricts officers' ability to issue dispersal orders and to deploy crowd-control devices whenever journalists or legal observers are present.  Doc.55, at 41-44.  But the court's definition of those terms offers little guidance.  The injunction requires officers confronted with rioters to quickly determine whether anyone in the crowd is displaying a "professional or authorized press pass" or "other official press credentials," carrying sufficiently "professional gear," or wearing sufficiently "distinctive clothing" (in the case of a journalist) or a special green hat or blue vest (in the case of a legal observer).  Doc.55, at 44.  But the injunction does not specify which or how many of these indicia are necessary.  *Id.*  The injunction also states that a journalist and legal observer is anyone "standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities."  *Id.*  These "indici[a]," however, "are not requirements."  *Id.*  The definitions thus plainly cover even journalists and legal

observers who are intermingled with protesters or who are engaging in protest activities.

These highly reticulated yet hopelessly vague instructions are unworkable. When protests turn violent, officers may not be able to "see clearly the writing on badges or the color of clothing (especially at night – when most of the violent protests occur)." Doc.58-3, at 7. Nor is it "always possible to know who is" standing to the side given the dynamic nature of the events, particularly given that some protestors specifically attempt to limit officers' ability to see. *Id.* "Time spent checking for credentials . . . or attempting visual confirmation under stress and potentially limited visibility[] is time not spent responding to violent rioters, moving to cover, or communicating critical updates." Doc.58-2, at 3-4.

These definitions are also ripe for abuse. The injunction permits violent protesters to use journalists and legal observers as shields by positioning themselves nearby. Doc.58-4, at 10. Rioters can also easily disguise themselves as journalists or legal observers "to avoid detection" and "perpetuate violence." Doc.58-4, at 9-10. "Press markings, press clothing, [and] professional photographic equipment" are "all publicly available." Doc.58-2, at 4. Indeed, "[m]any journalists . . . use cellphones as their photographic equipment," making them "indistinguishable from" the public. Doc.58-4, at 8. "Likewise, anyone can wear a green hat or a blue vest . . . ." Doc.58-3, at 6. Officers cannot "reliably differentiate . . . actual press and legal observers" from imposters. Doc.58-2, at 4. Any "hesitation by agents trying to reconcile

suspicious or threatening behavior[] with a bad actor's disguised appearance" may be "deadly." Doc.58-4, at 10. Even before the issuance of the injunction, at least one officer was assaulted by someone visually identifying as a reporter. Doc.58-3, at 4.

The injunction is unworkable in many other respects. For example, the injunction requires "two separate" and audible "warnings" and time to disperse before use of any crowd-control device, "unless the threat is so serious and imminent that a warning is infeasible." Doc.55, at 43. Officers will thus have to face the threat of contempt in assessing whether there is time for one warning—much less two—in a rapidly evolving situation. Doc.58-4, at-7. Similarly, the injunction prohibits officers from using crowd-control devices "if doing so could foreseeably result in injury to the press, legal observers, or protesters" who do not themselves pose a threat except in narrow circumstances. Doc.55, at 43. Yet violent protesters often "throw Molotov cocktails and launch commercial grade fireworks . . . at federal buildings" to light them on fire. Doc.58-3, at 5. Officers' most effective response is to "push the entire crowd" away with crowd-control munitions. *Id.* And because rioters "often . . . use protestors who are behaving peacefully as shields," "[t]he practical impact" of this provision is to prohibit officers from repulsing "a crowd containing violent individuals . . . to a safe distance from the federal building being attacked." *Id.*

Moreover, the injunction requires officers to ask anyone qualifying as a journalist or legal observer during a violent protest to voluntarily relocate to another position that preserves those individuals' ability to "report and observe." Doc.55, at

19

41.  Although that may be an available option in some circumstances, *see* Doc.47-3, at 13, it is dangerous to force officers to conduct such negotiations in all circumstances—including in "environment[s] where they are facing physical threats to themselves and others" and where rioters attempt to "avoid detection and arrest by hiding in crowds," Doc.58-2, at 3.  And the injunction gives officers no recourse if someone refuses to move.

Even those injunction provisions modeled on DHS policies (such as using objectively reasonable force or affording time for compliance, Doc.47-1, at 13-15) are unnecessary and may be counterproductive.  By incorporating these policies into an injunction, the district court placed itself in the position of arbitrating disputes over whether the policies were followed.  As a result, "anyone affected by crowd-control weapons could challenge" the reasonableness of all manner of split-second decisions "in court, under pain of contempt."  Doc.58-3, at 6.  Officers could face contempt charges even for accidents caused by the fact that, because "kinetic impact projectiles travel relatively slowly," "dynamic movements—such as a person turning so their back faces the officer, or a bystander stepping into the line of fire—can result in an inadvertent strike."  Doc.58-2, at 8-9.  Officers could also face liability for the actions of "violent opportunists" injuring others in the crowd by "kick[ing] or throw[ing]" properly deployed crowd-control devices.  Doc.58-2, at 8.  "The threat of being forced to defend against contempt charges—even those that [are] ultimately reject[ed]—for decisions made under pressure in chaotic and unpredictable

20

circumstances may chill officers' ability to respond to protests that have turned violent." Doc.58-3, at 6.

## II. The Remaining Stay Factors Decisively Favor The Government.

As demonstrated, the district court's injunction interferes with officers' ability to respond to violent crowds in the Los Angeles region. Constraining officers in this manner irreparably harms the government, which has a strong interest in preventing attacks on federal officers and damage to federal buildings. For the same reason, the injunction harms the public interest. On the other side of the ledger, plaintiffs have failed to establish Article III standing for prospective relief, much less irreparable harm warranting the court's broad injunction. That is particularly so given that, as explained above, DHS policies already constrain officers' use of crowd-control devices, *see supra* pp. 9, 20, and prohibit retaliation on the basis of First Amendment activity, *see supra* p. 9.

There are good reasons why courts should not issue orders of this kind. Courts are ill-positioned to second-guess the decisions of officers seeking to disperse a protest that has turned violent. Such occasions present "tense, uncertain, and rapidly evolving" circumstances that force officers "to make split-second judgments." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). The district court abused its discretion by entering an injunction that inappropriately constrains officers' ability to control riots and improperly privileges the district court's view of appropriate law-enforcement conduct over officers'

judgments in the moment. The equities thus tilt sharply against the court's

extraordinary injunction.

## CONCLUSION

For these reasons, the preliminary injunction should be stayed pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON

  */s/ Michael Shih*
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*
  *michael.shih@usdoj.gov*

October 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,200 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Michael Shih*
MICHAEL SHIH