Case No. 25-5975

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## LOS ANGELES PRESS CLUB, *et al.*,
*Plaintiffs-Appellees*

v.

## KRISTI NOEM, *in her official capacity as Secretary of Homeland Security;*
## UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
*Defendants-Appellants*

On Appeal from the United States District Court for the Central District of
California, Case No. 2:25-cv-05563-HDV-E
Honorable Hernán D. Vera

### PLAINTIFFS-APPELLEES' OPPOSITION TO MOTION FOR STAY
### PENDING APPEAL

<table>
<tr><td>

BRAUNHAGEY & BORDEN LLP
Matthew Borden
J. Noah Hagey
Kory J. DeClark
Greg Washington
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
borden@braunhagey.com
hagey@braunhagey.com
declark@braunhagey.com
gwashington@braunhagey.com

</td><td>

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
Peter J. Eliasberg
Jonathan Markovitz
Adrienna Wong
Meredith Gallen
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
peliasberg@aclusocal.org
jmarkovitz@aclusocal.org
awong@aclusocal.org
mgallen@aclusocal.org

</td></tr>
</table>

*[Additional Counsel Listed on Following Page]*

LAW OFFICE OF CAROL A. SOBEL
Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403

SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
Paul Hoffman
Michael Seplow
John Washington
200 Pier Avenue #226
Hermosa Beach, CA 90254
Telephone: (310) 396-0731
hoffpaul@aol.com
mseplow@sshhzlaw.com
jwashington@sshhzlaw.com

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
Summer Lacey
Jacob Reisberg
Mohammad Tajsar
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
slacey@aclusocal.org
jreisberg@aclusocal.org
mtajsar@aclusocal.org

LAW OFFICE OF PETER BIBRING
Peter Bibring (SBN: 223981)
2210 W. Sunset Blvd. # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022
peter@bibringlaw.com

*Attorneys for Plaintiffs-Appellees*
*Los Angeles Press Club, NewsGuild-Communications Workers of America, Sean*
*Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin*
*Adam Climer, and Abigail Olmeda*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................i-ii

TABLE OF AUTHORITIES...........................................................iii-iv

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................... 3

STANDARD OF REVIEW .................................................................. 5

ARGUMENT ..................................................................................... 6

I.    DEFENDANTS HAVE NOT PROVEN THEY WILL BE IRREPARABLY HARMED ................................................................................. 6

II.   DEFENDANTS HAVE NOT PROVEN THEY WILL SUCCEED ON THE MERITS....................................................................................... 8

      A.     The District Court Correctly Determined Plaintiffs Have Standing .... 9

      B.     Defendants Have Not Proven They Are Likely to Prevail on Plaintiffs' Right-of-Access Claims .................................................... 13

      C.     Defendants Fail to Prove They Are Likely to Win on Plaintiffs' Retaliation Claims ............................................................. 16

      D.     The Injunction's Scope Is Not an Abuse of Discretion ...................... 17

            1.     The Injunctive Terms from *Index* Are Workable ................................................................................. 18

            2.     Requiring Defendants to Comply with Their Own Policies Is Workable ................................................................................. 20

III.   PLAINTIFFS WILL BE SUBSTANTIALLY INJURED BY A STAY........ 22

IV.   A STAY IS CONTRARY TO THE PUBLIC INTEREST ............................ 22

CONCLUSION ................................................................................. 23

CERTIFICATE OF COMPLIANCE ..................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020)........................................................................7

*Anderson v. Bessemer City*,
   470 U.S. 564 (1985)..............................................................................5, 10

*Armstrong v. Brown*,
   768 F.3d 975 (9th Cir. 2014) ....................................................................5

*Associated Press v. Otter*,
   682 F.3d 821 (9th Cir. 2012)...................................................................23

*Beame v. Friends of the Earth*,
   434 U.S. 1310 (1977)................................................................................8

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ..................................................................17

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018)................................................................17

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)...............................................................................9, 10

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)................................................................................13

*Collins v. Jordan*,
   110 F.3d 1363 (9th Cir. 1996) .......................................................... 22, 23

*Cox v. Louisiana*,
   379 U.S. 536 (1965).................................................................................22

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ........................................................ 6, 7, 8

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ................................................................8, 9

*Fed. Election Comm'n v. Furgatch*,
   869 F.2d 1256 (9th Cir. 1989).................................................................10

*Hague v. Comm. for Indus. Org.*,
   307 U.S. 496 (1939)................................................................................14

