No. 25-5975

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

LOS ANGELES PRESS CLUB; NEWSGUILD - COMMUNICATIONS
WORKERS OF AMERICA; SEAN BECKNER-CARMITCHEL; RYANNE
MENA; LEXIS-OLIVIER RAY; CHARLES XU; BENJAMIN ADAM CLIMER;
ABIGAIL OLMEDA,

*Plaintiffs-Appellees*,

v.

KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; UNITED
STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Central District of California

———————————

**BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

BILAL A. ESSAYLI
  *Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF JURISDICTION ................................................................... 3

STATEMENT OF THE ISSUE ........................................................................... 3

STATEMENT OF THE CASE ............................................................................ 3

    A.    Statutory Background ............................................................... 3

    B.    Factual Background .................................................................. 5

    C.    Prior Proceedings ..................................................................... 8

        1.    Temporary Restraining Order Proceedings ...................... 8

        2.    Preliminary Injunction Proceedings .................................. 9

        3.    Stay Proceedings ................................................................ 11

SUMMARY OF ARGUMENT ......................................................................... 13

STANDARD OF REVIEW ............................................................................... 15

ARGUMENT ..................................................................................................... 16

I.    Plaintiffs Have Failed To Establish Any Of The Preliminary Injunction Factors. ........................................................................................................ 16

    A.    Plaintiffs Are Unlikely To Prevail on Their First Amendment Claims Because They Lack Standing To Seek Prospective Relief. .......... 16

        1.    The Individual Plaintiffs Lack Standing. ......................... 16

        2.    The Organizational Plaintiffs Lack Standing. ................. 21

    B.    Even If Plaintiffs Had Standing, They Are Unlikely To Prevail on the Merits of Their First Amendment Claims. ........................................ 22

    C.    The Remaining Equitable Factors Decisively Favor the
          Government. ............................................................................... 32

II.   The Injunction Should Be Vacated On The Independent Ground That
      It Exceeds The District Court's Constitutional And Equitable Authority. ........ 33

CONCLUSION ........................................................................................... 41

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*ACLU of Nevada v. City of Las Vegas,*
466 F.3d 784 (9th Cir. 2006) ..................................................... 30

*Boardman v. Pacific Seafood Grp.,*
822 F.3d 1011 (9th Cir. 2016) ................................................... 32

*Branzburg v. Hayes,*
408 U.S. 665 (1972) ......................................................... 27, 28

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ............................................................ 33

*California First Amend. Coal. v. Calderon,*
150 F.3d 976 (9th Cir. 1998) ..................................................... 27

*Caribbean Marine Servs. Co. v. Baldrige,*
844 F.2d 668 (9th Cir. 1988) .................................................... 32

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................... 14, 17, 19, 20

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ......................................................... 17, 20

*Columbia Pictures Indus., Inc. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) ................................................... 36

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998) ............................................................ 40

*East Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) ................................................. 20, 21

*Felarca v. Birgeneau,*
891 F.3d 809 (9th Cir. 2018) .................................................... 26

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ......................................................... 14, 22

*Graham v. Connor,*
490 U.S. 386 (1989) ............................................................ 40

*Hodgers-Durgin v. de la Vina,*
    199 F.3d 1037 (9th Cir. 1999) ............................................................ 32

*Index Newspapers LLC v. City of Portland,*
    480 F. Supp. 3d 1120 (D. Or. 2020) ................................................ 31, 39

*Index Newspapers LLC v. U.S. Marshals Serv.,*
    977 F.3d 817 (9th Cir. 2020) .............................. 20, 31, 32, 40

*LaDuke v. Nelson,*
    762 F.2d 1318 (9th Cir. 1985) ............................................................ 18

*Laird v. Tatum,*
    408 U.S. 1 (1972) ............................................................................... 20

*Leigh v. Salazar,*
    677 F.3d 892 (9th Cir. 2012) ............................................................. 26

*Mendocino Env't Ctr. v. Mendocino County,*
    192 F.3d 1283 (9th Cir. 1999) ...................................................... 22, 25

*Menotti v. City of Seattle,*
    409 F.3d 1113 (9th Cir. 2005) ................................................ 23, 26, 29

*Myers v. United States,*
    652 F.3d 1021 (9th Cir. 2011) ........................................................... 24

*New York v. Cathedral Acad.,*
    434 U.S. 125 (1977) ....................................................................... 34-35

*Noem v. Vasquez Perdomo,*
    No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025) ........................ 17

*Norbert v. City & County of San Francisco,*
    10 F.4th 918 (9th Cir. 2021) ............................................................. 15

*Nordstrom v. Ryan,*
    762 F.3d 903 (9th Cir. 2014) ............................................................. 18

*North Carolina v. Covington,*
    581 U.S. 486 (2017) .......................................................................... 34

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) .......................................................................... 17

iv

*Press-Enterprise Co. v. Superior Ct.*,
    478 U.S. 1 (1986) ............................................................. 26-27, 28

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ..................................................... 34

*Ryburn v. Huff*,
    565 U.S. 469 (2012) ............................................................. 40

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ........................................................ 15, 33

*Updike v. Multnomah County*,
    870 F.3d 939 (9th Cir. 2017) ................................................ 17, 20

*Whitley v. Albers*,
    475 U.S. 312 (1986) ............................................................. 40

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................... 16

*Wise v. City of Portland*,
    483 F. Supp. 3d 956 (D. Or. 2020) ......................................... 27, 31

**Statutes:**

6 U.S.C. § 202 ....................................................................... 4

6 U.S.C. § 211(c)(8) ................................................................. 3

6 U.S.C. § 252(a)(3) ................................................................. 4

8 U.S.C. § 1103(a)(5) ................................................................ 3

8 U.S.C. § 1357(a)(2) ................................................................ 4

8 U.S.C. § 1357(a)(4) ................................................................ 4

8 U.S.C. § 1357(a)(5) ................................................................ 4

19 U.S.C. § 1589a ................................................................... 4

28 U.S.C. § 1292(a)(1) .............................................................. 3

v

28 U.S.C. § 1331 .................................................................................. 3

28 U.S.C. § 1343 .................................................................................. 3

40 U.S.C. § 1315(a) ............................................................................. 4

40 U.S.C. § 1315(b)(1) ....................................................................... 4

40 U.S.C. § 1315(b)(2)(A) ................................................................. 4

40 U.S.C. § 1315(b)(2)(E) ................................................................. 4

40 U.S.C. § 1315(b)(2)(F) ................................................................. 4

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................................. 3

Fed. R. Civ. P. 65(d)(1)(B)-(C) ....................................................... 36

# INTRODUCTION

Beginning in June 2025, widespread protests have targeted Department of Homeland Security (DHS) officers conducting immigration-enforcement operations in the Los Angeles region. Although some protests remained peaceful, others turned violent. Rioters attacked officers with Molotov cocktails, mortar-style fireworks, and other dangerous projectiles. Rioters also breached the perimeter of federal buildings, damaged federal vehicles, and injured many officers. During one protest, a rioter even appeared to fire a gun at officers executing criminal warrants at a marijuana farm. At some violent protests, officers responded by issuing dispersal orders and using nonlethal crowd-control devices.

