No. 25-5975

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LOS ANGELES PRESS CLUB; NEWSGUILD - COMMUNICATIONS WORKERS OF AMERICA; SEAN BECKNER-CARMITCHEL; RYANNE MENA; LEXIS-OLIVIER RAY; CHARLES XU; BENJAMIN ADAM CLIMER; ABIGAIL OLMEDA,

*Plaintiffs-Appellees*,

v.

KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Central District of California

**REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL**

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. The Stay Factors Decisively Favor The Government. ........ 1

A. Standing ........ 1

B. First Amendment Merits ........ 5

C. Remaining Factors ........ 8

II. The Injunction Should Independently Be Stayed Because It Is Overbroad And Unworkable ........ 9

CONCLUSION ........ 12

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ................................................................................ 7

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .................................................................................. 2

*East Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ............................................................... 4, 8

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................ 4

*Index Newspapers LLC v. City of Portland*,
  480 F. Supp. 3d 1120 (D. Or. 2020) .................................................... 10

*Index Newspapers LLC v. U.S. Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ............................................ 4, 8, 10, 10-11

*Laird v. Tatum*,
  408 U.S. 1 (1972) .................................................................................... 3

*Leigh v. Salazar*,
  677 F.3d 892 (9th Cir. 2012) ................................................................. 7

*Myers v. United States*,
  652 F.3d 1021 (9th Cir. 2011) ............................................................... 5

*Press-Enterprise Co. v. Superior Ct.*,
  478 U.S. 1 (1986) ................................................................................ 6, 7

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
  65 F.4th 1012 (9th Cir. 2023) ................................................................ 2

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................................ 9

*Updike v. Multnomah County*,
  870 F.3d 939 (9th Cir. 2017) .............................................................. 2, 3

# INTRODUCTION

The district court itself recently determined, in denying the government's stay motion, that the preliminary injunction needed to be clarified and modified. Even as altered, however, the injunction continues to inhibit federal officers' ability to protect public safety. And it does so in ways completely untethered from the First Amendment principles on which it purports to rest. This Court should therefore stay this overbroad, unworkable, and legally groundless injunction.

# ARGUMENT

## I. The Stay Factors Decisively Favor The Government.

### A. Standing

As the government's stay motion explained, the district court erroneously concluded that plaintiffs have standing to seek injunctive relief. Neither plaintiffs nor the district court's stay denial have successfully rehabilitated that conclusion.

Plaintiffs urge (Opp'n 10-11) the Court to defer to the district court's findings that Department of Homeland Security (DHS) officers targeted plaintiffs with retaliatory force at certain protests in June and July. Those findings are clearly erroneous. *See infra* p. 5; Mot. 12-13; Doc.58, at 10-12. But even accepting those findings would not support the court's legal conclusion, reviewed de novo, that DHS has an officially sanctioned policy of First Amendment retaliation, much less that these plaintiffs are likely to be retaliated against in the future. *See San Diego County Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1022 (9th Cir. 2023)

("The existence of a case or controversy is a question of law we review de novo."). There is no dispute that DHS policies prohibit First Amendment retaliation. There is also no dispute that, as the court acknowledged, DHS's "policies correctly set out the bounds for the use of less lethal munitions and crowd control weapons." Doc.55, at 33.

Plaintiffs wrongly suggest (Opp'n 10-11) that the existence of an unwritten but officially sanctioned policy of retaliation can be inferred from their many allegations of retaliatory force. But as the district court recognized, DHS officers were faced with widespread and "multipl[ying]" protests during June and July 2025. Doc.55, at 2. Yet the court notably did not find that all or even most interactions between DHS officers and protesters involved retaliatory force. The record thus does not show that the incidents identified by plaintiffs are representative. Indeed, at two protests discussed by the court, no crowd-control devices were deployed at all. *See* Mot. 4-5 (describing incidents).