*Hart v. Massanari*,
   266 F.3d 1155 (9th Cir. 2001) ..................................................................8

*Index Newspapers LLC v. U.S. Marshals Service*,
   977 F.3d 817 (9th Cir. 2020)........................................................ passim

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985) ...............................................................9
*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ............................................... 15, 16, 23
*Libertarian Party of Los Angeles Cnty. v. Bowen*,
    709 F.3d 867 (9th Cir. 2013) .............................................................12
*Mayfield v. United States*,
    599 F.3d 964 (9th Cir. 2010) ...............................................................9
*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005) ...........................................................11
*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) .............................................................21
*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................... 6, 22, 23
*Porter v. Martinez*,
    68 F.4th 429 (9th Cir. 2023) ..............................................................12
*Press-Enter. Co. v. Superior Ct.*,
    478 U.S. 1 (1986) ............................................................. 14, 15, 17, 18
*Sanderlin v. Dwyer*,
    116 F.4th 905 (9th Cir. 2024) ............................................... 8, 16, 21
*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) ...........................................................................17
*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) .............................................................5
*United States v. Mitchell*,
    971 F.3d 993 (9th Cir. 2020) ...............................................................6
*Wooley v. Maynard*,
    430 U.S. 705 (1977) ...........................................................................10

**Rules**

Fed. R. App. P. 27(d)(2)(A) and 32(a)(5)-(6) ...........................................2
Federal Rule of Appellate Procedure 8 ....................................................5

## INTRODUCTION

Plaintiffs-Appellees are reporters, legal observers, and peaceful protesters whom Defendant-Appellant Department of Homeland Security repeatedly assaulted at the ongoing protests over DHS immigration raids in the Central District of California. After reviewing more than 60 declarations and extensive video and photo evidence, the District Court issued a preliminary injunction that prohibits DHS from preventing journalists from reporting on these events and stops DHS from retaliating against people reporting on and protesting against DHS. The Order comprises 45 pages of factual findings detailing how DHS agents repeatedly misused crowd-control weapons to attack people who posed no danger, and straightforward application of the facts to this Court's precedent, including *Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817, 827 (9th Cir. 2020), where this Court upheld a similar injunction against DHS for retaliating against and dispersing journalists and legal observers at protests.

Defendants ignore these findings, which can only be set aside for clear error. They ignore unrebutted expert testimony from former Commissioner of Customs and Border Protection, Gil Kerlikowske, that the injunction is safe and workable for law enforcement. They submitted no videos or declarations to contradict the "avalanche" of videos and declarations showing them gratuitously opening fire on peaceful crowds, shooting people in the head with teargas canisters, intentionally

1

shooting at press vehicles, teargassing seniors and children, and assaulting people standing far apart from protest activities. Their submitted evidence comprised hearsay declarations with generalized statements that fail to explain why they repeatedly injured Plaintiffs—many of them several times at different locations— who posed no threat of violence to anyone.

In light of the evidence the District Court credited—and not the "Statement" in Defendants' brief, which ignores the District Court's findings and is unsupported by the record—Defendants cannot meet any of the *Nken* stay factors. They spend less than a page claiming irreparable harm and overlook that they have no evidence that the injunction has ever harmed Defendants in the five weeks it has been in effect, or in the months DHS was subject to similar terms in *Index*.

Defendants repeat the same arguments this Court rejected in *Index*, which do not establish any chance of success. Plaintiffs have standing both because they intend to continue to report, observe, and protest and have been repeatedly and unlawfully assaulted when doing so, and because, as intended, Defendants' violence is chilling their exercise of First Amendment rights. Copious, unrebutted evidence establishes retaliatory intent, and Defendants fail to prove that their blanket policy of preventing journalists from covering the protests is narrowly tailored to achieve any overriding government interest. To the contrary, "excluding

2

the media from public fora can have particularly deleterious effects on the public interest." *Index*, 977 F.3d at 830.