Plaintiffs are journalists, protesters, press organizations, and a self-identified legal observer. They allege that, at certain protests in June and July 2025, DHS officers targeted them with crowd-control devices in retaliation for exercising their First Amendment rights. On September 10, the district court granted plaintiffs' request for an intrusive preliminary injunction that binds DHS and all DHS officers operating in Los Angeles and the surrounding counties. Among other things, the injunction exempts any journalist or legal observer from obeying lawful orders to disperse from a violent protest and radically constrains officers' ability to use crowd-control devices to control violent protests, essentially permitting rioters to use journalists and legal observers as human shields. The injunction compounds these problems by defining "Journalist" and "Legal Observer" so broadly that it covers

anyone standing an unspecified distance away from a protest, anyone wearing unspecified distinctive clothing indicative of journalist status, and anyone wearing a certain kind of green hat or blue vest.

This injunction is legally unsound and practically unworkable.  At the threshold, plaintiffs lack standing because their allegations of past harm do not support their speculation that such harm will recur in the future.  On the merits, the district court erroneously concluded that DHS has an unspoken policy of retaliation, despite the fact that DHS policies expressly forbid such retaliation and despite evidence supporting an obvious nonretaliatory explanation for plaintiffs' alleged injuries: namely, that the injuries were incidental results of officers' efforts to control violent protests.  The court further erred by accepting plaintiffs' assertion of a special right of access—belonging exclusively to journalists—to violent protests while remaining immune from otherwise lawful crowd-control measures.  The court compounded these legal errors by adopting an overbroad and unworkable injunction, wholly untethered to any First Amendment principles, that drastically limits officers' ability to control rioting crowds with nonlethal force and that places the court in the position of superintending every DHS officer operating in Los Angeles and six surrounding counties.  This Court should therefore vacate the injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331 and § 1343. Dkt. No. 1, at 6. As explained below, however, plaintiffs lack standing to seek prospective injunctive relief. *Infra* pp. 16-22. On September 19, 2025, the government timely appealed the district court's injunction. ER-202; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the First Amendment entitles plaintiffs to a preliminary injunction that exempts journalists and legal observers from lawful dispersal orders issued by DHS officers and that restrains DHS officers from using nonlethal crowd-control devices except in extremely limited circumstances.

## STATEMENT OF THE CASE

### A.    Statutory Background

As relevant here, DHS's mission in Los Angeles encompasses two main components: the enforcement of federal immigration laws and the protection of federal property and personnel.

DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). U.S. Customs and Border Protection (CBP), an agency within DHS, is charged with "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(8). Immigration and Customs Enforcement (ICE), another agency within DHS, is charged with enforcing

3

and administering federal immigration laws, preventing terrorism, and combating transnational criminal threats. *See, e.g.*, *id.* §§ 202, 252(a)(3).  CBP and ICE officers have criminal and civil arrest authority.  *See, e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a.

Congress has also charged the Secretary of Homeland Security with "protect[ing] the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property."  40 U.S.C. § 1315(a).  To fulfill this responsibility, the Secretary has designated DHS employees for "duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1).  These officers—including officers of the Federal Protective Service, an agency within DHS—possess a wide range of law-enforcement powers.  For example, they can "enforce Federal laws and regulations for the protection of persons and property," *id.* § 1315(b)(2)(A); "conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property," *id.* § 1315(b)(2)(E); and "carry out such other activities for the promotion of homeland security as the Secretary may prescribe," *id.* § 1315(b)(2)(F).

4

### B. Factual Background

This appeal arises from violent protests targeting DHS officers conducting immigration-enforcement operations in Los Angeles and the surrounding counties between June and July 2025. Declarations by supervisory DHS officials indicate that, when certain protests during that period turned violent, officers responded by issuing dispersal orders and by deploying crowd-control devices.

From June 6 through June 9, rioters besieged the federal Metropolitan Detention Center and attacked the officers defending it with Molotov cocktails, fireworks, and other dangerous projectiles while chanting "Kill ICE!" ER-95-99. "[M]any" officers were injured by "bricks being thrown through windows, vehicles being burned, and Molotov cocktails." ER-97.

On June 7, 20 officers at a federal facility in Paramount were surrounded by an agitated crowd that eventually numbered in the hundreds. ER-123-127. Rioters trapped officers in the area with roadblocks and large fires, attacked vehicles attempting to leave, and attacked officers with rocks, fireworks, cinderblocks, and bottles of human waste. ER-125. One rioter punched an officer in the face and fled while the crowd covered his escape. ER-125. Many officers were injured, including one whose finger was broken by an object thrown through the window of his vehicle. ER-127. The officer in command described the riot as "one of the most dangerous situations that [he] ha[s] been involved with" in 23 years of service. ER-126.

On June 9, an "extremely violent demonstration" eventually involving as many as 1,700 rioters occurred at the Santa Ana Federal Building. ER-99-100. Rioters encroached on federal property and attacked federal officers with dangerous objects. ER-99-100. Although initial crowd-dispersal efforts were successful, the crowd only grew throughout the day, "and the group began to throw" potentially lethal "mortar type fireworks at the officers, which would explode near the officers exposing them to loud concussive noise, fire[,] and ignited fireworks fragments." ER-100.

On June 20, violent protesters attacked federal officers on a mission at a Maywood carwash. ER-50. Rioters hurled metal objects and other projectiles at the officers. ER-50. One person crashed his car into a government vehicle, and another smashed a window on that vehicle with a crowbar. ER-50.

And on July 10, federal officers executing criminal warrants at a marijuana farm in Camarillo were met by over 500 protesters attempting to disrupt the operation. ER-51-52. Rioters launched "commercial grade fireworks," glass bottles, rocks, and other projectiles. ER-52. Rioters wielding baseball bats and rocks damaged dozens of government vehicles, ER-82, while others dumped screws in the road to disable vehicles' tires, ER-83. Rioters blocked vehicles attempting to leave, including one transporting a detainee who required immediate medical attention. ER-52. One rioter ran a government vehicle off the road into a ditch. ER-54. One "protester appears to have fired a handgun at officers." ER-82.

6

DHS declarations also indicate that, at other protests in June and July, when protesters obstructed or attacked federal officers, officers were able to control the situation with limited application of crowd-control devices or without using such devices at all.

On June 23, protesters surrounded officers outside a Home Depot and blocked the officers' exit route with a truck. ER-51. Officers dispersed the group using a single tear-gas canister. ER-51.

On July 4, hundreds of protesters attacked officers at the Metropolitan Detention Center. ER-101-104. One officer was struck by a flagpole, ER-102, and another was kicked, ER-134. Officers responded by issuing repeated dispersal orders, ER-102, and by "relocating media personnel to an area from which they could safely observe the unlawful assembly," ER-103. Officers did not deploy any crowd-control devices. ER-104; ER-134.