Plaintiffs emphasize (Opp'n 10) their allegations of multiple past injuries. But "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (alteration and quotation marks omitted). Thus, in *Updike v. Multnomah County*, 870 F.3d 939 (9th Cir. 2017), this Court held that a plaintiff lacked standing to seek an injunction compelling a county to provide him with certain interpretive services at its detention facilities, even though he alleged he had been booked at county detention

2

facilities on five prior occasions and that the county had repeatedly denied him the interpretive services he desired. *Id.* at 948. The Court deemed these past wrongs "insufficient to establish that the risk of recurring injury [wa]s more than speculative," in significant part because the plaintiff had failed to "identif[y] specific County policies and practices" that would be applied to him in the future. *Id.*

Plaintiffs and the district court also emphasize (Opp'n 10, 16; Doc.74, at 13) certain statements by the Secretary of Homeland Security and other DHS officials. Those statements reflect concern with violence directed at DHS officers. *See* Doc.74, at 13. The statements are not inconsistent with, and do not purport to override, DHS policies prohibiting First Amendment retaliation and setting limits on the use of nonlethal force.

Plaintiffs echo the district court's erroneous conclusion (Opp'n 12; Doc.74, at 8-9) that their standing is supported by their allegations of a First Amendment chill. Those assertions are in tension with plaintiffs' insistence that they "intend to continue to be present" at future protests notwithstanding their incorrect belief that DHS "maintain[s] a pattern and practice" of retaliation. Opp'n 12 (quotation marks omitted). In any event, the invocation of subjective chilling effects cannot substitute for the requirement that plaintiffs objectively prove a certainly impending likelihood of being subjected to retaliatory force in the future. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972).

3

Plaintiffs' reliance (Opp'n 8 n.3) on *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020), is misplaced. That decision's standing analysis did not present a "pure question of law . . . necessarily compelled by preexisting binding precedent." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 n.3 (9th Cir. 2021). The panel instead held, "[o]n [that] record," that the government was unlikely to succeed in arguing that those plaintiffs lacked standing. *Index Newspapers*, 977 F.3d at 827. That holding does not control this case and lacks persuasive force given the deficiencies in this record discussed above.

Finally, plaintiffs' perfunctory defense (Opp'n 13) of the district court's organizational-standing analysis lacks merit. Plaintiffs have failed to explain how DHS officers' responses to violent protests directly affected the organizational plaintiffs' core business activities—the hosting of events and the issuance of scholarships and awards in the case of Los Angeles Press Club, and the advancement of members' "economic interests . . . through collective bargaining agreements" in the case of NewsGuild. Doc.55, at 18-19. Because DHS did not directly compel the organizations to alter their activities or to expend any resources, the organizations' voluntary decision to divert resources away from their core missions does not generate standing. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394-396 (2024).

**B.     First Amendment Merits**

**1.**     With respect to plaintiffs' retaliation claims, plaintiffs repeat (Opp'n 16-17) the district court's finding that the DHS officers who allegedly injured them were motivated by retaliatory animus.  The government has established, however, that those findings were clearly erroneous because the court "simply ignored" contradictory evidence.  *Myers v. United States*, 652 F.3d 1021, 1036 (9th Cir. 2011).  For example, the court's stay-denial order acknowledged the government's observation that plaintiff Sean Beckner-Carmitchel could have been struck while standing near violent protesters at the Paramount protest "because [DHS officers] were trying to aim away from the larger crowd or because a protestor kicked or threw the can[]ister when it landed."  Doc.74, at 12.  But the court made no effort to defend its conclusion that Mr. Beckner-Carmitchel had been deliberately and not incidentally injured.  Doc.55, at 30.  Similarly, the court reaffirmed (Doc.74, at 12-13) its prior findings that no "innocent explanations" existed for other alleged instances of retaliation, *see* Doc.55, at 30-31, without addressing the possibility that, because crowd-control devices "travel relatively slowly," they may well cause "inadvertent strike[s]," Doc.58-2, at 8-9, or the possibility that DHS officers were unable to clearly distinguish journalists intermingled with violent crowds, Doc.47-6, at 6.  And even accepting that some of the alleged incidents involved excessive force would not support the court's inference of an unwritten but officially sanctioned DHS-wide policy of retaliation.  *Supra* pp. 1-3.