## BACKGROUND

The record includes "detailed and credible declarations from nearly 50 journalists, legal observers, and protestors" and videos and photos captured by eyewitnesses. (Dkt.55 at 2.) Defendants' motion disregards the District Court's findings on this record and instead proffers a "Statement" that relies exclusively on self-serving hearsay declarations discredited in the proceedings below—going so far as to repeat claims about "violent protesters" specifically disproven by video.[1]

The District Court found that contrary to "Defendants' characterization of all protestors as 'rioters,'" the "uncontradicted evidence reveals that the gathered crowds in downtown Los Angeles, Santa Ana, Paramount, Maywood, Camarillo, and Carpinteria included community leaders, families including children and elderly individuals, and other concerned community members." (*Id.* at 32.) Even when "[v]iewed in the light most generous to Defendants," the court found, "the

---

[1] *Compare, e.g.,* Mot. at 4 (repeating claims about violent riot in Camarillo) *with* Dkt.55 at 16 (finding videos of protest in Camarillo, along with numerous declarations, show no violence by press and protestors DHS attacked); Mot. at 3 (repeating claims about "extremely violent demonstration" of "1,700 rioters" attempting to breach Santa Ana federal building) *with* Dkt.49 at 2-3 (video, photos, and declarations showing DHS officers abruptly firing less lethal munitions on far smaller peaceful demonstration on sidewalk many yards from federal building).

3

record reveals" that Defendants' attacks on protests have not focused on violent rioters, but targeted "peaceful protesters, journalists, and observers"—including, for example, a "group of … teens and seniors gathered at a bus stop and park" in the city of Maywood, and "a nonviolent group of community members, including seniors and young children, in Carpinteria." (*Id.* at 32-33.)

The court "reject[ed] Defendants' baseless accusations that Plaintiffs … participated in violent riots," finding "Defendants … failed to adduce a *shred* of evidence" to support this. (*Id.* at 28.) Rather, the court found DHS "deployed force against [Plaintiffs], though they were not engaged in or even proximate to any violent or noncompliant actions." (*Id.* at 39.) And it noted the "avalanche of evidence before [it]—along with federal officials' statements" indicating that these attacks on Plaintiffs were part of "a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." (*Id.* at 33; *see also id.* at 30 (finding "extensive record evidence [shows] federal officers repeatedly targeted journalists and peaceful legal observers far from any … bad actors" and Defendants failed to "proffer any innocent explanations for these incidents"); *id.* at 23-24 (finding "many victims had been standing on public streets, sidewalks, and parks," away from crowds "and were not engaged in unlawful activity" when DHS injured them); *id.* at 30 ("Defendants deployed

4

crowd control weapons even when crowds were already dispersing or attempting to comply with orders").)

## <u>STANDARD OF REVIEW</u>[2]

To decide whether the party moving for a stay has met the high standard to show a strong likelihood of success on the merits, this Court reviews the District Court's findings of fact for clear error, its legal conclusions de novo, and the injunction's scope for abuse of discretion. *Index*, 977 F.3d at 824 (citing *Armstrong v. Brown*, 768 F.3d 975, 979 (9th Cir. 2014)).

"A district court's factual findings are entitled to deference unless they are clearly erroneous." *Id.*; *see also Anderson v. Bessemer City*, 470 U.S. 564, 573–575 (1985) (under "clearly erroneous" standard, appellate court may not reverse "plausible" factual finding even if convinced "that had [it] been sitting as the trier of fact, [it] would have weighed the evidence differently"). A finding is not "clearly erroneous" unless it is "illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

---

[2] For the reasons stated in Plaintiffs' motion to strike, CA9 Dkt.9, this motion should also be denied for failure to comply with Federal Rule of Appellate Procedure 8. *See Vasquez Perdomo v. Noem,* No. 25-4312, Dkt.9 at 2 (9th Cir. Jul. 16, 2025).

## LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy." *United States v. Mitchell*, 971 F.3d 993, 999 (9th Cir. 2020) (quotation omitted). Such a "stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quotation omitted). The party requesting a stay bears the burden of proving all four *Nken* factors. *Id.* at 433-34.

## ARGUMENT

## I. DEFENDANTS HAVE NOT PROVEN THEY WILL BE IRREPARABLY HARMED

Defendants spend less than a page on what they call "the remaining stay factors." (Mot. at 21.) However, if a party moving for a stay has not made the requisite showing of irreparable harm, "then a stay may not issue, regardless of … the other stay factors." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (citing *Nken*, 556 U.S. at 433–34). To justify a stay, Defendants must show that they are likely to suffer irreparable injury "during the period before the appeal is decided." *Index*, 977 F.3d at 824. "Simply showing some possibility of irreparable injury fails to satisfy … [t]he demanding standard applicable here." *Id*.