On July 7, officers conducted an operation at MacArthur Park, where protesters slashed one of the tires on a van. ER-82. Plaintiffs allege that officers pointed "less-lethal guns" at a filmmaker on site. ER-151. *But see* ER-132 ("[O]fficers did not point their weapons at protestors to threaten them."). Officers did not deploy any crowd-control devices. ER-50, ER-81-82, ER-131-132.

On July 10, officers attempted to execute criminal warrants at a separate marijuana farm in Carpinteria. One protester threw a water bottle at officers, and three or four others "were seen bending down to grab what was assumed to be

7

rocks." ER-133. Officers deployed a single crowd-control device to disperse the threat. ER-133. They also deployed four other devices during the protest, "none of which were used as direct impact" and which represented "the lowest level of force options applicable" "[u]nder the circumstances." ER-133.

## C. Prior Proceedings

Plaintiffs are three journalists, two press organizations, two protesters, and one self-identified legal observer. ER-23. Their complaint against DHS alleges "claims for First Amendment right of access and retaliation." ER-23.[1]

### 1. Temporary Restraining Order Proceedings

In district court, plaintiffs sought a temporary restraining order based on injuries they allegedly sustained during the events of June 6 through June 9. The court denied the application because plaintiffs had failed to establish the "'substantial risk' of future harm required for standing." ER-180 (Wilson, J.). The court also concluded that, even if plaintiffs had meritorious claims, the "appropriate remedy" would be "a narrowly crafted" remedy barring DHS "from using excessive force to disperse crowds without warning," as opposed to a broad remedy that "would restrict lawful crowd control measures and potentially impede" the government's "legitimate law enforcement responsibilities." ER-181.

---

[1] The complaint also asserted excessive-force claims that were not the basis for the district court's preliminary injunction, ER-23, ER-29 n.17, and are not at issue in this appeal.

## 2.    Preliminary Injunction Proceedings

After the case was transferred to a different judge in the same district court, plaintiffs moved for a preliminary injunction based largely on the same record as their motion for a temporary restraining order.  On September 10, 2025, the court granted plaintiffs' motion.  ER-45-47 (Vera, J.).  The court determined that plaintiffs had standing to seek prospective injunctive relief based on allegations that, at certain protests in June and July 2025, DHS officers allegedly targeted plaintiffs with crowd-control devices in retaliation for exercising their First Amendment rights as "reporters, legal observers, and protest[e]rs."  ER-25-27 & 27 n.14.  The court then concluded that plaintiffs were likely to prevail on their First Amendment claims.  With respect to retaliation, the court acknowledged that DHS policies "correctly set out the bounds for the use of" crowd-control devices, ER-35, but nevertheless inferred the existence of an unspoken DHS "practice of violating . . . First Amendment rights" based on plaintiffs' allegations of intentional targeting, ER-35.  Alternatively, the court concluded that journalists and legal observers have a constitutional right of access to violent protests.  ER-36-39.  As described by the court, this right effectively exempts the press from otherwise lawful dispersal orders that members of the public must follow.  *See* ER-38.  And in weighing the other preliminary-injunction factors, the court determined that plaintiffs' asserted harms outweigh any burden the injunction might place on the government, giving short shrift to the government's countervailing practical concerns.  ER-39-40.

9

The preliminary injunction places stringent restrictions on DHS officers' ability to respond to violent protests in Los Angeles County and the surrounding area. ER-45-47.

The injunction protects three categories of people: "Journalists," "Legal Observers," and "protesters." ER-45-46. The injunction defines "Journalist" as anyone "carrying a . . . press pass," anyone "carrying professional gear," anyone "wearing . . . official press credentials," or anyone wearing "distinctive clothing[] that identifies the wearer as a member of the press." ER-46. The definition also extends to anyone "standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, although these are not requirements." ER-46. "These indicia are not exclusive, and a person need not exhibit every indicium to be considered a Journalist . . . ." ER-46. The injunction's definition of "Legal Observer" covers anyone "wearing a green National Lawyers Guild-issued or authorized Legal Observer hat (typically a green hat) or wearing a blue [American Civil Liberties Union]-issued or authorized Legal Observer vest." ER-46. This definition likewise extends to anyone "standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, although these are not requirements." ER-46. The injunction does not define the term "protester."

The injunction imposes five limitations on officers' authority to issue dispersal orders and to deploy crowd-control devices.

10

- First, the injunction prohibits officers from "[d]ispersing" any "Journalist or Legal Observer" without "probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order." ER-45. Officers may only "ask press or legal observers to change location." ER-45.

- Second, the injunction prohibits officers from using crowd-control devices on "members of the press, legal observers, and protesters who are not themselves posing a threat of imminent harm to a law enforcement officer or another person." ER-45.

- Third, the injunction prohibits officers from firing "kinetic impact projectiles or flash-bang grenades at identified targets[] if doing so could foreseeably result in injury to the press, legal observers, or protesters who are not posing a threat of imminent harm to a law enforcement officer or another person, unless such force is necessary to stop an immediate and serious threat of physical harm to a person." ER-45.

- Fourth, the injunction prohibits officers from "[u]sing any crowd control weapon without giving at least two separate warnings in a manner and at a sound level where it can be heard by the targeted individuals, unless the threat is so serious and imminent that a warning is infeasible." ER-45. The warnings must contain notice that officers "may employ crowd control weapons and must give the targeted individuals sufficient time to avoid the use of force." ER-45-46.

- Fifth, the injunction prohibits officers from firing "tear gas canisters or flash-bang grenades so as to strike any person, or firing [kinetic impact projectiles] or other crowd control weapons at . . . sensitive areas, unless that person poses an immediate threat of death or serious bodily injury." ER-46.

### 3. Stay Proceedings

The district court's order did not address the government's request that, "[t]o the extent the Court issues any injunctive relief, . . . such relief be stayed" pending appeal. Dkt. No. 47, at 30. Accordingly, on September 19, the government renewed its request for a stay pending appeal and provided supporting declarations from

11

supervisory DHS personnel explaining why the injunction was unworkable and would inflict irreparable injury on the government and the public interest. *See generally* Dkt. No. 58. The declarations made clear, for example, that the injunction can easily be abused by rioters using journalists and legal observers as shields, Dkt. No. 58-4, at 10, and by rioters disguising themselves as journalists or legal observers, Dkt. No. 58-2, at 4; Dkt. No. 58-3, at 6. The declarations underscored that officers cannot "reliably differentiate . . . actual press and legal observers" from imposters. Dkt. No. 58-2, at 4. The declarations stressed that any "hesitation by agents trying to reconcile suspicious or threatening behavior[] with a bad actor's disguised appearance" may be "deadly." Dkt. No. 58-4, at 10. Indeed, even before the issuance of the injunction, at least one officer was assaulted by someone visually identifying as a reporter. Dkt. No. 58-3, at 4. And the declarations explained that the district court's injunction meant that officers could potentially face contempt charges even for accidents in fast-moving environments, especially given that "kinetic impact projectiles travel relatively slowly" and "dynamic movements—such as a person turning so their back faces the officer, or a bystander stepping into the line of fire—can result in an inadvertent strike." Dkt. No. 58-2, at 8-9.