5

Moreover, to the extent individual DHS officers used more force than was warranted under the circumstances, that conduct is most naturally evaluated under the Fourth Amendment's excessive force standards or other doctrines applicable to individual officer misconduct. Plaintiffs' argument would improperly convert any excessive-force claim arising from a protest into a First Amendment retaliation claim as well. Opp'n 16 (stating that "misuse of force" during a protest is, in plaintiffs' view, a First Amendment violation).

2. With respect to plaintiffs' right-of-access claims, plaintiffs have failed to explain how a violent protest is a governmental proceeding to which a First Amendment right of access could ever attach. Mot. 14. Nor have plaintiffs correctly applied the right-of-access test, which requires both that the "place and process have historically been open to the press and general public" and that "public access play[] a significant positive role" in the process at issue. *Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8 (1986). There is no tradition of public access to violent protests, and members of the press have no special First Amendment right to disregard dispersal orders or to be exempted from the use of crowd-control devices when a protest has turned violent. Mot. 15-16. Yet that is precisely what the injunction grants them. *See* Doc.55, at 43-44.

Plaintiffs note (Opp'n 14) that violent protests usually occur on public streets and sidewalks that are "open to the public." But plaintiffs do not seek to access public streets and sidewalks in the abstract. They seek to "observ[e] protestors'

6

interactions with law enforcement" in the specific context of the Los Angeles protests, Doc.55, at 36, which were "blighted by violent actors," Doc.55, at 29. The relevant governmental proceeding, therefore, is a violent protest that law-enforcement officers are attempting to control. And it is well-settled that "[n]ewsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded," as is the case with violent protests. *Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972).

Plaintiffs' cited authorities support the government, illustrating that the right-of-access inquiry necessarily turns on the specific proceeding to which plaintiffs are asserting access. In *Press-Enterprise Co.*, 478 U.S. 1, the Supreme Court held that, to determine if journalists have a right of access to preliminary hearings, courts must examine whether such hearings have traditionally been open to the public, *id.* at 10. The Court did not consider if the courthouses where such hearings take place were public fora. In *Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012), this Court held that, to determine if journalists have a right to access "horse gathers" conducted by the Bureau of Land Management, courts must examine whether "horse gathers have historically been open to the general public," *id.* at 901. The Court did not consider if the public had a right to access the land where horse gathers are conducted.

3. The stay panel's decision in *Index Newspapers* does not control the merits, plaintiffs' assertions (Opp'n 13-15) notwithstanding. As noted, the decision was based on a different record, and the panel's merits holdings were not "necessarily

7

compelled by preexisting binding precedent." *East Bay Sanctuary Covenant*, 993 F.3d at 661 n.3. For example, until that decision, "the First Amendment-based right of public access" had "never been deemed to apply to riot control and crowd dispersal in a public street." *Index Newspapers*, 977 F.3d at 844 (O'Scannlain, J., dissenting). The panel's preliminary and predictive analysis in *Index Newspapers* thus does not compel the Court's resolution of the government's stay motion in this case. And for the reasons articulated in Judge O'Scannlain's dissent, the Court should not follow *Index Newspapers* here.

### C. Remaining Factors

Contrary to plaintiffs' suggestion (Opp'n 6), the government has established that the injunction would irreparably harm both the government and the public interest. Most significantly, the injunction undermines DHS officers' ability to protect the public, federal property, and themselves. Mot. 18-21. Even before the injunction was issued, one DHS officer had already been assaulted by someone visually identifying as a reporter. Doc.58-3, at 4. That some injunction provisions were based on existing DHS policies (Opp'n 7) does not mitigate these harms, since the injunction places the district court in the position of superintending compliance with those policies in chaotic and unpredictable circumstances on pain of contempt. Mot. 19-20. Moreover, the government's district court stay application was timely filed and supported by declarations from supervisory DHS officials specifically explaining the

8

harms of the court's injunction in the context of the circumstances currently confronting DHS officers in Los Angeles. *See generally* Doc.58-2; Doc.58-3; Doc.58-4.