Defendants have not proven irreparable harm pending appeal, which is fatal to their stay motion. The District Court found that the facts do not show Defendants face irreparable harm. (Dkt.60 at 1.) Defendants have not shown this finding was clearly erroneous or shown any harm during the five weeks the

6

injunction has been in place. They do not even address the District Court's finding that Defendants can "identify no instance … where [they] have suffered any harm as a result of the injunction." (*Id*.) Though Defendants "had available to [them] the best evidence of harms likely to occur because of the injunction: evidence of harms that *did* occur because of the injunction," they present none to support their stay motion. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020). In lieu of evidence of actual injury, they rely on "only . . . assumptions, and projections," which fails to show irreparable harm. *Id.*

Defendants offer only two conclusory sentences addressing irreparable harm. (Mot. at 21.) "[B]y submitting [such] conclusory factual assertions and speculative arguments that are unsupported in the record," Defendants fail to meet their burden of proving irreparable harm in the "relatively short period" before the appeal is decided. *Al Otro Lado*, 952 F.3d at 1008; *Doe #1*, 957 F.3d at 1059-60; *Index*, 977 F.3d at 836 (DHS did not show irreparable harm, where it provided no evidence that injuries it sustained were more severe or frequent when operating under injunction).

Defendants' speculation about what might happen ignores the court's findings detailed in Section II.D below: that the injunction merely combines the same relief this Court upheld in *Index*—which Defendants complied with for months—with Defendants' own policies and what they say they already do, and is

7

supported by a lengthy track record of safety and workability and expert testimony by CBP's former commanding officer. *See Index,* 977 F.3d at 835, 838 (no irreparable harm where such evidence supported District Court's finding that injunction would not "impede [DHS's] ability to safely achieve their mission").

Finally, Defendants waited nine days to seek a stay below to merely repeat arguments they asserted opposing the preliminary injunction. Such unexplained delay undermines their claims of irreparable harm. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) ("The applicants' delay in … seeking a stay vitiates much of the force of their allegations of irreparable harm.").

## II.   DEFENDANTS HAVE NOT PROVEN THEY WILL SUCCEED ON THE MERITS

Defendants separately fail to meet "the high standard of showing a *strong* likelihood of success on the merits." *Doe #1*, 957 F.3d at 1062. They cannot show that the court's factual findings are clearly erroneous or that it erred in its straightforward application of binding precedent. Instead, they merely recycle arguments this Court already rejected in *Index*.[3]

---

[3] Defendants incorrectly argue *Index* is not binding. (Mot. at 11, 16.) This Court has cited *Index* as precedent. *See, e.g., Sanderlin v. Dwyer*, 116 F.4th 905, 910-11 (9th Cir. 2024). *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 656 (9th Cir. 2021), addressed whether a decision by a motions panel is law of the case for a later merits panel in the same case. It does not negate that published motions panel decisions are "binding circuit authority." *Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001). *Biden* held that "published motions panel order[s] may be binding

## A.    The District Court Correctly Determined Plaintiffs Have Standing[4]

The court correctly held that plaintiffs may establish standing by showing "either 'continuing, present adverse effects' of a defendant's past illegal conduct, or 'a sufficient likelihood that [they] will again be wronged in a similar way.'" (Dkt.55 at 23.) The court properly found Plaintiffs have standing on both bases.

*First*, the court found Plaintiffs faced a realistic likelihood of recurrent injury. This Court "will affirm a district court's ruling on standing when the court has determined that the alleged threatened injury is sufficiently likely to occur, unless that determination is clearly erroneous or incorrect as a matter of law." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010). Defendants do not dispute that Plaintiffs may establish standing based on a "realistic[] threat[]" of repeated injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983); *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985) (district court's "specific finding of likely recurrence" distinguished case from *Lyons*). Nor do they show the court's

---

as precedent for other panels deciding the same issue," 993 F.3d at 656—here, whether to stay the preliminary injunction pending appeal: the precise issue *Index* decided.

[4] Defendants only argue Plaintiffs lack standing to seek injunctive relief for their retaliation claim. They do not address Plaintiffs' standing for their access claims. Defendants effectively admit to a policy that authorizes dispersing press, legal observers, and protesters alike. *See, e.g.,* Mot. at 14-18. For this independent reason, their standing argument is not likely to succeed.

finding is "without support" from the record, as necessary to establish clear error. *Anderson*, 470 U.S. at 573.[5]