The government requested a decision from the district court by September 26 under the court's local rules. Dkt. No. 58, at 2. The court declined to decide the case on that timetable and instead set a moderately expedited briefing schedule that gave plaintiffs until September 29 to file their opposition and the government until

12

October 2 to file its reply. Dkt. No. 60, at 1. In reply, the government informed the court that, "[g]iven the need for prompt action, [the government] expect[s] to file a motion for a stay pending appeal in the Ninth Circuit no later than October 9, if the motion is denied or if no action is taken on the motion." Dkt. No. 65, at 1.

By October 9, the district court had yet to decide the motion. The government therefore filed a stay motion in this Court on that date. The government's district court stay motion remains pending, as does its stay motion in this Court.

## SUMMARY OF ARGUMENT

The district court's preliminary injunction, issued under the guise of protecting plaintiffs' First Amendment rights, functions like a detailed law-enforcement operations manual and micromanages how DHS agents respond to violent riots. But these plaintiffs have no standing to seek that sort of structural injunction. Nor can the detailed strictures of the injunction be reasonably drawn from the First Amendment. And, if nothing else, the injunction is both untenably overbroad and dangerously unworkable. For all of these reasons, this Court should vacate it.

At the threshold, plaintiffs lack standing to seek prospective injunctive relief. The district court's standing analysis hinges on its findings that, on a handful of occasions in June and July 2025, DHS officers intentionally targeted plaintiffs with crowd-control devices in retaliation for plaintiffs' First Amendment activity. Those findings were clearly erroneous because the court ignored an obvious alternative explanation for plaintiffs' past injuries—namely, that the strikes incidentally resulted

13

from officers' nonretaliatory attempts to control violent protests. But plaintiffs would lack standing even accepting the district court's findings because, as the Supreme Court held in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), plaintiffs cannot establish standing based on incidents that occurred in the past and that plaintiffs can only speculate may recur in the future. And the court's alternative theory of standing— that the organizations have organizational standing because they diverted time and resources as a result of DHS's alleged conduct—cannot be reconciled with *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395 (2024) (holding that the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions . . . is incorrect" (citation omitted)).

The injunction is also groundless on the merits. The district court erroneously inferred that DHS officers were retaliating against plaintiffs' First Amendment activity based on alleged instances of excessive force, ignoring other plausible explanations for plaintiffs' injuries and conflating a Fourth Amendment excessive-force claim with a First Amendment claim. The court further erred in crediting plaintiffs' right-of-access theory, granting preferential treatment to the press to ignore lawful crowd-control measures contrary to Supreme Court precedent.

The remaining equitable factors likewise favor the government. The injunction significantly impedes officers' ability to control violent protests and unacceptably increases the risk of serious injury both to the officers and to the public. On the other side of the ledger, plaintiffs' alleged harms are insufficient even to support their

14

standing to obtain injunctive relief, much less outweigh the harms engendered by the injunction's interference with federal officers attempting to protect themselves and the public from rioters.

Even if plaintiffs were entitled to some form of injunctive relief, such relief must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Because plaintiffs' standing derives from their allegations of past retaliation, their claims would justify—at most—a narrow injunction prohibiting retaliation against those plaintiffs with standing. But this injunction covers every DHS officer in Los Angeles and the surrounding counties. It extends to everyone who qualifies as a journalist, legal observer, or protester under the court's expansive understanding of those terms. And it imposes a host of unworkable restrictions on federal officers' ability to control violent protests. The district court abused its discretion by entering an injunction that far exceeds the constitutional and equitable limits on the court's authority.

## STANDARD OF REVIEW

This Court "review[s] an order regarding preliminary injunctive relief for abuse of discretion, but review[s] any underlying issues of law de novo." *Norbert v. City & County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (quotation marks omitted).

## ARGUMENT

### I. Plaintiffs Have Failed To Establish Any Of The Preliminary Injunction Factors.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The district court's injunction should be vacated because plaintiffs have failed to satisfy any of these factors. Plaintiffs not only lack standing to seek prospective injunctive relief based on their alleged past injuries; their First Amendment claims are also likely to fail on the merits. Nor do the injunction's expansive terms—which impose intrusive restrictions on DHS agents' ability to respond to violent riots—bear any reasonable relation to plaintiffs' First Amendment claims. Finally, the injunction is both untenably overbroad and dangerously unworkable.

### A. Plaintiffs Are Unlikely To Prevail on Their First Amendment Claims Because They Lack Standing To Seek Prospective Relief.

#### 1. The Individual Plaintiffs Lack Standing.

At the threshold, the individual plaintiffs lack standing to seek prospective injunctive relief based on allegations that individual officers retaliated against them for their First Amendment activities in the past. The district court rested principally on allegations that, at certain protests in June and July, DHS officers used excessive force

16

against plaintiffs in retaliation for exercising their First Amendment rights. ER-26-27 & 27 n.14. As explained below, *infra* pp. 22-25, those findings were clearly erroneous. But even accepting those findings would not establish the individual plaintiffs' standing for prospective relief. Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *2 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring in grant of application for stay) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)). Plaintiffs must demonstrate a "real and immediate threat of repeated injury." *Updike v. Multnomah County*, 870 F.3d 939, 947 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). Plaintiffs may not rely on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The Supreme Court's decision in *Lyons* illustrates these principles. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part"—even though the police department allegedly had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.* at 105.

*Lyons* and its progeny foreclose plaintiffs' standing. At the outset, plaintiffs have failed even to show that DHS has a policy of retaliation. DHS expressly

prohibits officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." ER-108. Any officers who use retaliatory force violate these policies and act in a manner antithetical to the values DHS is committed to upholding. DHS also authorizes officers to use force "only when no reasonably effective, safe, and feasible alternative appears to exist." ER-68. Even then, officers may employ "only the level of force that is *objectively reasonable* in light of the facts and circumstances confronting [the officer] at the time force is applied." ER-68 (emphasis in original). "[W]hen feasible," officers must "attempt to identify themselves and issue a verbal warning" before applying force and must "afford the subject a reasonable opportunity to voluntarily comply." ER-70. And officers must "discontinue[]" their use of force "when resistance ceases or when the incident is under control." ER-68. Officers have a duty to intervene in and to report improper uses of force, ER-70, and a failure to do so "is, itself, misconduct that may result in disciplinary action," ER-71. As the district court acknowledged, these "policies correctly set out the bounds for the use of less lethal munitions and crowd control weapons." ER-35.