## II. The Injunction Should Independently Be Stayed Because It Is Overbroad And Unworkable.

Even if plaintiffs were entitled to some form of equitable relief, the government's motion showed that the injunction should be stayed because it is both overbroad and unworkable. Plaintiffs' opposition does not even attempt to explain how the injunction—which grants preferential treatment to journalists and legal observers and which functions like a detailed law-enforcement operations manual—is no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). We are aware of no First Amendment principle that would justify, for example, requiring DHS officers to issue at least "two separate warnings" containing specific language at a specific "sound level." Doc.55, at 43-44. The injunction thus exceeds the district court's constitutional and equitable authority.

Plaintiffs' defense of the injunction's workability also misses the mark. Like the district court, Doc.74, at 15, plaintiffs rely principally on the opinions of Mr. Gil Kerlikowske, Opp'n 18-19, 21-22. But those opinions are based mainly upon his experiences as Chief of Police in Seattle more than 25 years ago. Doc.34-26, at 1, 3; *see* Opp'n 18. His knowledge of the situation in Los Angeles is secondhand. And his opinions do not address, except in conclusory fashion, the practical concerns

9

identified by federal law-enforcement officers currently deployed to Los Angeles. The opinions are therefore entitled to little weight. Plaintiffs' argument that the injunction is workable because the court based certain provisions on existing DHS policies fails for the reasons discussed. *Supra* p. 8; Mot. 19-21.

Plaintiffs also rely (Opp'n 18-19) on the injunction imposed in *Index Newspapers*. But the circumstances that gave rise to that injunction were different. That case involved officers' use of dispersal orders while defending a federal courthouse. *Index Newspapers*, 977 F.3d at 822. Here, protests have occurred not only at static locations but at public locations where DHS officers are conducting immigration-enforcement missions. Moreover, unlike the *Index Newspapers* injunction, this injunction significantly restricts the use of crowd-control devices. *Compare* Doc.55, at 43-44, *with Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1155-57 (D. Or. 2020). Thus, whether the *Index Newspapers* injunction was workable in the context of the 2020 Portland riots sheds no light on whether this far broader injunction is workable in this context.

Plaintiffs note (Opp'n 19) that, in *Index Newspapers*, the City of Portland represented that it had successfully complied with an injunction like the one entered against the federal government in that case. The view of the City of Portland about a different injunction in a different case is irrelevant to whether DHS's actions in this case were narrowly tailored or whether the injunction is workable. Regardless, the City's experiences in *Index Newspapers* cast considerable doubt on the district court's

10

characterization. *See Index Newspapers*, 977 F.3d at 850-51, 850 n.9 (O'Scannlain, J., dissenting) (explaining the City's inconsistent litigation positions).

As the government's stay motion explained, there are good reasons why courts do not typically superintend law-enforcement operations to this intrusive degree. Mot. 21. Indeed, the district court recently clarified or modified certain provisions in response to the government's showing that the injunction is unworkable. Doc.74, at 14-15. But those revisions fall far short of resolving the government's concerns. For example, although the court has now clarified that the use of a smartphone alone does not turn a protester into a journalist covered by the injunction, the court did not resolve any of the government's other concerns with respect to the breadth of that definition. *See* Mot. 17-19. And the court did not address the breadth of its legal-observer definition at all. In all events, that the court has already had to alter untenable aspects of its injunction underscores why the court should not be micromanaging DHS operations at all.

## CONCLUSION

For these reasons and the reasons set forth in the government's stay motion, the preliminary injunction should be stayed pending appeal.

<div style="text-align: right;">

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON

 */s/ Michael Shih*
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*
  *michael.shih@usdoj.gov*

</div>

October 2025

## CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) and Local Rules 27-1(d) and 32-3 because it contains 2,591 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Michael Shih*
MICHAEL SHIH