The court's finding that Plaintiffs' injuries are likely to recur is based on extensive evidence showing Defendants repeatedly injured several Plaintiffs multiple times at different protests, as part of an "ongoing, sustained pattern" of unnecessary, indiscriminate and excessive force that "persisted for weeks and was ongoing." (Dkt.55 at 23-24; *see also Lyons*, 461 U.S. at 102 ("past wrongs [are] evidence bearing on whether there is a real and immediate threat of repeated injury") (quotation omitted); *Wooley v. Maynard,* 430 U.S. 705, 712 (1977) (plaintiff injured three times had standing).) The court also found that the evidence—including Defendants' statements that their past attacks on Plaintiffs were consistent with agency policy and refusal to recognize the wrongful nature of those attacks—established a likelihood that Defendants would violate Plaintiffs' rights again under *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989). (Dkt.55 at 24, 37-38; *see Index*, 977 F.3d at 826 (district court's

---

[5] In their stay motion below, Defendants incorrectly argued some of the District Court's credibility determinations were "clearly erroneous," without explaining how the court's order rests on those determinations or addressing how their declarants' sworn statements contradict themselves and each other. (*See* Dkt.58 at 10-12). When a district court's factual findings rest on credibility determinations, they are due "even greater deference." *Anderson*, 470 U.S. at 575; *id.* at 575 (district court crediting one witness over another "can virtually never be clear error").

10

detailed analysis of *Furgatch* factors to find realistic likelihood of recurrent injury showed DHS's standing argument was unlikely to succeed).)

Defendants concede that a plaintiff can demonstrate a realistic threat of repeated injury by showing their harm was part of a pattern of "officially sanctioned" behavior—even if there is no written policy authorizing that behavior. (Mot. at 9; *see also* Dkt.55 at 14 (a "policy or custom of retaliation 'may be inferred [from] 'widespread practices or evidence of repeated constitutional violations' and the absence of evidence that [] officers were discharged or reprimanded' for retaliatory actions") (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).) The court found that Defendants injured Plaintiffs pursuant to such a pattern of retaliation, based on an "avalanche" of evidence from twelve protests and federal officials' statements. (Dkt.55 at 33-34.) Defendants cite no authority for their contention that this quantum of evidence is so insufficient that the court's finding is clearly erroneous.[6] *See, e.g., Menotti*, 409 F.3d at 1148 (five incidents from same day could permit inference of policy of suppressing speech.)

_____

[6] Defendants argue that DHS agents did not fire their weapons at two protests. (Mot. at 10.) At one, agents brandished weapons at two plaintiff organization members when they attempted to record agents' interactions with protesters. (Dkt.55 at 13.) At the other, agents pushed press off a public sidewalk, denying a plaintiff organization member access to report on the protest. (*Id.*) This does not show that the court's finding of a pattern of retaliation is clear error.

11

The court found that the specific protests where Defendants maintain a pattern and practice of firing indiscriminately at protesters, journalists, and legal observers are ongoing—and Plaintiffs "intend to continue to be present" at *those very protests*. (Dkt.55 at 25 n.14; *cf. Porter v. Martinez*, 68 F.4th 429, 437 (9th Cir. 2023) (concrete plan to engage in targeted conduct supports finding standing).) Defendants do not meaningfully contest these findings, which establish that this case is unlike *Lyons* or *Updike*, where the future harm was predicated on law enforcement encountering plaintiff at "the wrong place at the wrong time" and stopping or arresting him based on an individualized suspicion—a "string of contingencies" that is not at issue here. (Dkt.55 at 24-25 ("Unlike in *Lyons*—where plaintiff could avoid further injury by 'avoid[ing] … illegal conduct'—Plaintiffs were injured engaging in innocent activities.").)

*Second*, the court found that Plaintiffs are experiencing "continuing, present adverse effects" of Defendants' past illegal conduct. (Dkt.55 at 25-26 (crediting evidence of Plaintiffs limiting their First Amendment activities based on chilling effects of past injuries). The court correctly found such chilling establishes ongoing constitutional injury. (*Id.* (citing cases); *see also Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury.").)

Plaintiffs' ongoing First Amendment injuries make this case "sharply differ[]

from. . . *Lyons.*" *Index,* 977 F.3d at 826.[7] As the District Court found, those injuries

are not self-imposed but caused by DHS's attacks on Plaintiffs. (Dkt.55 at 23-26)

(discussing chilling effects on Plaintiff Mena's reporting caused by Defendants'

shooting her on two separate occasions); *id.* at 28-29 (finding "injuries inflicted by

Defendants have prevented journalists, legal observers, and protestors from

persisting in their [First Amendment] activities"); *Clapper v. Amnesty Int'l USA,*

568 U.S. 398, 418 (2013) (acknowledging Supreme Court cases holding that

constitutional claims may arise from chilling effects "fairly traceable" to

government action).