Nor have plaintiffs plausibly alleged an unwritten policy of "officially sanctioned" retaliation. *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985)). Even assuming the district court did not clearly err by finding that individual DHS officers intentionally retaliated against plaintiffs between June 6 and July 10, *but see infra* pp. 22-25, that would amount

18

at most to a handful of isolated episodes, nothing close to an official but unwritten policy. In June and July 2025, DHS officers were faced with widespread and "multipl[ying]" protests while conducting operations in the Los Angeles region. ER-4. The court focused on allegations of injury sustained at only a few specific protests. *See* ER-6-19 (describing June 6-9 incidents at Metropolitan Detention Center, June 7 incident at Paramount, June 9 incident at Santa Ana Federal Building, June 20 incident at Maywood car wash, and July 10 incident at Camarillo marijuana farm). But the record does not indicate that retaliatory force was used at *all* such protests, as presumably would have occurred if an unwritten DHS policy condoning retaliation existed. To the contrary, the record shows that, during at least two other incidents during the same period, officers deployed *no* crowd-control devices despite being confronted by protesters. ER-101-104 (describing July 1 incident at Metropolitan Detention Center); ER-82 (describing July 7 incident at MacArthur Park). And the court's suggestion that Secretary Noem "ratified Defendants' practice of meeting First Amendment protected activities with force," ER-36 & n.28, is not supported by the few statements identified by the court.

Further, the record does not establish that the individual plaintiffs would again be subjected to retaliatory force even if such a policy existed. *See Lyons*, 461 U.S. at 105. As noted, there were widespread protests in the Los Angeles region in June and July, but the district court identified only a comparatively small number of allegedly retaliatory incidents involving plaintiffs; most alleged incidents did not involve

plaintiffs at all. *See* Dkt. No. 65, at 3 (explaining that 42 of plaintiffs' 53 declarants during motion briefing were nonparties). Thus, even if plaintiffs "intend to continue their activities as reporters, legal observers, and protestors," ER-26, they have failed to establish that they will themselves be retaliated against in the future, *see Lyons*, 461 U.S. at 105-06, 108; *accord Updike*, 870 F.3d at 948 (rejecting the plaintiff's argument that, because officers had denied him interpretive services during five prior arrests, he was at risk of being denied interpretive services in the future).

The district court suggested that *Lyons* does not control because plaintiffs have alleged a chilling effect under the First Amendment. ER-27-28. But plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm," including by alleging a "subjective chill" on protected speech. *Clapper*, 568 U.S. at 416-18 (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)).

This Court's discussion of standing in *Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817 (9th Cir. 2020), does not change the analysis. To start, that decision lacks precedential force because its "predictive analysis" turned on the "probabilistic" standard governing motions to stay a preliminary injunction pending appeal. *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 & n.3 (9th Cir. 2021). In conducting that inquiry, the stay panel was "predicting the likelihood of success of the appeal." *Id.* at 660. "In resolving the merits of a preliminary injunction appeal," by contrast, a "merits panel is deciding the likelihood of success of the actual litigation." *Id.* "[T]he issues are different." *Id.* Nor did the stay panel conclusively

decide a "pure question[] of law" already settled by "binding authority." *Id.* at 661 n.3. The stay panel's decision thus did not "forever decide the merits of the parties' claims" even in the *Index Newspapers* case, much less forever decide the merits of this case. *Id.* at 661.

The decision also lacks persuasive force here. The decision not only conflicts with the Supreme Court cases discussed above but also involved different facts and a different record. For instance, this record undermines plaintiffs' assertions of future injury because officers did not uniformly deploy crowd-control devices when confronted by violence. *Supra* pp. 18-20. And this record also contains evidence of obvious alternative explanations for plaintiffs' alleged injuries that the district court ignored. *Infra* pp. 23-25.

### 2. The Organizational Plaintiffs Lack Standing.

The district court also concluded that the two organizational plaintiffs—LA Press Club and NewsGuild—have associational standing because some of their "members [have] standing in their own right" for the alleged retaliatory injuries they suffered. ER-28-29. That conclusion is erroneous for the reasons set forth above.

In a footnote, the district court reached the alternative conclusion that the organizational plaintiffs have organizational standing because DHS allegedly "frustrated their core purpose of defending journalists' safety and working conditions." ER-29 n.16; *see* ER-20-21 (summarizing allegations that the organizations have "diverted significant time and resources" away from their regular

21

duties). This theory is incompatible with the Supreme Court's recent decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). That case squarely held that the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions . . . is incorrect." *Id.* at 395 (citation omitted). Plaintiffs' allegations of generic setbacks to their respective missions, and the costs they have incurred as a result, are no different from the allegations rejected in *Alliance for Hippocratic Medicine.*

## B. Even If Plaintiffs Had Standing, They Are Unlikely To Prevail on the Merits of Their First Amendment Claims.

Even if any plaintiff had standing to seek prospective injunctive relief, their First Amendment retaliation and right-of-access claims would fail on the merits. Plaintiffs have failed to show any violation of the First Amendment, let alone a violation that would be redressed by the injunction's novel rules for when and how DHS may engage in lawful crowd-control measures.

1. To establish a claim for First Amendment retaliation, plaintiffs must demonstrate that their First Amendment activity is a "substantial or motivating factor" in the conduct of DHS officers. *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999) (quotation marks omitted).

The district court failed to identify any direct evidence supporting plaintiffs' claim that DHS intentionally targeted plaintiffs for their First Amendment activity. Indeed, DHS policies expressly forbid such retaliation. ER-108. Instead, the court

inferred retaliatory intent based solely on its view that DHS officers' response to violent protests was "excessive and indiscriminate," relying on instances of journalists being struck with crowd-control devices. ER-31. That inference fails for numerous reasons.

As an initial matter, the district court ignored the most obvious alternative explanation for plaintiffs' alleged injuries: that those injuries incidentally resulted from officers' legitimate efforts to protect federal personnel, federal property, and the public from the chaos of violent protests. *See* ER-31 (acknowledging record evidence "that the protests were blighted by violent actors"). As the record reveals, many crowd-control devices (such as tear gas, pepper spray, and flashbangs) are designed to "disperse widely." ER-62. The devices are therefore likely to impact not only violent protesters but also people standing nearby who have disobeyed orders to disperse, ER-62—including journalists who position themselves in such locations. In such circumstances, the First Amendment does not immunize the public from the incidental effects of law-enforcement officers' efforts to restore order. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1134-35 (9th Cir. 2005). Because it is lawful under the First Amendment to use crowd-control devices to disrupt and disperse a violent mob, the use of those same devices does not transgress the First Amendment simply because reporters happen to be present in or near the crowd. *See infra* pp. 26-29.

The district court entirely disregarded this alternative explanation despite record evidence supporting it. *E.g.*, ER-127 (declaration indicating that "news crews

[had] set up their equipment in the middle of the violent rioters" at the Paramount protest); ER-138, 140 (declaration indicating that one member of a plaintiff organization affected by tear gas during the Camarillo protest had positioned herself "close to [a] truck, in the center of the road," that "was surrounded by protesters"); ER-190 (declaration indicating that one plaintiff was standing "6 feet away from protestors" when officers began deploying crowd-control devices). The court also did not even address the possibility, again supported by the record, that "[i]n many cases, once chemical munitions are deployed by federal officers, violent opportunists kick or throw the chemical munition can[]isters causing injury to others." ER-89. The court clearly erred by "simply ignor[ing]" evidence contradicting its inference that DHS deliberately targeted plaintiffs in retaliation for their First Amendment activities. *Myers v. United States*, 652 F.3d 1021, 1036 (9th Cir. 2011).