Defendants misstate the District Court's alternative basis for determining

that the plaintiff organizations have standing. (Mot. at 12.) Their standing is not

based on money they expended to advocate against Defendants, but on how

Defendants' attacks on their members have interfered with their core business

activities and frustrated their missions. (Dkt.55 at 26 (collecting cases).)

### B. Defendants Have Not Proven They Are Likely to Prevail on Plaintiffs' Right-of-Access Claims

Defendants have not proven that they are likely to prevail on Plaintiffs'

right-of-access claims under *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1 (1986)

---

[7] *Noem v. Vasquez Perdomo*, No. 25A169 (U.S. Sept. 8, 2025), is different for the same reason.

("*Press-Enterprise II*"), which are legally identical to the right-of-access claims in *Index*.

Defendants argue that the right of access does not apply to "violent protests" (Mot. at 14.): the same incorrect argument they made in *Index.* As this Court explained in *Index*, in upholding an injunction that prohibited DHS from dispersing journalists and legal observers after the police had declared an unlawful assembly, "Portland's streets and sidewalks—and the process—public protests and law enforcement's response to them—have historically been open to the public." 977 F.3d at 830 (citing *Hague v. Comm. for Indus. Org*., 307 U.S. 496, 515 (1939). Here, too, "Plaintiffs allege incidents that took place on public streets and sidewalks, 'the archetyp[ical] … traditional public forum.'" (Dkt.55 at 23, 35.)

Defendants' circular argument is that by unilaterally declaring a riot, they can transform a public forum or process into something else, thereby eliminating Plaintiffs' right of access. But that is not how the *Press-Enterprise II* analysis works. In *Press-Enterprise II*, the Supreme Court did not examine the right to attend closed hearings, it examined the right to attend preliminary hearings. 478 U.S. at 10. Thus, in *Index*, this Court did not consider whether Plaintiffs had a right to access an unlawful assembly; it looked to the more general activity of a protest in a public forum. 977 F.3d at 830; *see also Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) (examining "the vital public interest in preserving the media's

14

ability to monitor government activities"). No case applying *Press-Enterprise II* has adopted Defendants' approach.

Defendants make little effort to contest the court's findings that they failed to show dispersing reporters and legal observers is "narrowly tailored" to serve an "overriding government interest," *Press-Enterprise II*, 478 U.S. at 9, or that Plaintiffs offered "convincing[]" evidence showing that DHS's use of violence to disperse journalists and legal observers was *not* essential or narrowly tailored. (Dkt.55 at 36-37.)

Defendants also argue the injunction "grants the press a special First Amendment immunity to dispersal orders and the use of crowd-control devices that the public does not possess." (Mot. at 14.) This Court rejected the same mischaracterization in *Index*, explaining: "Federal Defendants reframe the issue and mischaracterize the preliminary injunction as recognizing a special, across-the-board exemption for members of the press and legal observers." 977 F.3d at 829. As this Court held, "the threshold issue presented is whether plaintiffs have a constitutionally protected right to access the public forum where the protests are staged, and as the District Court observed, the preliminary injunction does not afford plaintiffs any special rights beyond those enjoyed by the general public pursuant to the First Amendment." *Id*. That is because the press's right of access to report on the protests is independent of protesters' rights to assemble and speak.

15

*See Leigh*, 677 F.3d at 900 ("The district court focused mostly on its conclusion that Leigh was not treated differently than other members of the public, a consideration that is not part of the *Press–Enterprise II* balancing test.").

### C. Defendants Fail to Prove They Are Likely to Win on Plaintiffs' Retaliation Claims

The District Court made seven pages of findings on retaliation. (Dkt.55 at 27-34.) Defendants fail to prove that those findings were wrong, much less clear error.

Contrary to Defendants' arguments (Mot. at 2, 12), in the context of a protest, misuse of force becomes a way to punish and deter protected speech. (Dkt.55 at 33; *see also Sanderlin*, 116 F.4th at 911-14 (shooting protester without justification sufficient to establish retaliatory intent for First Amendment violation). As in *Index*, DHS's repeated use of excessive force on non-violent individuals is strong circumstantial evidence of retaliation. *See* 977 F.3d at 827-28. Also contrary to Defendants' arguments (Mot. at 12), the court relied on direct evidence of animus—official statements and officially sanctioned practices—*and* circumstantial evidence (Dkt.55 at 33-34 & n.28; Dkt.49 at 5), either of which is sufficient. *Index*, 977 F3d at 827.