The district court emphasized some plaintiffs' allegations that they were standing between 20 and 50 feet away from protesters when struck by crowd-control devices. ER-26 n.11. Here too, however, the court did not even consider other obvious alternative explanations. For example, plaintiff Sean Beckner-Carmitchel states that, during the Paramount protest, he was hit by a tear-gas canister while standing across the street from federal officers and about 20 feet away from a crowd of rioters. ER-183-184; *see* ER-126-127 (describing "high level of sustained violence" necessitating use of crowd-control devices). DHS policy prohibits officers from firing tear-gas canisters directly at individuals except when deadly force is reasonable. ER-

24

120.  Thus, it is at least plausible that Mr. Beckner-Carmitchel was struck not because federal officers were targeting him with force but because officers were attempting to disperse a violent crowd by firing tear gas away from that crowd in compliance with DHS policy—a crowd from which he was standing just 20 feet away.  It is likewise at least plausible that plaintiff Ryanne Mena—who alleges that she was "with" Mr. Beckner-Carmitchel at the Paramount protest when struck by a crowd-control device and who acknowledges that the officers were using those devices against protesters at the same time, ER-193-194—was incidentally struck.

Crucially, however, even accepting the district court's findings would not support the court's attribution of retaliatory intent as a matter of law to DHS as a whole—rather than, at most, to a few officers acting contrary to agency policy.  Those policies, to reiterate, expressly forbid officers from using retaliatory force.  *See supra* pp. 17-18.  The court's inference is particularly untenable given the surrounding factual context.  As set forth above, *supra* pp. 18-20, there have been many interactions between DHS officers and protesters in the region that did not result in allegations of retaliation.  Plaintiffs' allegations are therefore unlikely to prove that their First Amendment activity was a "substantial or motivating factor" in DHS's conduct.  *Mendocino Env't Ctr.*, 192 F.3d at 1300-01 (quotation marks omitted).

Relatedly, even assuming that individual officers used "excessive and indiscriminate force" in the circumstances the court cited, ER-31, that would show—at most—that the officers in question used too much force when trying to restore

25

order. Such allegations would be tested against the Fourth Amendment's excessive-force standards, or, where appropriate, other doctrines applicable to individual officer misconduct. *See, e.g.*, *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018). The court's findings do not show that plaintiffs were targeted because of their speech, much less support the court's inference of an officially sanctioned DHS policy of retaliation. Accepting the court's contrary conclusion would erroneously convert any allegation of excessive force in response to a violent protest into a First Amendment retaliation claim as well.

2.      The district court justified the injunction on the alternative theory that DHS violated plaintiffs' First Amendment "right of access to protests." ER-36-38. The court appeared to base this theory on the allegations of retaliatory force discussed above, ER-38, so it fails on standing grounds for the same reasons as plaintiffs' retaliation claims, *see supra* pp. 16-21.

Even setting standing to one side, plaintiffs' claim of a right of access to violent protests would fail on the merits. There is no reasonable dispute that, when a protest turns violent and threatens federal personnel and property, officers may respond by issuing general dispersal orders and by using appropriate force. *See Menotti*, 409 F.3d at 1155-56. In that context, protesters and journalists are not entitled to special treatment.

The nature of the right-of-access doctrine confirms this conclusion. The doctrine was developed to evaluate claims of access to certain "government

26

proceeding[s] or activit[ies]." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012); *see Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8-9 (1986) (applying doctrine to "governmental processes"). The district court failed to explain how officers' attempts to control a violent protest—which the government did not organize—is a government proceeding to which a right of access should ever attach.

Applying the right-of-access framework to violent protests is especially inapt because it essentially grants the press a special First Amendment immunity to dispersal orders and the use of crowd-control devices that the public does not possess. Indeed, plaintiffs argued below that, due to the press's right of access, the First Amendment generally requires officers to respond to violent protests without dispersing journalists and legal observers. *See* Dkt. No. 34-1, at 12.[2] The district court incorporated that argument into the injunction, which prohibits officers from "[d]ispersing . . . Journalist[s] or Legal Observer[s]" during a violent protest and permits officers only to request, with caveats, that such individuals "change location to avoid disrupting law enforcement." ER-45. It is black-letter law, however, that the press lacks a "constitutional right of special access to information not available to the public generally." *California First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir.

---

[2] Plaintiffs have not cited, and we are not aware of, any decision of this Court holding that the First Amendment extends a special right of access to legal observers beyond whatever rights the public may possess. *Cf. Wise v. City of Portland*, 483 F. Supp. 3d 956, 967 (D. Or. 2020) (concluding that self-styled "[p]rotest medics . . . have no unique status under the First Amendment that allows them to disregard lawful orders").

1998) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972)) (discussing other cases). Members of the public have no First Amendment right to disregard dispersal orders or to be exempted from the use of crowd-control devices.

Even if violent protests are governmental proceedings subject to the right-of-access doctrine, the district court erred by concluding that such a right would attach here. The doctrine applies only when the "place and process [in question] have historically been open to the press and general public" and when "public access plays a significant positive role in the functioning of the particular process" at issue. *Press-Enterprise*, 478 U.S. at 8. The court concluded that the second prong was met due to the public's interest in press coverage of protests in Los Angeles. ER-37. But that cannot overcome the reality that there is no tradition of public access to violent protests. *Branzburg*, 408 U.S. at 684-85 ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded . . . ."). The existence of such a tradition is a prerequisite for a right-of-access claim to proceed. *Press-Enterprise*, 478 U.S. at 9.

Because no right of access attaches to violent protests, the Court need not consider whether the issuance of dispersal orders and the use of crowd-control devices are narrowly tailored. *Press-Enterprise*, 478 U.S. at 8-9 (explaining that a court considers whether restrictions on public access are narrowly tailored only if that particular "place and process" have traditionally been open to the public). But if the Court reaches the question, it should conclude that such measures are the narrowest

28

means of addressing unpredictable and violent protests. As the government's declarants explained, "[t]he most effective crowd control techniques" in situations involving "imminent destruction of federal property or harm to federal officers" are "those that use chemical irritants to temporarily incapacitate the individuals attempting to cause harm and force them away from the facility." ER-95. Similarly, when officers are confronted by a "protest that is obstructing transportation," the use of crowd-control devices may be both "appropriate" and "necessary." ER-117. By design, many such devices "have an impact upon a specific area" or "may collaterally affect persons in a crowd." ER-118.

There is no reasonable dispute that officers need not refrain from issuing dispersal orders or deploying crowd-control devices against rioters simply because peaceful protesters or innocent bystanders may also be in the crowd. "[O]nce a pattern of chaotic violence ha[s] been established, it [i]s unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions." *Menotti*, 409 F.3d at 1134. When "law-breaking and law-abiding protestors [a]re often indistinguishable, and where those abiding the law might [be] interfer[ing] indirectly with enforcement" against those who are not, *id.* at 1135, officers may lawfully respond to "a small group of violent protestors . . . determined to cause chaos" even if their response affects peaceful protesters or innocent bystanders too, *id.* at 1134; *see id.* at 1126-28. The First Amendment does not grant journalists a special exception to this rule.