Defendants argue that the court clearly erred in discounting innocent explanations for officers' use of force. (Mot. at 12.) The court, however, carefully examined numerous videos and declarations detailing how DHS officers hit

16

multiple journalists while they were "standing to the side, not interfering with law enforcement" and shot protesters "already dispersing," alongside the unrebutted expert declarations and found "[d]efendants do not—and cannot—proffer any innocent explanations for these incidents[.]" (Dkt.55 at 30-34.) Moreover, the court rejected many of Defendants' arguments because they were unsupported or contradicted by the voluminous evidence Plaintiffs submitted. (*Id.* at 28, 32 n.26.)

### D. The Injunction's Scope Is Not an Abuse of Discretion

A District Court has "considerable discretion in ordering an appropriate equitable remedy." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018). "Crafting a preliminary injunction is 'an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017)).

Defendants have not shown abuse of discretion. They ignore that the injunction merely requires them to (1) follow the same terms this Court upheld in *Index* and (2) comply with their own use-of-force policies. They repeat arguments rejected in *Index* and rest entirely on unsupported speculation by their own employees. That fails to carry their burden.

17

### 1. The Injunctive Terms from *Index* Are Workable

The first paragraph of the injunction "mirrors the district court's injunction in *Index*[]." (Dkt.55 at 40.) Defendants repeat the argument this Court rejected in *Index*, that in the heat of a protest, officers will be endangered by trying to figure out who qualifies as a journalist. (Mot. at 17-18.)[8] They attempt to support this argument with speculation by federal agents, who lack experience in policing urban unrest (Dkt.55 at 20 n.8), which fails to prove the court committed clear error by relying on Plaintiffs' expert's unrefuted testimony. (*Id.* at 40-42; Dkt.60 at 1.) The court correctly rejected Defendants' recycled workability theories for at least three reasons:

First, Mr. Kerlikowske repeatedly oversaw protests in Seattle exceeding 50,000 people, where police did not disperse reporters or legal observers, and this practice did not endanger officers. (Dkt.55 at 19-20, 36 (citing Dkt.49-1 ¶4; Dkt.34-26 ¶31).) He opined that complying with the injunction should be safe for trained personnel. (*Id.*; Dkt.34-26 ¶4.) His testimony defeats speculation about

---

[8] *See* 977 F.3d at 834-35 ("district court was not persuaded" by defendants' contentions that scope of injunction was unworkable because it would "hinder their ability to safely protect federal property and people on federal property" and defendants did not show "the court likely erred").

what might happen by DHS employees whom Mr. Kerlikowske used to command, who lack such experience. (Dkt.55 at 20 n.8, 38; Dkt.49-1 ¶¶6-9.)

Second, Portland followed the same injunction for more than a year—including during 100 consecutive days of large, volatile protests in 2020—before adopting the terms of the injunction as law. (Dkt.55 at 36-37; Dkt.6-3 ¶28; Dkt.34-26 ¶31.) A California statute and other courts have imposed similar requirements. (Dkt.55 at 41.) This unrebutted evidence, too, refutes Defendants' speculation.

Third, DHS, itself, operated safely under the same injunctive terms applying to reporters and legal observers. (Dkt.64 at 16.) In rejecting DHS's same arguments, this Court credited Mr. Kerlikowske's opinions that this injunction is "safe and workable for law enforcement," that "dispersing press and legal observers is not necessary to protect public safety, and … that trained and experienced law enforcement personnel can differentiate press from protesters in the heat of crowd control." *Index*, 977 F.3d at 836.

Defendants postulate about hypothetical situations that have never occurred. For example, they argue that someone *might* use false press credentials. (Mot. at 18.) But they offer no proof that anyone has actually done this, or that such hypothetical person ever harmed any federal agent during the pendency of the injunction now, or when DHS was under it in *Index*. Moreover, the injunction would not restrain Defendants from arresting such a person and using reasonable

19

force to do so, including less-lethal weapons if the person posed an imminent threat of harm. (Dkt.55 at 43 ¶1, 3.)[9]

### 2. Requiring Defendants to Comply with Their Own Policies Is Workable

Defendants argue that requiring them to follow their own policies "may be counterproductive" (Mot. at 20) but fail to prove abuse of discretion.