29

The district court emphasized the opinion of Mr. Gil Kerlikowske, a retired law-enforcement officer, "that law enforcement need not disperse journalists and legal observers who are not participating in the protest to protect federal property and public safety—even when an unlawful assembly is declared." ER-38. But Mr. Kerlikowske's opinions regarding the handling of violent protests are based mainly upon his experiences as Chief of Police in Seattle more than 25 years ago. *See* ER-154, 156. His knowledge of the situation in Los Angeles is entirely secondhand. *See* ER-158-159. None of his three declarations states whether he ever personally confronted the tactics adopted by rioters in Los Angeles. And none of them addresses, except in conclusory fashion, the practical concerns identified by federal law-enforcement officers currently deployed to Los Angeles. For these reasons, the court clearly erred by crediting Mr. Kerlikowske's opinions over those of current DHS supervisory officials who have confronted these protests. In any event, those opinions do not control the question whether DHS officers' responses to the violent protests at issue were narrowly tailored. *See ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 791-92 (9th Cir. 2006) (holding that "First Amendment questions are mixed questions of law and fact" subject to de novo review).

The district court also again relied on plaintiffs' allegations that DHS officers "lack[ed] any valid justification for targeting journalists" with crowd-control devices. ER-38. But as explained, *supra* pp. 18-19, the court erred by attributing retaliatory intent to DHS as an agency (as opposed to individual officers who acted contrary to

30

express DHS policy). As further explained, *supra* pp. 25-26, plaintiffs' allegations of individual officer misconduct would support, at most, claims not under the First Amendment but under the Fourth Amendment or other doctrines applicable to individual officer misconduct.

Finally, the district court emphasized that, in *Index Newspapers*, the City of Portland represented that it had successfully complied with an injunction like the one entered against the federal government in that case. ER-38. The view of the City of Portland about a different injunction in a different case is irrelevant to whether DHS' actions in this case were narrowly tailored. Regardless, the City of Portland's experiences in *Index Newspapers* cast considerable doubt on the district court's characterization. The City itself reported "issues with persons with 'press' markings intermingling with protesters and interfering with law enforcement." *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1148 n.11 (D. Or. 2020). And in a similar lawsuit brought by self-identified "protest medics" demanding an exemption from lawful dispersal orders issued by the Portland Police Bureau, the City vigorously opposed those plaintiffs' request for injunctive relief because the injunction was "unworkable." *Wise v. City of Portland*, 483 F. Supp. 3d 956, 971 (D. Or. Sept. 2, 2020). "Why the City expect[ed] the [Portland Police Bureau] to identify and to exempt" journalists and legal observers, "but not 'protest medics,' is difficult to understand." *Index Newspapers*, 977 F.3d at 850 n.9 (O'Scannlain, J., dissenting).

31

**3.** At various points in its analysis of the merits, the district court relied on the fact that, in *Index Newspapers*, a majority of the stay panel held that a different set of plaintiffs was likely to prevail on similar First Amendment claims. *E.g.*, ER-33, ER-35, ER-38. But that decision lacks precedential force, *see supra* p. 11, and lacks persuasive force for the reasons set forth in Judge O'Scannlain's dissent, *Index Newspapers*, 977 F.3d at 844-52 (O'Scannlain, J., dissenting).

## C. The Remaining Equitable Factors Decisively Favor the Government.

The injunction should also be vacated because the remaining equitable factors decisively favor the government. "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original)). Here, plaintiffs' allegations of injury are insufficient even to support their standing to obtain injunctive relief, much less demonstrate irreparable injury. *Cf. Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042-44 (9th Cir. 1999) (en banc) (holding that, even if plaintiffs had standing to obtain prospective relief based on past injuries notwithstanding the Supreme Court's decision in *Lyons*, their alleged irreparable injury remained too speculative to support injunctive relief). And any harms to plaintiffs are outweighed by the harms the injunction inflicts on the government and the public interest,

particularly given the injunction's sweeping breadth and unworkability. As explained below, *infra* pp. 34-40, the injunction's vague definitions and intrusive restrictions on the use of dispersal orders and crowd-control devices undermine officers' ability to protect themselves and the public.

## II.    The Injunction Should Be Vacated On The Independent Ground That It Exceeds The District Court's Constitutional And Equitable Authority.

In all events, the injunction should independently be vacated as an abuse of discretion because it is both overbroad and unworkable.

As the Supreme Court reiterated in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), injunctions must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861; *see Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (holding that injunctions "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").

Here, plaintiffs' standing to sue for prospective relief is based solely on their allegations of past retaliation. Accordingly, plaintiffs' claims would justify—at most—a narrow injunction directing DHS to stop retaliating against those plaintiffs who could establish their Article III standing. *See* ER-181 (acknowledging, in the order denying plaintiffs' application for a temporary restraining order, that "[p]laintiffs' requested relief is too broad" and "violates the fundamental principle that injunctive relief must be precisely tailored to address only the specific constitutional harm").

33

The district court's injunction sweeps far more broadly than that. The injunction requires the government to accord preferential treatment to anyone who qualifies as a "Journalist," "Legal Observer," or "protester" in Los Angeles and the surrounding counties by exempting them from otherwise lawful dispersal orders and deployments of crowd-control devices. ER-45-46. It also imposes granular preconditions on the use of nonlethal force. For example, it requires officers to issue at least "two separate warnings" containing specific language "at a sound level where [they] can be heard by the targeted individuals." ER-45-46. It further prohibits officers from using crowd-control devices (which are effective precisely because they affect a large area) when their use might have an incidental impact on journalists and protesters. ER-45. These specific instructions to DHS officers grossly exceed what is required to remedy whatever viable First Amendment claims plaintiffs might have— meaning that the injunction grossly exceeds the constitutional and equitable limits on the district court's authority. *Cf. Roman v. Wolf*, 977 F.3d 935, 946 (9th Cir. 2020) (admonishing district court to refrain from "imposing provisions that micromanage the Government's administration" of a federal detention facility and that "wade into facility administration at a granular level beyond what is required to remedy the constitutional violation identified").

The injunction independently constitutes an abuse of discretion because the district court failed to account for "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quoting *New*

34

*York v. Cathedral Acad.*, 434 U.S. 125, 129 (1977)). The injunction micromanages DHS and every DHS officer operating in Los Angeles and six other counties by imposing all manner of impractical restrictions on officers' ability to respond to violent protests, posing serious risks to federal personnel and property and to the public.