Defendants do not dispute that their own polices require them to give warnings "unless the threat is so serious and imminent that a warning is infeasible." (Mot. at 19.) Such relief was not an abuse of discretion because the warnings Defendants claim to have provided were insufficient. (Dkt.55 at 41.)

Defendants argue that they should not be constrained from using crowd control weapons to disperse or push back people engaged in speech they want to suppress, or from shooting non-threatening people in the head. (Mot. at 19.) This explains why injunctive relief is appropriate. *See Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) (police cannot shoot individual with pepper ball for ignoring dispersal order); *Sanderlin*, 116 F.4th at 915. The court found that the specific uses of crowd control weapons the injunction bars are "not necessary to restrain violent protestors"—and in fact, "risk[] escalating tensions and further endangering both

---

[9] Mr. Kerlikowske explained: "It appears that there were a few incidents where someone at the protest was engaged in a crime, but there is nothing in the proposed preliminary injunction to prevent such an individual from being arrested and charged." (Dkt.34-26 ¶59.)

law enforcement and the public" (Dkt.55 at 30, 40-41 (citing Dkt.6-3 ¶¶17, 28–29, 32, 47; Dkt.34-26 ¶20; Dkt.47-5 ¶10; Dkt.34-26 ¶¶10–11)—and Defendants fail to show these findings were clear error. (*See also* Dkt.34-26 ¶14 ("An individual who is the threat from hurling objects, or using fireworks as weapon, should be specifically identified. Any less-lethal projectile should be directed to them and not fired generally into the crowd. Even when the individual is identified it may not be possible to fire the less-lethal projectile because of that person's use of the general crowd as cover," because such projectiles "are capable of killing people").)[10] As the court correctly found, the enjoined practices violate Defendants' own policies. (Dkt.55 at 40, 42.)

"[T]he proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996) (citing *Cox v. Louisiana*, 379 U.S. 536, 551 (1965)). As Mr. Kerlikowske testified, "[l]ess lethal weapons should not … be used on someone for disobeying a lawful

---

[10] Defendants speculate that someone might throw a Molotov cocktail and then hide in a crowd. (Mot. at 19.) They fail to identify any specific instance of that occurring, how big the crowd supposedly would be in this hypothetical, what other abilities they would have to identify and isolate the wrongdoer, or how the injunction differs in such a situation from the law of this Circuit. (Dkt.55 at 42.)

order to disperse or stop blocking a road. Trespassing is just a minor infraction. It should not be met with less-lethal force … Less-lethal force should only be used on aggressive individuals who pose an immediate threat to law enforcement or to prevent an assault." Dkt.49-1 ¶10.

## III.   PLAINTIFFS WILL BE SUBSTANTIALLY INJURED BY A STAY

Defendants make little attempt to address "whether issuance of the stay will substantially injure the other parties interested in the proceeding." *Nken*, 556 U.S. at 426. The court found that Plaintiffs were experiencing ongoing chilling. (Dkt.55 at 26, 29.) Because loss of First Amendment freedoms, "even for minimal periods of time, unquestionably constitutes irreparable injury," a colorable First Amendment claim justifies injunctive relief. *Index*, 977 F.3d at 837-38. For the reasons in Section II.A, above, Plaintiffs will be chilled from exercising their First Amendment rights if the injunction is stayed.

## IV.   A STAY IS CONTRARY TO THE PUBLIC INTEREST

Defendants fail to show "issuance of the stay will [not] substantially injure" the public. *Nken*, 556 U.S. at 433-35. Courts have "consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation omitted). This Court has repeatedly recognized the public's interest in protecting the First Amendment

rights of reporters and protesters is especially strong. *See, e.g., Index*, 977 F.3d at 831; *Leigh*, 677 F.3d at 900; *Collins*, 110 F.3d at 1371.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Defendants' motion.

Dated: October 20, 2025                Respectfully submitted,

                                       **BRAUNHAGEY & BORDEN LLP**

                                       By: */s/   Matthew Borden*
                                                Matthew Borden

                                       *Attorneys for Plaintiffs-Appellees*

23

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 27(d)(2)(A) and 32(a)(5)-(6), and Circuit Rules 27-1(d) and 32-3, the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and contains 5,197 words.

Dated: October 20, 2025          Respectfully submitted,

**BRAUNHAGEY & BORDEN LLP**

By:  */s/   Matthew Borden*
             Matthew Borden