To begin, the injunction drastically restricts officers' ability to issue dispersal orders and to deploy crowd-control devices whenever journalists, legal observers, and protesters are present. ER-45-46. But the injunction never defines the term "protester." And its definitions of "journalist" and "legal observer" are so broad as to offer no meaningful guidance. The injunction requires officers confronted with rioters to quickly determine whether anyone in the crowd is displaying a "professional or authorized press pass" or "other official press credentials," carrying sufficiently "professional gear," or wearing sufficiently "distinctive clothing" (in the case of a journalist) or a special green hat or blue vest (in the case of a legal observer). ER-46. The injunction does not specify which or how many of these indicia are necessary. ER-46. The injunction also states that a journalist and legal observer is anyone "standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities." ER-46. These "indici[a]," however, "are not requirements" either. ER-46. The definitions thus plainly cover even journalists and legal observers who are intermingled with protesters or who are engaging in protest activities.

35

These highly reticulated yet hopelessly vague definitions fail to "describe" the people protected by the injunction "specifically" and "in reasonable detail," as the Federal Rules of Civil Procedure require. Fed. R. Civ. P. 65(d)(1)(B)-(C); *see, e.g., Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047-48 (9th Cir. 2013) (vacating injunction on this basis). They are also unworkable in practice. Riots present officers with the challenge of controlling a "chaotic" and "rapidly evolving" situation. ER-94. In such circumstances, officers "may be unable to differentiate between members of the press and other participants, especially while in the midst of a . . . violent situation where there is imminent physical danger to . . . officers and members of the public." ER-84. The difficulty of this task is compounded by the fact that rioters sometimes "shin[e] . . . lasers at officer[s'] eyes" to impede visibility, "which can result in temporary blindness and permanent damage." ER-96.

Worse, the injunction's definitions are ripe for abuse. Because the injunction forbids officers from using crowd-control devices whenever journalists, legal observers, and protesters "who are not themselves posing a threat of imminent harm" are present, ER-45, the injunction enables violent protesters to use journalists and legal observers as shields by positioning themselves nearby. Rioters can also easily disguise themselves as journalists or legal observers because "[p]ress markings" are "publicly available," ER-61, as are green hats and blue vests. But officers cannot readily "differentiate between actual press" and disguised rioters in the chaos of a riot,

36

where "violent opportunists . . . use the anonymity of crowds to assault law enforcement officers." ER-84-85.

The injunction is unworkable in many other respects as well. For example, the injunction requires "two separate" and audible "warnings" and time to disperse before the use of any crowd-control device, "unless the threat is so serious and imminent that a warning is infeasible." ER-45. This "blanket requirement . . . would prevent officers from responding to exigent circumstances" where complying with "an arbitrary two-warning standard" would "compromise safety." ER-63-64. Moreover, there is no way for officers to "guarantee or prove [that] everyone" who might be affected by crowd-control devices "was able to hear and understand these warnings" prior to the devices' deployment, ER-64, as the injunction also requires, ER-45. Any perceived failure to comply could expose officers to contempt proceedings.

The injunction also prohibits officers from using crowd-control devices against any "identified target[] if doing so could foreseeably result in injury to the press, legal observers, or protesters" who do "not themselves pos[e] a threat of imminent harm to a law enforcement officer or another person." ER-45. This provision contains a narrow exception for "force . . . necessary to stop an immediate and serious threat of physical harm to a person." ER-45. But it contains no exception for the protection of property. The injunction thus prohibits officers "faced with imminent threats to federal property"—such as "commercial grade fireworks or Molotov cocktails that have the potential to burn federal buildings"—from deploying crowd-control devices

37

in response.  ER-94.  The injunction therefore "invite[s] the wanton destruction of federal property" by barring officers from using crowd-control devices "prior to the offense[s] taking place."  ER-94.  The provision also fails to account for circumstances where protesters block the only ingress or egress points available to federal officers but do not yet pose a "specific imminent threat of harm to a person." ER-117.  "In this situation, the use of a crowd control device may be necessary to obtain compliance with . . . lawful order[s]" to remove the obstruction.  ER-117.  The injunction nevertheless prohibits the use of crowd-control devices in this manner.

Additionally, the injunction requires officers to ask anyone qualifying as a journalist or legal observer during a violent protest to voluntarily relocate to another position that preserves those individuals' ability to "report and observe."  ER-45. Although that option may be available in some circumstances, *see* ER-103, it is illogical and dangerous to force officers to conduct such negotiations in all circumstances. Officers issue dispersal orders both to protect themselves and to protect the people who have been ordered to disperse.  ER-93.  "An order enjoining . . . officers from dispersing members of the press or legal observers simply because of their status endangers everyone involved."  ER-93.  That is especially true because the injunction gives officers no recourse if someone refuses to move.  When a riot has started, "[a]ny delay in compliance . . . poses a risk to officer safety, public safety, and the safety of any press or legal observers who may be present."  ER-62.

Finally, the injunction inappropriately places the district court in the position of superintending officers' decisions on how best to disperse violent protests. As a result of the injunction, officers' snap judgments about who is covered by the injunction or whether one of the injunction's legalistic exceptions applies—all in the midst of a riot—may now be second-guessed in contempt proceedings. Officers could face contempt charges even for accidentally striking someone with a crowd-control device. Whether or not such charges are ultimately found to be meritorious, the mere threat of protracted contempt litigation imposes a significant additional burden on officers. And given the injunction's practical unworkability, the injunction's purported safe harbor for officers who "incidentally expose[]" "a protester, journalist[,] or legal observer . . . to crowd-control devices after such a device was deployed in a manner that complies with th[e] injunction," ER-46, offers only illusory protection.

The district court did not seriously contend with any of these concerns. Instead, the court relied on the fact that, in *Index Newspapers*, the motions panel denied the government's application for a stay pending appeal of a similar injunction entered in 2020. ER-42, ER-44. But the injunction here is broader even than the extraordinary injunction issued there. For example, this injunction's restrictions on the use of crowd-control devices during violent protests have no analogue in *Index Newspapers*. *Compare* ER-45-46, *with Index Newspapers,* 480 F. Supp. 3d at 1155-57. The facts that gave rise to *Index Newspapers* were also markedly different. For example, that

39

case mainly involved federal officers' use of dispersal orders while defending a federal courthouse in Portland from rioters. *Index Newspapers*, 977 F.3d at 822. Here, by contrast, protests have occurred not only at static locations such as federal buildings but at public locations where officers are conducting immigration-enforcement missions. Thus, the question whether the *Index Newspapers* injunction was workable in the context of the 2020 Portland riots sheds no light on the question whether this far broader injunction is workable in the context of the circumstances federal officers are confronting on the ground in Los Angeles.

There are good reasons why courts should not issue injunctions of this kind. Courts are ill-positioned to second-guess the decisions of officers seeking to disperse a protest that has turned violent. Such occasions present "tense, uncertain, and rapidly evolving" circumstances that force officers "to make split-second judgments." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Officers must "restore and maintain lawful order, while not exacerbating disorder more than necessary." *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998). They must "act decisively and . . . show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). The district court's injunction impermissibly undermines officers' ability to perform these vital law-enforcement functions and should therefore be vacated by this Court.

40

## CONCLUSION

For these reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

BILAL A. ESSAYLI
  *Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON

 */s/ Michael Shih*
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*

October 2025

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

/s/ Michael Shih
MICHAEL SHIH

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,846 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Michael Shih*
MICHAEL SHIH