Case No. 25-5975

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### LOS ANGELES PRESS CLUB, *et al.*,
*Plaintiffs-Appellees*

v.

### KRISTI NOEM, *in her official capacity as Secretary of Homeland Security;* UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
*Defendants-Appellants*

On Appeal from the United States District Court for the Central District of California, Case No. 2:25-cv-05563-HDV-E
Honorable Hernán D. Vera

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

BRAUNHAGEY & BORDEN LLP
Matthew Borden
J. Noah Hagey
Kory J. DeClark
Greg Washington
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
borden@braunhagey.com
hagey@braunhagey.com
declark@braunhagey.com
gwashington@braunhagey.com

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
Peter J. Eliasberg
Jonathan Markovitz
Adrienna Wong
Meredith Gallen
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
peliasberg@aclusocal.org
jmarkovitz@aclusocal.org
awong@aclusocal.org
mgallen@aclusocal.org

*[Additional Counsel Listed on Following Page]*

BRAUNHAGEY & BORDEN LLP
Kevin Opoku-Gyamfi
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403
opokugyamfi@braunhagey.com

LAW OFFICE OF CAROL A.
SOBEL
Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: (310) 393-3055
carolsobellaw@gmail.com

SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
Paul Hoffman
Michael Seplow
John Washington
200 Pier Avenue #226
Hermosa Beach, CA 90254
Telephone: (310) 396-0731
hoffpaul@aol.com
mseplow@sshhzlaw.com
jwashington@sshhzlaw.com

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
Summer Lacey
Jacob Reisberg
Mohammad Tajsar
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
slacey@aclusocal.org
jreisberg@aclusocal.org
mtajsar@aclusocal.org

LAW OFFICE OF PETER BIBRING
Peter Bibring
2210 W. Sunset Blvd. # 203
Los Angeles, CA 90026
Telephone: (213) 471-2022
peter@bibringlaw.com

*Attorneys for Plaintiffs-Appellees*
*Los Angeles Press Club, NewsGuild-Communications Workers of America, Sean*
*Beckner-Carmitchel, Ryanne Mena, Lexis-Olivier Ray, Charles Xu, Benjamin*
*Adam Climer, and Abigail Olmeda*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ................................................... 4

ISSUES PRESENTED ...................................................................... 4

STATEMENT OF THE CASE ........................................................... 5

    A.    Factual Background ........................................................... 5

    B.    Procedural History ............................................................ 8

        1.    Temporary Restraining Order Proceedings.......................... 8

        2.    Preliminary Injunction Proceedings.................................... 9

        3.    Stay Proceedings ............................................................ 12

SUMMARY OF ARGUMENT ......................................................... 14

STANDARD OF REVIEW ............................................................. 16

ARGUMENT ................................................................................ 17

I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN HOLDING THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................................................... 17

    A.    Plaintiffs Have Standing To Seek Prospective Relief ................. 17

        1.    The Record Establishes a Real Threat of Repeated Injury 19

        2.    Plaintiffs Have Standing Based on the Continuing, Present Chilling Effects of Defendants' Conduct ........................... 24

        3.    The Organizational Plaintiffs Have Standing ................... 26

    B.    The District Court Did Not Abuse Its Discretion in Concluding Plaintiffs Are Likely to Prevail on Their Right-of-Access Claims ................................................................................ 27

        1.    Public Streets, Sidewalks, Parks and Protests Have Traditionally Been Open to the Press and the Public ........ 28

        2.    Public Access Plays an Important Role in Holding the Government Accountable.................................................. 31

i

3. The District Court Did Not Commit Clear Error in Finding that Defendants' Blanket Dispersal Policy Is Not Narrowly Tailored to Preserve an Overriding Government Interest .. 32

C. The District Court Did Not Abuse its Discretion in Holding that Plaintiffs Are Likely to Prevail on their First Amendment Retaliation Claims ................................................................. 37

1. Defendants' Argument that the District Court Committed Error by Only Relying on Circumstantial Evidence Is Legally and Factually Incorrect ........................................ 41

2. The District Court Did Not Commit Clear Error in Finding Retaliatory Intent ................................................................. 41

3. Defendants' Repeated Violations of Their Own Written Policies Are Only Further Evidence of Intent ................... 43

4. That Defendants' Conduct Also Violates the Fourth Amendment Does Not Preclude a First Amendment Retaliation Claim ................................................................. 45

II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ................................................... 46

III. THE BALANCE OF EQUITIES FAVORS PLAINTIFFS ............... 47

IV. THE INJUNCTION DID NOT EXCEED THE DISTRICT COURT'S AUTHORITY ................................................................................. 48

A. The District Court Issued an Injunction Tailored to Provide Plaintiffs Complete Relief .......................................................... 50

B. The District Court Did Not Commit Clear Error in Finding The Scope of the Injunction Workable ............................................. 53

1. The District Court's Finding That The Injunctive Terms from *Index* Are Workable Is Not Clearly Erroneous .......... 54

2. The District Court Did Not Commit Clear Error In Finding That Requiring Defendants to Comply with Their Own Policies Is Workable ............................................................. 57

V. THE INJUNCTION IS IN THE PUBLIC INTEREST .......................... 61

CONCLUSION ............................................................................................... 61

CERTIFICATE OF COMPLIANCE ............................................................. 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump,*
  605 U.S. 91 (2025) ................................................................. 51

*ACLU of Nevada v. City of Las Vegas,*
  466 F.3d 784 (9th Cir. 2006) ................................................ 36

*Anderson v. City of Bessemer City, N.C.,*
  470 U.S. 564 (1985) ............................................................. 43

*Associated Press v. Otter,*
  682 F.3d 821 (9th Cir. 2012) ........................................... 48, 61

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) ............................................... 48

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't,*
  466 F. Supp. 3d 1206 (W.D. Wash. 2020) .......................... 47

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ................................................ 49

*Castro v. Cnty. of Los Angeles,*
  833 F.3d 1060 (9th Cir. 2016) .............................................. 44

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) .......................................................... 18, 19

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................ 25, 26

*Cmty. House, Inc. v. City of Boise,*
  490 F.3d 1041 (9th Cir. 2007) .............................................. 48

*Collins v. Jordan,*
  110 F.3d 1363 (9th Cir. 1996) ....................................... 48, 60, 61

*Cox Broad. Corp. v. Cohn,*
  420 U.S. 469 (1975) ............................................................. 31

*Cox v. Louisiana,*
  379 U.S. 536 (1965) ............................................................. 60

*Cuviello v. City of Vallejo,*
  944 F.3d 816 (9th Cir. 2019) ................................................ 47

*Daily Herald Co. v. Munro,*
  838 F.2d 380 (9th Cir. 1988) ................................................ 37

*Earth Island Inst. v. U.S. Forest Serv.*,
  351 F.3d 1291 (9th Cir. 2003) .................................................. 17

*East Bay Sanctuary Covenant* v. *Bid*en,
  ("EBSC"), 993 F.3d 640 (9th Cir. 2021) .................................. 29

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
  92 F.3d 1486 (9th Cir. 1996) .................................. 51, 52, 53

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................. 46

*Fed. Election Comm'n v. Furgatch*,
  869 F.2d 1256 (9th Cir. 1989) .................................................. 23

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................. 27

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) ...................................................... 31

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,
  457 U.S. 596 (1982) .................................................................. 30

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir. 2001) .......................................... 23, 45

*Hague v. Comm. for Indus. Org.*,
  307 U.S. 496 (1939) .................................................................. 28

*Hart v. Massanari*,
  266 F.3d 1155 (9th Cir. 2001) .................................................. 29

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) .................................................. 16

*Hodgers-Durgin v. de la Vina*,
  199 F.3d 1037 (9th Cir. 1999) .................................................. 24

*Immigrant Defs. L. Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) .................................................. 27

*Index Newspapers LLC v. City of Portland*,
  480 F. Supp. 3d 1120 (D. Or. 2020) ...................................... 35

*Index Newspapers LLC v. U.S. Marshals Service*,
  977 F.3d 817 (9th Cir. 2020) .......................................... passim

*Junior Sports Mags. Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) .................................................. 29

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) .................................................. 46

iv

*LaDuke v. Nelson,*
  762 F.2d 1318 (9th Cir. 1985) ............................................................ passim

*Laird v. Tatum,*
  408 U.S. 1 (1972) ........................................................................................ 26

*Leigh v. Salazar,*
  677 F.3d 892 (9th Cir. 2012) ............................................................. passim

*Libertarian Party of Los Angeles Cnty. v. Bowen,*
  709 F.3d 867 (9th Cir. 2013) ................................................................... 25

*Lozman v. Riviera Beach,*
  585 U.S. 87 (2018) ...................................................................... 46, 51, 52

*LSO, Ltd. v. Stroh,*
  205 F.3d 1146 (9th Cir. 2000) .................................................................. 23

*Mayfield v. U.S.,*
  599 F.3d 964 (9th Cir. 2010) .................................................................... 19

*Melendres v. Arpaio,*
  695 F.3d 990 (9th Cir. 2012) .................................................................... 48

*Mendocino Env't Ctr. v. Mendocino Cnty.,*
  192 F.3d 1283 (9th Cir. 1999) .................................................................. 38

*Menotti v. City of Seattle,*
  409 F.3d 1113 (9th Cir. 2005) ........................................................... 21, 45

*Nelson v. City of Davis,*
  685 F.3d 867 (9th Cir. 2012) .................................................................... 59

*Noem v. Vasquez Perdomo,*
  No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025) ........................... 24

*Nordstrom v. Ryan,*
  762 F.3d 903 (9th Cir. 2014) ....................................................... 18, 24, 44

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ................................................................................... 18

*Porter v. Martinez,*
  68 F.4th 429 (9th Cir. 2023) ..................................................................... 23

*Press-Enter. Co. v. Superior Ct.,*
  478 U.S. 1 (1986) ...................................................................... 27, 28, 29, 32

*Riley's Am. Heritage Farms v. Elsasser,*
  32 F.4th 707 (9th Cir. 2022) ..................................................................... 48

*Sanderlin v. Dwyer,*
  116 F.4th 905 (9th Cir. 2024) ...................................................29, 46, 51, 59

v

*Spencer v. Kemna,*
   523 U.S. 1 (1998) ................................................................ 24, 26

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ............................................................ 18, 25

*Thomas v. Cnty. of Los Angeles,*
   978 F.2d 504 (9th Cir.1992) .................................................... 20

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) .................................................................. 50

*Trump v. Int'l Refugee Assistance Project,*
   582 U.S. 571 (2017) .................................................................. 49

*United States v. Hinkson,*
   585 F.3d 1247 (9th Cir. 2009) ............................................ 16, 19

*Updike v. Multnomah Cnty.,*
   870 F.3d 939 (9th Cir. 2017) .................................................... 25

*Villa v. Maricopa Cnty.,*
   865 F.3d 1224 (9th Cir. 2017) .................................................. 18

*Walters v. Reno,*
   145 F.3d 1036 (1998) ............................................................... 37

*Warsoldier v. Woodford,*
   418 F.3d 989 (9th Cir. 2005) .................................................... 46

*Washington v. Trump,*
   145 F.4th 1013 (9th Cir. 2025) ...................................... 48, 49, 57

*Wooley v. Maynard,*
   430 U.S. 705 (1977) .................................................................. 20

**Statutes**

28 U.S.C. § 1292(a)(1) ................................................................ passim

28 U.S.C. § 1331 .............................................................................. 4

28 U.S.C. § 1343 .............................................................................. 4

28 U.S.C. § 2201 .............................................................................. 4

28 U.S.C. § 2202 .............................................................................. 4

Cal. Penal Code § 13652 ................................................................ 57

## INTRODUCTION

Plaintiffs-Appellees are journalists, legal observers, peaceful protesters, and press associations. At the ongoing protests over immigration operations in the Central District of California, Defendant-Appellant Department of Homeland Security repeatedly shot Plaintiffs and association members in the head, upper body, and back with searing tear gas canisters, rubber bullets, and pepper balls, unnecessarily teargassed them without warning, and fired unremitting volleys of chemical and projectile weapons at them when they posed no threat to law enforcement—injuring several Plaintiffs multiple times, on different days. Plaintiffs have suffered traumatic brain injuries, gaping wounds, severe respiratory distress, and other painful injuries, causing them to limit their reporting and making them more hesitant to speak out.

In the proceedings below, Defendants submitted no evidence contradicting more than 40 declarations, video, photo, and expert evidence showing them gratuitously opening fire on peaceful crowds, shooting people in the head for holding up protest signs, intentionally shooting at press vehicles, and assaulting journalists standing far apart from protest activities. They refuse to disavow any of this conduct; offered no proof that they investigated any of it; continued to engage in it even after representing to the District Court that they would not; and publicly stated that filming DHS was "violence" justifying their use of force.

1

Based on careful review of the voluminous evidence, the District Court found that DHS was engaged in an official pattern of preventing journalists and legal observers from reporting on these events and retaliating against people reporting on and protesting against DHS—all in violation of the First Amendment—and issued a preliminary injunction prohibiting it from assaulting journalists, legal observers, and protesters who do not pose any imminent threat. Its order comprises 45 pages of factual findings and a straightforward application of the facts to this Court's precedent, including *Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817, 827 (9th Cir. 2020), where this Court upheld a similar injunction against DHS to stop it from retaliating against and dispersing journalists and legal observers at protests.

Under longstanding Supreme Court precedent, Plaintiffs have standing because Defendants' unlawful assaults repeatedly injured them; because they face a credible threat of recurring injury, as they intend to continue to report, observe, and demonstrate at the same ongoing protests where Defendants' officially-sanctioned pattern of misconduct repeatedly injured them; and because, as intended, Defendants' violence is chilling their exercise of First Amendment rights.

In light of the evidence the District Court credited—and not the "Factual Background" in Defendants' brief, which ignores the Court's findings— Defendants cannot show that the District Court abused its discretion in holding that

2

Plaintiffs are likely to prevail on the merits of their First Amendment Right-of-Access and Retaliation claims. Defendants' legal arguments mirror those that this Court rejected in *Index* based on substantial Ninth Circuit and Supreme Court precedent, where this Court held that (1) journalists and legal observers have a right to observe and record protests without being assaulted, even when other individuals present engage in violent acts, and (2) that a similar pattern of unnecessary, excessive and indiscriminate force was "exceptionally strong" evidence of retaliatory motive. 977 F.3d at 829. Copious, unrebutted evidence supports the District Court's finding of retaliatory motive and its finding that Defendants' blanket policy of preventing journalists from covering the protests is not essential or narrowly tailored to achieve any overriding interest.

Defendants cannot demonstrate the District Court's findings were clearly erroneous. Their evidence comprised generalized declarations that did not specifically address why it was necessary to repeatedly assault Plaintiffs, nor the case-by-case analysis by Plaintiffs' expert. In response to the expert opinion of former Seattle Police Chief and Customs and Border Protection Commissioner Gil Kerlikowske, who explained that the injunction is safe and workable and that multiple police agencies—including DHS after *Index*—have followed similar terms without any danger to law enforcement, Defendants proffered only declarations from DHS officials lacking crowd control experience, who provided

3

support for Mr. Kerlikowske's opinion that the injunction simply holds DHS to its own written policies. In *Index*, this Court held that on a similar record, Defendants failed to establish the district court's findings were clearly erroneous, when they were based on eyewitness accounts and videos of the events and the same expert's testimony. Accordingly, the District Court's injunction should be affirmed.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.     Based on its detailed review of the declarations, videos, photos and expert testimony in the record, did the District Court commit clear error in finding that DHS was engaging in a pattern of using force to unnecessarily disperse reporters and legal observers and retaliate against people reporting on, observing, and peacefully protesting against DHS's immigration operations, and that this conduct was chilling Plaintiffs' exercise of their First Amendment rights and created on ongoing threat of future injury to Plaintiffs?

2.     In light of its findings and credibility determinations, did the District Court abuse its discretion by issuing a preliminary injunction that largely mirrors Defendants' own written policies and the terms of the injunction in *Index* based on

its factual findings that the injunction was safe and workable for law enforcement, and its conclusions that Plaintiffs were likely to prevail on their First Amendment right-of-access and retaliation claims and faced irreparable injury absent the relief granted?

## STATEMENT OF THE CASE

### A.    Factual Background

Since June 2025, when DHS launched the ongoing immigration operations across the Central District of California, Californians of all ages concerned about their family members, constituents, and neighbors have repeatedly risen to protest the government's actions. (ER-4; ER-34 n.26; *see also* ER-13; ER-16; ER-19.) "[M]embers of the press" and legal observers "did what they have always done: positioned themselves at the scene to report on, record, photograph, and observe these events of immense public importance." (ER-4.) In response, as the District Court found, DHS "unleashed crowd control weapons indiscriminately and with surprising savagery," inflicting serious harm on peaceful protesters, legal observers, and press alike. (*Id.*)

Leading up to the preliminary injunction, DHS deployed this violence at no fewer than twelve protests, including in Los Angeles from June 6–9, in Paramount on June 7, in Santa Ana on June 9, in Maywood on June 20, in Ladera Heights on June 23, in Los Angeles on July 7, and in Camarillo and Carpinteria on July 10.

(ER-6–19.) These protests differed in size and character, but the throughline was that DHS agents deployed the same patterns of excessive and retaliatory violence at all. (*Id.*; *see also* ER-4.) Through a sustained pattern of conduct that "persisted for weeks" at protests large and small, DHS misused crowd control weapons in ways prohibited by the agency's own policies, to threaten, injure, and deter people from exercising their rights to assemble, protest, and document these events. (*Id.*; ER-26; ER-32–34.) DHS consistently misused these weapons in ways that needlessly imperiled everyone present and caused serious injuries. (ER-23; ER-34 (citing 3-SER-498–11;3-SER-568–69.)

Plaintiffs are journalists, legal observers, and protesters directly and repeatedly injured by Defendants' pattern of retaliatory force, as well as a press organization and a labor union representing media workers whose members DHS repeatedly shot, teargassed, threatened, and denied access to report. (ER-25–26; ER-28.) The District Court found, based on the voluminous record, that Defendants' conduct caused Plaintiffs and their members to suffer traumatic brain injuries, gaping wounds that required sutures, severe respiratory distress, and other physical injuries, which in turn chilled their First Amendment exercise. (ER-30–31; ER-11 (citing 3-SER-538–42); ER-28 n.15.) The journalist Plaintiffs and the organizational Plaintiffs' members have limited their reporting due to being attacked and fear of being injured again (*Id.*; 4-SER-631; 3-SER-2; ER-144; ER-

6

151). Defendants' attacks on the protester Plaintiffs have made them more hesitant to speak out. (ER-31 (citing 3-SER-526; 3-SER-542).)

The District Court found Defendants repeatedly assaulted Plaintiffs and many other journalists, legal observers, and protesters who did not threaten law enforcement or federal property. (ER-26 n.11; ER-31 ("The record is littered with declarants who are disabled, traumatized, or terrified after suffering injuries at the hands of Defendants.").) Declarations and videos in the record show DHS engaged in a brutal pattern of violent conduct that includes: indiscriminately firing projectile weapons into nonviolent crowds that included young children (ER-35); shooting people in the head with impact munitions (ER-4; ER-34); repeatedly shooting at journalists with pepper balls and tear gas canisters while they took cover behind media trucks (ER-4; ER-8); launching chemical weapons at protestors who were already dispersing, including teens, seniors, and local officials who left a protest to take refuge in a community park (ER-4; ER-33); shooting people who were running away in the back (ER-33); and showering crowds with "countless volleys of tear gas, rubber bullets, and smoke bombs" without warning. (ER-4; ER-16–18.)

To date, Defendants have not disputed they used such force; nor have they disavowed this conduct. Rather, Defendants proclaim these actions are consistent with agency policy. (ER-26.) Defendants have not investigated whether DHS

7

officers violated the law in responding to protests. Indeed, the District Court found, Defendant Noem and other federal officials ratified this pattern "of meeting First Amendment protected activities with force." (ER-36.) Each time DHS agents unleashed such force at protests throughout the Central District, DHS officials made statements approving the agency's conduct. (*Id.*; ER-35; 2-SER-254–55.) DHS officials sanctioned retaliation against First Amendment protected activities through official written materials, such as a bulletin titled "Recent Anti-Law Enforcement Tactics Used in Unlawful Civil Arrest" which identified "use of cameras," "livestreaming" and videorecording at protests as "unlawful civil unrest" tactics and "threats." (ER-35 (citing 3-SER-412; 4-SER-641).)

### B. Procedural History

#### 1. Temporary Restraining Order Proceedings

On June 18, 2025, Plaintiffs filed this action and applied for a temporary restraining order (TRO) to prevent Defendants from further violating their First Amendment rights. (3-SER-621.) On June 20, the TRO was denied without prejudice to Plaintiffs seeking a preliminary injunction, on the grounds that Plaintiffs had not sufficiently shown a danger of ongoing harm based solely on declarations about DHS's conduct between June 6 and 9. (ER-180.)

In their TRO opposition, Defendants represented the protests were "dwindling," so they would no longer engage in the challenged conduct. (ER-40.)

After the Court denied the TRO, Defendants "used retaliatory force against journalists, legal observers, and protesters on at least five [more] occasions" including *on the same day* the court denied the TRO, before Plaintiffs obtained a preliminary injunction. (*Id*.)

### 2. Preliminary Injunction Proceedings

On July 18, Plaintiffs filed their motion for preliminary injunction, which "included dozens of declarations detailing several ***additional*** incidents (June 20 at Maywood, June 23 at Ladera Heights, July 4 in downtown Los Angeles, July 7 at MacArthur Park, and July 10 at Carpinteria and Camarillo) post-dating the TRO Order." (1-SER-7.) The motion also cited additional public statements by DHS officials approving of the agency's conduct and expressing intent to quash protest against its immigration raids. (*See* ER-35 (noting "federal officials' statements").)

On August 18, Defendants filed their opposition. (ER-222.) It did not include any video or photo evidence rebutting Plaintiffs' evidence. Defendants did not offer evidence that they had investigated any of DHS's attacks on Plaintiffs or other declarants. They did not disavow any of the conduct of DHS agents documented by Plaintiffs' evidence. (ER-26.) On August 22, Plaintiffs filed a reply. The Court heard oral argument on August 25. (ER-222–23.)

On September 10, "[a]fter reviewing carefully all of the evidence presented," the District Court granted a modified version of the preliminary

9

injunction Plaintiffs requested. (ER-5.) The findings and reasoning in the District Court's 45-page order were based, in part, on "detailed and credible declarations from nearly 50 journalists, legal observers, and protestors" whom DHS agents attacked "us[ing] rubber bullets, pepper balls, tear gas, and other crowd control weapons … at protests from June 6 through July 10, 2025." (ER-4.)

The District Court found that contrary to "Defendants' characterization of all protestors as 'rioters,'" the "uncontradicted evidence reveals that the gathered crowds in downtown Los Angeles, Santa Ana, Paramount, Maywood, Camarillo, and Carpinteria included community leaders, families including children and elderly individuals, and other concerned community members." (ER-34.) Even when "[v]iewed in the light most generous to Defendants," the District Court found, "the record reveals" that Defendants' attacks on protests have not focused on violent rioters, but targeted "peaceful protesters, journalists, and observers"— including, for example, a "group of … teens and seniors gathered at a bus stop and park" in the city of Maywood, and "a nonviolent group of community members, including seniors and young children, in Carpinteria." (ER-34–5.)

The District Court "reject[ed] Defendants' baseless accusations that Plaintiffs … participated in violent riots," finding "Defendants … failed to adduce a *shred* of evidence" to support this accusation. (ER-30.) It found DHS "deployed force against [Plaintiffs], though they were not engaged in or even proximate to

10

any violent or noncompliant actions." (ER-41.) And it noted the "avalanche of evidence before [it]—along with federal officials' statements" indicating that these attacks on Plaintiffs were part of "a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." (ER-35; *see also* ER-32 (finding "extensive record evidence [shows] federal officers repeatedly targeted journalists and peaceful legal observers far from any … bad actors" and Defendants failed to "proffer any innocent explanations for these incidents"); ER-25 (finding "many victims had been standing on public streets, sidewalks, and parks," away from crowds "and were not engaged in unlawful activity" when DHS injured them); ER-33 ("Defendants deployed crowd control weapons even when crowds were already dispersing or attempting to comply with orders"); ER-31 ("Defendants' excessive and indiscriminate response evinces strong and persuasive evidence of retaliatory intent.").)

The District Court concluded: "under the guise of protecting the public, federal agents have endangered large numbers of peaceful protestors, legal observers, and journalists—as well as the public that relies on them to hold their government accountable." (ER-5.)

On these determinations, the District Court issued a preliminary injunction that combines the protections for reporters and legal observers affirmed in *Index* with provisions that restrain Defendants from using force in ways that violate their

own written policies and clearly established Ninth Circuit law. (ER-45–7.) The injunction "does not prohibit Defendants from otherwise lawfully arresting anyone and using otherwise lawful force in effectuating that arrest if they have probable cause to believe a crime being committed." (1-SER-17.) It "does not prevent [Defendants] from dispersing any individuals obstructing federal property or otherwise engaging in unlawful activity"—whether they are identified as a journalist or legal observer, or not. (ER-42.) Nor does the order "outright *forbid* the use of crowd control weapons; [it] permit[s] them to be deployed under certain circumstances and against certain individuals." (1-SER-17.) Moreover, "[w]hen such deployment is permitted under the injunction, as when an individual poses a threat of imminent harm to a person," the order provides that Defendants "shall not be liable for violating this injunction if a protestor, journalist or legal observer is incidentally exposed." (1-SER-17.)

### 3.    Stay Proceedings

On September 19, Defendants filed a Notice of Appeal and an *Ex Parte* Application to Stay Preliminary Injunction Pending Appeal in the District Court. (2-SER-65.) After Plaintiffs submitted their opposition to Defendants' stay motion in this Court, the District Court denied Defendants' stay motion below. (1-SER-3.)

In the order denying the stay, the District Court reiterated that it issued a preliminary injunction after "carefully review[ing] all of the evidence presented by

both sides in this action, including detailed and credible declarations from nearly 50 journalists, legal observers, and protestors; declarations from experts []; and declarations from top law enforcement officials." (1-SER-4.) The District Court emphasized that the preliminary injunction was based on "the Court's extensive credibility determinations and factual findings" after "carefully reconstruct[ing] events" at the protests presented in the record, "relying on declarations submitted by Plaintiffs and Defendants, and photos, videos, maps, and reports contained therein." (1-SER-4–6; *see also* ER-3.)

The District Court also revisited Defendants' workability arguments, while noting they were substantially "identical to those raised by the Defendants at the preliminary injunction stage" and unpersuasive for the same reasons. (1-SER-16.) The District Court found that Defendants' workability concerns were based on "speculation" and were shown by Mr. Kerlikowske's declaration and the Ninth Circuit's decision in *Index* to be "overblown." (1-SER-17 (citing 3-SER-492; 3-SER-454; 2-SER-104.) It found there was no evidence of any "instance post-dating the issuance of the PI Order in which it actually proved unworkable and resulted in harm to Defendants." (1-SER-17–18.) However, in response to Defendants' arguments, the District Court made modifications to its order to clarify how a person shall be identified as a journalist by the terms of the order and to provide a

safe harbor for unintentional violations of the preliminary injunction's access protections for legal observers. (1-SER-16–17.)

## SUMMARY OF ARGUMENT

The District Court correctly held that Plaintiffs are likely to prevail on the merits of their First Amendment right-of-access and retaliation claims, that Plaintiffs would face irreparable injury without an injunction, and that the balance of equities and public interest militated in favor of Plaintiffs. It did not abuse its discretion by requiring Defendants to comply with the same terms this District Court approved of in *Index* and with their own use-of-force policies.

*First*, the District Court's order is grounded in findings of fact based on Plaintiffs' voluminous and largely unrebutted evidence. Those findings are not clearly erroneous: Defendants have engaged in a sustained pattern of officially sanctioned conduct that subjects Plaintiffs to an ongoing threat of harm, and Defendants' repeated acts of violence against Plaintiffs imposed ongoing chill on their First Amendment exercise. Defendants injured Plaintiffs multiple times while they were engaged in innocent reporting and protest activities, which Plaintiffs intend to continue at the very protests where Defendants maintain their official pattern of retaliatory violence and their policy of denying journalists and legal observers access. Accordingly, Plaintiffs have standing.

14

*Second*, the District Court did not clearly err in finding that Defendants repeatedly denied the journalist and legal observer Plaintiffs access to report on public protests against DHS actions from city streets and sidewalks. The District Court did not abuse its discretion in finding that Defendants' policy of violently driving away reporters and legal observers whenever they decide to disperse a protest is not essential to maintain public safety or narrowly tailored to achieve an overriding interest. Plaintiffs' right-of-access claims are identical to the claims in *Index*, and Plaintiffs are likely to prevail for the same reasons.

*Third*, the District Court did not commit clear error in finding a policy or custom of retaliation based on the "avalanche of evidence" showing Defendants repeatedly attacking non-violent individuals and reporters who were deliberately standing far apart from crowds, combined with federal officials' statements encouraging and approving this conduct.

*Fourth*, the District Court did not abuse its discretion in concluding Plaintiffs would suffer irreparable harm absent relief. Any First Amendment deprivation is an irreparable harm. The profound intimidation here—where Plaintiffs face serious injury or death for exercising their First Amendment rights—easily satisfies that standard.

*Fifth*, the District Court did not abuse its discretion in the scope of relief that it issued because it carefully tailored the injunction to be only as broad as

15

necessary to provide complete relief to the named plaintiffs, and it correctly found, based on ample evidence, that the injunction is workable and safe for law enforcement. Moreover, the injunction tracks Ninth Circuit law and Defendants' own policies.

*Sixth*, the balance of equities and public interest support the relief the District Court issued. Peaceful protest and the free press are cornerstones of our democracy. Preventing Defendants from repressing dissent about their own conduct is an especially critical check on government power because Defendants have been publishing their own narrative about the important events at issue.

## STANDARD OF REVIEW

This Court reviews a preliminary injunction for abuse of discretion. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc*., 736 F.3d 1239, 1247 (9th Cir. 2013). A district court abuses its discretion only where it applies the wrong legal standard or makes "a factual finding that [is] illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id*. at 1247 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc) (defining the "significantly deferential test" for determining if district court made a "clearly erroneous finding of fact")). If "the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result

16

if it had applied the law to the facts of the case." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003).

## ARGUMENT

### I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN HOLDING THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### A. Plaintiffs Have Standing To Seek Prospective Relief

Over the five weeks before the preliminary injunction, at 12 different locations, Defendants sustained a pattern of conduct that repeatedly injured Plaintiffs in brutal, chilling ways detailed by the District Court. (ER-25–26; ER-32.) Defendants do not disavow this conduct, nor dispute that it continues to chill Plaintiffs' First Amendment exercise. They simply argue that the District Court should have ignored the mountain of evidence showing a continuing pattern of officially sanctioned, retaliatory violence targeting Plaintiffs, their members, and others reporting and demonstrating at protests against DHS raids, when assessing Plaintiffs' standing to seek an injunction protecting their First Amendment rights to report and demonstrate at those very protests.[1] (AOB at 16-17.)

---

[1] Defendants do not meaningfully challenge Plaintiffs' standing for their right-of-access claims, inaccurately asserting they are the same as Plaintiffs' retaliation claims. (AOB at 26.) Defendants effectively admit to a policy of denying press and legal observers access to public streets and sidewalks to report on protests they wish to disperse. (AOB at 28-29.) As Defendants acknowledge, such "an 'unwritten policy' of 'officially sanctioned'" conduct demonstrates a threat of

Under binding precedent, however, Defendants' recurrent misconduct is directly relevant to Plaintiffs' standing in two ways. First, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," and a plaintiff facing such a threat has standing. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164, 167 (2014). Second, past conduct establishes a plaintiff's standing when it causes them "continuing, present adverse effects." *O'Shea*, 414 U.S. at 495-96.

The District Court found that the evidence showed both. (ER-25 (quoting *Villa v. Maricopa Cnty*., 865 F.3d 1224, 1229 (9th Cir. 2017) (quoting *O'Shea*, 414 U.S. at 495–96; *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); ER-27–28 (finding continuing, present adverse effects on Plaintiffs' First Amendment exercise); ER-25–27 (finding non-speculative risk of recurrent injury); 1-SER-7 ("This Court found that Plaintiffs established standing on both bases").) The Court's findings on both bases distinguish this case from *Lyons*, where the District Court never made "a specific finding of likely recurrence," *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985), and where there was no ongoing First Amendment injury, as there is here, establishing "continuing, present adverse effects." *See Index*, 977 F.3d at 826.

---

recurrence sufficient to establish standing. (AOB at 18 (citing *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014)).)

### 1. The Record Establishes a Real Threat of Repeated Injury

This Court "will affirm a district court's ruling on standing when the court has determined that the alleged threatened injury is sufficiently likely to occur, unless that determination is clearly erroneous or incorrect as a matter of law." *Mayfield v. U.S.*, 599 F.3d 964, 970 (9th Cir. 2010). Defendants do not dispute that as a matter of law, Plaintiffs may establish standing based on a "realistic[] threat[]" of repeated injury. *Lyons*, 461 U.S. at 106. Their argument boils down to a challenge to the District Court's factual finding that the evidence shows such a threat. But Defendants cannot show that the court's finding was "without support" from the record, as necessary to establish it was "clearly erroneous." *Hinkson,* 585 F.3d at 1262-63.

The District Court's finding of a likelihood of repeated injury was based on extensive evidence showing Defendants repeatedly injured Plaintiffs as part of an "ongoing, sustained pattern" of officially sanctioned behavior that "persisted for weeks and was ongoing." (ER-25–26 (quoting *Index*, 977 F.3d at 836)). The Court specifically based its conclusion on the fact that DHS officers injured multiple Plaintiffs on more than one occasion in similar ways. (*Id.* (citing declarations of Plaintiffs Mena (ER-189–94) (shot by pepper ball and rubber bullet on two separate occasions); Beckner-Carmitchel (ER-184, 4-SER-662) (hit by tear gas canister and pepper ball at two different protests); Ray Decl. (4-SER-628, 630)

(shot at with pepper balls on two occasions, and struck repeatedly along with other journalists the second time).)

The court's finding was further supported by additional declarations from other journalists, including members of Plaintiffs LA Press Club and other protesters and legal observers, repeatedly injured by the same pattern of conduct. (*See, e.g.,* ER-10 (photojournalist struck in cheek by pepper ball then struck in shin with rubber bullet fired by DHS officers one day, and "shot in the back with rubber bullets ***three times***" by DHS on a different day) (emphasis original) (citing 4-SER-654–56); ER-149 (LA Press Club member shot with pepper ball, then shot again in the back with projectile later that evening by DHS agents); 3-SER-599–600 (legal observer teargassed and later the same evening hit in the foot by a pepper ball while observing protest).)

This evidence of repeated injury to the same individuals provides robust support for the court's finding of likely recurrence and distinguishes this case from *Lyons*. *See Index*, 977 F.3d at 826 (plaintiffs had standing to seek injunctive relief where, "[u]nlike Lyons, the district court found that some journalists and legal observers monitoring the protests had been injured by the Federal Defendants more than once."); *accord*, *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir.1992); *see also Wooley v. Maynard,* 430 U.S. 705, 712 (1977) (plaintiff injured three times showed a threat of recurrence that established standing).

The District Court also correctly reasoned, as Defendants concede (AOB at 18), that a plaintiff can demonstrate a sufficient threat of repeated injury by showing their harm was part of a "pattern of officially sanctioned … behavior," even if there is no written policy authorizing that behavior. (ER-25 (citing cases); *see also* ER-36 (a "policy or custom of retaliation 'may be inferred [from] 'widespread practices or evidence of repeated constitutional violations' and the absence of evidence that [] officers were discharged or reprimanded' for retaliatory actions") (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).) The court found that Defendants injured Plaintiffs pursuant to such a pattern, based on an "avalanche" of evidence from multiple protests showing DHS "agents acted pursuant to a common and widespread practice," and DHS officials' statements ratifying the agents' conduct at those protests. (ER-35; *see also* ER 25.)

These findings further distinguish this case from *Lyons*, where the Supreme Court "pointed to the absence of 'any [record] evidence showing a pattern of …behavior,' and 'expressly noted the absence of any written or oral pronouncements by [defendants] sanctioning' the challenged conduct." *LaDuke*, 762 F.2d at 1324 (observing "[t]he Supreme Court has repeatedly upheld the appropriateness of federal injunctive relief to combat a 'pattern' of illicit law enforcement behavior," collecting cases).

21

Defendants' claim that the District Court found a pattern of conduct based on "at most … a handful of episodes ... at only a few specific protests" misstates both the court's order and the record. (AOB at 19.) The court's order meticulously detailed—based on review of numerous declarations—Defendants' pattern of conduct at more than **twelve** protests in the Los Angeles region persisting over five weeks, including numerous episodes of retaliatory force that took place at each. (*See, e.g.,* ER-11–2; ER-16–17).) Defendants cite no authority for their contention that this quantum of evidence is so insufficient that the court's finding of a pattern is clearly erroneous; in fact, their argument is directly contradicted by a wall of authority set forth above addressing review of a district court's factual findings and legal conclusions on the appeal of a preliminary injunction.[2]

The court found it was likely this pattern would continue to threaten Plaintiffs with repeated injury based not only on Secretary Noem's multiple statements "ratify[ing] Defendants' practice of meeting First Amendment protected activities with force" (ER-36), but also on an official DHS memo (3-SER-410); the fact that Defendants' pattern of conduct continued despite their assurances to the

---

[2] Defendants argue that DHS agents did not fire their weapons at two protests. (AOB at 10.) At one, agents brandished weapons at LA Press Club members on two different occasions, when they attempted to record agents' interactions with protesters. (ER-15.) At the other, agents pushed press off a public sidewalk, denying one of the same LA Press Club members access to report. (*Id.*) This does not show the court's finding of a pattern of retaliation is clear error.

Court that it would not (ER-39); Defendants' statements that their past attacks on Plaintiffs were consistent with agency policy; and their refusal to recognize the wrongful nature of those attacks. (ER-26; ER-39). *See Gomez v. Vernon,* 255 F.3d 1118, 1127 (9th Cir. 2001) (failure to take remedial steps to acknowledge or correct violations supported finding of a policy or custom of retaliation); *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("failure to disavow" challenged conduct weighs "in favor of a finding of standing"). The court properly assessed this evidence and the factors outlined in *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989), to determine it was likely that Defendants would harm Plaintiffs again. (ER-39–40). As in *Index*, the District Court's detailed analysis of these factors to find a realistic likelihood of recurrence supports Plaintiffs' standing. 977 F.3d at 826-27.

The court also found Plaintiffs face a real threat of being injured again by Defendants' conduct, because the specific protests where Defendants maintain an unwritten policy of firing indiscriminately at protesters, journalists, and legal observers are ongoing—and Plaintiffs "intend to continue to be present" at *those very protests*.[3] (ER-27 n.14; *cf. Porter v. Martinez*, 68 F.4th 429, 437 (9th Cir.

---

[3] Defendants contend that even if they have such a policy, Plaintiffs are unlikely to be injured again, because they will not attend all the protests where such force is used. (AOB 19-20.) This argument is a logical fallacy. It is undisputed that Plaintiffs plan to attend some protests, so the relevant question is how likely DHS

2023), *cert. denied*, 144 S. Ct. 1007 (2024) (concrete plan to engage in targeted conduct supports finding standing).) It further found that "[u]nlike in *Lyons*— where plaintiff could avoid further injury by 'avoid[ing] . . . illegal conduct'— Plaintiffs were injured engaging in innocent activities." (ER-26–27 (citing *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999); *Spencer v. Kemna*, 523 U.S. 1, 15 (1998)).) Defendants do not meaningfully contest these findings, which establish that this case is unlike *Lyons*, where the future harm was predicated on law enforcement's encountering plaintiff at "the wrong place at the wrong time" and stopping or arresting him based on individualized suspicion of a crime—a "string of contingencies" that is not at issue here. (*See* 1-SER-7–8 (distinguishing *Lyons* and *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025)).)

### 2. Plaintiffs Have Standing Based on the Continuing, Present Chilling Effects of Defendants' Conduct

The District Court also found that Defendants' pattern of conduct caused continuing, present chilling effects on Plaintiffs' First Amendment exercise— establishing a separate basis for standing. (ER-27–28; 3-SER-490; 3-SER-525; 3-

---

is to use retaliatory force at whichever protests they attend. If DHS has an officially-sanctioned practice of using retaliatory force at protests of its immigration operations—as the evidence and the District Court's findings show— the likelihood that DHS will use such force at a given protest attended by Plaintiffs is sufficiently real and immediate to establish standing. *Nordstrom,* 762 F.3d at 911; *LaDuke*, 762 F.2d at 1324.

24

SER-437).) Unlike the injuries alleged in *Lyons* and *Updike v. Multnomah Cnty.*, 870 F.3d 939 (9th Cir. 2017), these First Amendment injuries are ongoing. (*See* 1-SER-9–10 ("[B]oth the Ninth Circuit and Supreme Court have made clear that the standing analysis differs for First Amendment injuries") (citing *Susan B. Anthony List*, 573 U.S. at 154-55, 158-67; *Index*, 977 F.3d at 826).)

Defendants do not challenge the District Court's finding that the injuries they inflicted on Plaintiffs caused continuing chilling effects. Defendants merely argue, against a long line of this Court's and Supreme Court authority, that such chilling effects are not cognizable injury that can establish standing. (AOB at 20; *see, e.g., Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury.").)

Defendants' reliance on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013), is unavailing, because that case addressed whether plaintiffs could establish a concrete injury-in-fact to establish standing based on *subjective chill alone*, without evidence the plaintiffs had ever been harmed by the challenged government action. Here, in contrast, it is undisputed that Defendants' action caused Plaintiffs "concrete, particularized, and actual injury," for example, traumatic brain injuries caused by DHS agents shooting them in the head. *Clapper*, 568 U.S. at 409 (ER-30–31.) The District Court found that Plaintiffs' chill traces

directly to these injuries; it was not "manufactured" or "self-inflicted" as Defendants callously suggest. (*See, e.g,* ER-28 n.15 (discussing chilling effects on Plaintiff Mena's reporting caused by Defendants' shooting her on two separate occasions); *see also id.* at 31.) As *Clapper* acknowledges, the Supreme Court has repeatedly held that chilling effects "fairly traceable" to government action give rise to standing to assert a constitutional claim. 568 U.S. at 417-18 (citing *Laird v. Tatum,* 408 U.S. 1, 11 (1972)).

### 3. The Organizational Plaintiffs Have Standing

The plaintiff organizations have associational standing based on the standing of their members repeatedly denied access, injured and chilled by Defendants' officially sanctioned pattern of retaliatory force. (ER-28.) Moreover, the District Court made specific factual findings about how Defendants' conduct interfered with the plaintiff organizations' core business activities, and Defendants have not argued or shown that those findings were clearly erroneous. (ER-29 n.16 (citing 3-SER-529–31 (describing how DHS actions have frustrated the LA Press Club's longstanding efforts to expand press rights and to fundraise to maintain its programming); 3-SER-401, 404 (describing how DHS actions have frustrated NewsGuild's preexisting efforts to advance journalists' economic interests and working conditions, including by postponing National Labor Relations Act representative responsibilities).) These findings satisfy organizational standing

requirements. (ER-28 (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987 (9th Cir. 2025))

Defendants misstate the District Court's alternative basis for determining that the plaintiff organizations have standing. (AOB at 12.) As set forth above, their standing is not based on money they diverted to oppose Defendants' policies, but on how Defendants' attacks on their members have interfered with their core business activities and frustrated their missions.

### B.    The District Court Did Not Abuse Its Discretion in Concluding Plaintiffs Are Likely to Prevail on Their Right-of-Access Claims

The District Court correctly held that Plaintiffs are likely to prevail on their right-of-access claims under *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1 (1986) ("*Press-Enterprise*"). Under *Press-Enterprise*, the Court examines: (1) whether the place and process to which Plaintiffs seek access have historically been open to the press and general public, and (2) whether public access plays a significant positive role in the functioning of the process in question. 478 U.S. at 8-9; *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012); *Index*, 977 F.3d at 829-30. If so, then Plaintiffs have a right of access, and the government may overcome it only by showing "that it has 'an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Index*, 977 F.3d at 829 (quoting *Press-Enterprise*, 478 U.S. at 9).

27

### 1. Public Streets, Sidewalks, Parks and Protests Have Traditionally Been Open to the Press and the Public

The District Court found that Defendants denied Plaintiffs access to report from "public streets and sidewalks, 'the archetyp[ical] … traditional public forum.'" (ER-37 (quoting *Index*, 977 F.3d at 829 (citing *Press-Enterprise*, 478 U.S. at 8).) Defendants present no evidence or authority showing the District Court abused its discretion in making this determination.

Defendants argue that the right of access does not apply to "officers' attempt to control a violent protest" (AOB at 27) and that "there is no tradition of public access to violent protests." (*Id*. at 28.) This is the same incorrect argument they made, and this Court rejected, in *Index*. As this Court explained, in upholding an injunction that prohibited DHS from dispersing journalists and legal observers after the Portland police had declared an unlawful assembly, "Portland's streets and sidewalks—and the process—public protests and law enforcement's response to them—have historically been open to the public." *Index*, 977 F.3d at 830 (citing *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).

Defendants' circular argument is that by unilaterally declaring a riot, they can transform a public forum or process into something else, thereby eliminating

Plaintiffs' right of access.[4] But a "court cannot rubber-stamp an access restriction

simply because the government says it is necessary," *Leigh,* 677 F.3d at 900, and

that is not how the *Press-Enterprise* analysis works. For example, in rejecting

Defendants' same argument in *Index*, this Court did not look at whether plaintiffs

had a right to access an unlawful assembly; it looked to the more general activity

of a protest. 977 F.3d at 830.[5]

Similarly, in *Press-Enterprise*, the Supreme Court did not examine the right

to attend closed hearings, it examined the right to attend preliminary hearings. 478

---

[4] The danger of this argument is evident here, where the District Court rejected
Defendants "baseless accusations" that Plaintiffs were engaged in violent riots
(ER-30); where the court found that Defendants violently dispersed journalists and
legal observers who were not "even proximate" to any violence (ER-41); where
Defendants' assertions that they were responding to violent riots are disproven by
video evidence in the record (2-SER-152; 2-SER-155; 2-SER-158); and where,
despite all this, Defendants continue to repeat in every filing, including this one,
the same mendacious claim that Plaintiffs sought and seek participation in "violent
protests."

[5] Defendants argue *Index* is not precedent (AOB at 20), but this Court has
repeatedly cited and incorporated *Index* as precedent. *See, e.g., Sanderlin v. Dwyer*,
116 F.4th 905, 910-11 (9th Cir. 2024); *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th
1109, 1115, 1121 (9th Cir. 2023). The case Defendants rely on, *East Bay Sanctuary
Covenant v. Biden* ("*EBSC*"), 993 F.3d 640, 656 (9th Cir. 2021), addressed whether
a decision by a motions panel is law of the case for a later merits panel in the same
case. It does not negate that published motions panel decisions are "binding circuit
authority." *Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001). Moreover, the
district court *did* cite *Index* for "pure question[] of law" already settled by "binding
authority" (AOB at 21 (citing *EBSC*, 993 F.3d at 661 n.3)), including whether the
right of access attaches to protests taking place off of federal property, on public
streets and sidewalks. 977 F.3d at 830-31.

U.S. at 10. In *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, the Supreme Court looked at the right to attend trials, not the right to attend closed trials. 457 U.S. 596, 605 (1982). And in *Leigh*, this Court did not look at the right to access federal property that the government had closed off to conduct horse roundups; it looked more generally at the right to monitor the government's enforcement actions. 677 F.3d at 900 (examining "the vital public interest in preserving the media's ability to monitor government activities"). Defendants can cite no case applying *Press-Enterprise* that has adopted their approach.

Defendants also argue the injunction "grants the press a special First Amendment immunity to dispersal orders and the use of crowd-control devices that the public does not possess." (AOB at 27.) This Court rejected the same mischaracterization in *Index*, explaining: "Federal Defendants reframe the issue and mischaracterize the preliminary injunction as recognizing a special, across-the-board exemption for members of the press and legal observers." 977 F.3d at 829.[6] As this Court held, "the threshold issue presented is whether plaintiffs have a constitutionally protected right to access the public forum where the protests are staged, and as the District Court observed, the preliminary injunction does not afford plaintiffs any special rights beyond those enjoyed by the general public

---

[6] Defendants fail to register that *Index* addresses the access rights of legal observers as well as press. (AOB at 27 n.2.)

pursuant to the First Amendment." *Id*.; *see also Leigh*, 677 F.3d at 900 (District Court erred by "focusing mostly on its conclusion that Leigh was not treated differently than other members of the public, a consideration that is not part of the [*Press–Enterprise*] balancing test"). As in *Index,* the injunction reflects not a "special exemption to the press," but the District Court's finding that "dispersing the press was not essential to protecting the government's interests." 977 F.3d at 831.

### 2. Public Access Plays an Important Role in Holding the Government Accountable

Defendants offer little challenge to the second prong of *Press-Enterprise*, but suggest that there is nothing redeemable about having the press cover a protest that supposedly "turns violent." (AOB at 26.) This is inaccurate. The press plays a "vitally important role" in this process by acting as surrogates for the public. *Index*, 977 F.3d at 831; *Leigh*, 677 F.3d at 900; *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (public access to government operations "not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally."); ER-37 (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490-91 (1975); *Leigh*, 677 F.3d at 900).

### 3. The District Court Did Not Commit Clear Error in Finding that Defendants' Blanket Dispersal Policy Is Not Narrowly Tailored to Preserve an Overriding Government Interest

Defendants make little effort to contest the Court's findings that they failed to show dispersing reporters and legal observers is "narrowly tailored" to serve an "overriding government interest." *Press-Enterprise*, 478 U.S. at 9. They admit that they do not exempt reporters and legal observers from dispersal orders or blanket deployments of sweeping force regardless of whether they create any danger to law enforcement. (ER-94.)

Under *Press-Enterprise*, Defendants can only defeat Plaintiffs' right of access by proving that the restriction they impose is "narrowly tailored to serve" an "overriding interest based on findings that closure is essential to preserve higher values." 478 U.S. at 830 (quotation omitted). The District Court correctly found that the government had not adduced evidence to meet its burden under the last prong of the *Press-Enterprise* analysis,[7] whereas Plaintiffs offered "convincing[]" evidence showing that DHS's use of violence to disperse journalists and legal observers was *not* essential or narrowly tailored. (ER-3–39 (citing *Index*, 977 F.3d at 832-33).) Defendants cannot show that the District Court committed clear error

---

[7] The District Court weighed the declaration of Matthew Harvey, CBP's Director of the Less-Lethal Training Branch, but noted that "while Harvey has expertise on CBP policy on the use of crowd control weapons," he did not have expertise about supervising police responses to protests, unlike Mr. Kerlikowske. (ER-22.)

in making a finding based on expert testimony from CBP's former commanding officer, whose testimony this Court accepted as "qualified, credible, and persuasive" in similar circumstances. *Index*, 977 F.3d at 833.

Defendants ask this Court to make a different factual finding than the District Court (AOB at 28), misapprehending the nature of this Court's review. To do so, they point to a sum-total of three citations to their declarations, none of which show that violently denying press and legal observers access to report from city streets and sidewalks on protests that DHS is dispersing is essential or narrowly tailored:

First, they quote a portion of the declaration of a Federal Protective Service official that states: "FPS officers are frequently called upon to prevent the imminent destruction of federal property or harm to federal officers. The most effective crowd control techniques in those situations are those that use chemical irritants to temporarily incapacitate the individuals attempting to cause harm and force them away from the facility." (AOB at 29 (citing ER-95).) This statement provides no support for the argument that dispersing journalists and legal observers reporting on protests from city streets and sidewalks is essential or narrowly tailored, nor does it justify Defendants' practice of attacking journalists and legal observers who are not near any threat, much less engaged in causing harm

33

themselves (ER-36)—and simply because something is "most efficient" does not mean that it is tailored in any way.

Defendants then cite two statements by a CBP weapons trainer concerning the portions of the injunction that address Defendants' misuse of crowd control weapons and failures to give warnings before deploying force (AOB at 29 (citing ER-117–18).) They, too, say nothing to support the contention that "targeting journalists—standing far apart from protestors, let alone any violent actors" with crowd control weapons to disperse them from reporting on protests is essential or narrowly tailored. (ER-38.) Though Defendants contend that "many crowd-control devices … may collaterally affect persons in a crowd" (ER-118), they ignore that the same paragraph of the CBP trainer's declaration states the agency trains agents to circumscribe their use of such devices due to the "possible collateral harm," and they do not address the existence of other, more narrowly tailored crowd-control options.

The remainder of Defendants' arguments are not based on any evidence and were not presented below, so they cannot be grounds for reversing the District Court. To the extent the Court even considers these waived arguments, they lack merit.

First, Defendants claim that the City of Portland found the injunction that this Court approved in *Index* was unworkable. (AOB at 31.) This argument ignores

the unrefuted evidence that was actually in the record of that case, which is that (1) the City of Portland followed the injunction in *Index* for years without any injury or danger to law enforcement (ER-38–39), and (2) the injunction was so safe and workable that the Portland police adopted the terms of the injunction from *Index* as its permanent policy. (*Id.*) The snippet from the District Court's decision in *Index* that Defendants only partially cite also rejected their argument. It states: "The Federal Defendants argue that this is 'proof' that the preliminary injunction is 'unworkable.' Whether the City might request a modification at some point in the future, however, is not evidence of unworkability." *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1148 n.11 (D. Or. 2020). That the City of Portland never sought to modify the injunction and enshrined it in law only further refutes Defendants' workability arguments. This argument that they never presented to the District Court does not somehow establish that the District Court committed clear error by finding that Defendants failed to carry their burden of proving narrow tailoring.

Second, Defendants assert that Mr. Kerlikowske was not personally familiar with protests similar to those in the Los Angeles area and fault him for basing his testimony on the uncontradicted declarations, videos, and photographs in the record. (AOB at 30.) These arguments lack merit. Mr. Kerlikowske has 52 years in law enforcement for both state police, the United States Army, Department of

35

Justice, and Customs and Border Protection. (3-SER-494.) He is internationally consulted for his expertise on law enforcement at protests. (3-SER-515–21.) As Chief of Police in Seattle, he "led and orchestrated the policing of hundreds of large and potentially volatile protests, many of which were larger than the recent protests in Los Angeles." (3-SER-494.) Unlike Defendants' "fact" witnesses, whose testimony exclusively comprised recounting hearsay from unnamed individuals, Mr. Kerlikowske reviewed a wide array of declarations and video evidence in the record, like any expert would. (2-SER-104–09; 3SER-460–61; 3-SER-497–98.) It was not clear error to credit his testimony, as both the District Court and this Court did in *Index*, 977 F.3d at 833, 836.

Defendants next argue that the District Court erred in finding there was no sufficient justification for targeting journalists with crowd-control devices, because it attributed to the agency a retaliatory motive. But retaliatory motive is not an element of a right-of-access claim, and the court's finding is directly relevant to show Defendants' dispersal tactics against the press are not essential or narrowly-tailored, regardless of any question of motive.

Finally, Defendants urge this Court to reweigh all the evidence below, citing *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 791-92 (9th Cir. 2006) for the proposition that mixed questions of law and fact under the First Amendment are subject to de novo review. (AOB at 30.) This argument is incorrect. *See*, *e.g.*,

*Index*, 977 F.3d at 834 (citing *Walters v. Reno*, 145 F.3d 1036, 1047 (1998) ("The dissent faults us for deferring to the district court's findings, but that is precisely what our precedent requires."). A district court's factual findings in striking down a rule that violates the First Amendment are reviewed for clear error. *Daily Herald Co. v. Munro*, 838 F.2d 380, 383-86 (9th Cir. 1988) ("When the government challenges the district court's holding that the government has unconstitutionally restricted speech, on the other hand, we review the district court findings of fact for clear error.").

### C. The District Court Did Not Abuse its Discretion in Holding that Plaintiffs Are Likely to Prevail on their First Amendment Retaliation Claims

Based on the overwhelming evidence in the record, the District Court correctly held that Plaintiffs were likely to prevail on their retaliation claim. Plaintiffs submitted over 40 unrebutted declarations showing that DHS repeatedly assaulted protesters, journalists, and legal observers when they posed no danger to law enforcement, shot people in the head, back and upper torso, assaulted people who were far away from crowds, misused crowd-control weapons, and violated their own written policies. Plaintiffs also submitted direct evidence of retaliation, including public statements by federal officials in which they expressed retaliatory animus and unrebutted expert testimony that Defendants had repeatedly misused crowd-control weapons and deployed excessive, unnecessary, and indiscriminate

force. Defendants submitted no evidence to contradict any of this testimony or show that they had investigated any of the incidents Plaintiffs described.

To state a First Amendment retaliation claim, a plaintiff must show (1) that he or she was engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999). The third element can be established by direct *or* circumstantial evidence. *See, e.g., Index*, 977 F.3d at 827.

The District Court made seven pages of findings on retaliation and found that all the elements were met. (ER-29–36.) It held that Plaintiffs satisfied the first element because reporting, observing, and protesting are protected by the First Amendment, and found that Defendants' "accusations" that any of the Plaintiffs "participated in violent riots" was not supported by any evidence. (ER-30.) It found that Plaintiffs satisfied the second element of their retaliation claim because there was no dispute that "being subjected to rubber bullets, tear gas, pepper balls, and other crowd control weapons would deter individuals of ordinary firmness from continuing to engage in the protected activity." *Id*. And it also found, "[h]aving carefully reviewed each incident and Defendants' response, "that

38

Defendants' excessive and indiscriminate response evinces strong and persuasive evidence of retaliatory intent." *Id*. Its findings were correct.

In *Index*, this Court held that a similar record of unnecessary and excessive DHS violence constituted "exceptionally strong" evidence of retaliation." *Index*, 977 F.3d at 829. This Court further held that "misuse of crowd-control munitions" could be circumstantial evidence of retaliation. *Id*. at 828.

The record amply supports the District Court's inference of retaliatory intent based on the same types of evidence this Court cited in *Index*. DHS repeatedly and unnecessarily attacked protesters, journalists, and legal observers in ways that violate its own policies. (*See*, *e.g.*, ER-183-184; 3-SER-611–12, 614–15; 3-SER-539–41; 3-SER-548; 3-SER-604–05; 4-SER-627–30; 4-SER-654–55; 3-SER-544–45; 3-SER-523–25; 2-SER-291; 2-SER-137; *see also* 3-SER-462 ("My review of the materials I have seen shows that DHS appears to have engaged in widespread use of excessive and unnecessary force against journalists, legal observers and protesters.").)

The unrefuted evidence also shows that DHS agents assaulted multiple journalists while they were "standing to the side, not interfering with law enforcement" (ER-32 citing ER-190-94; ER-183-84; 4-SER-629-30; 4-SER-654-55) and that "Defendants deployed crowd control weapons even when crowds were already dispersing or attempting to comply with orders to disperse." (ER-33

39

(noting that it "is undisputed that Defendants lack *any* justification to fire crowd control weapons at individuals who are complying with orders to disperse").) The Court also relied on Mr. Kerlikowske's expert declarations opining that the violence documented in the record was unnecessary and excessive (3-SER-500–01)[8] and public statements by federal officials ratifying Defendants' conduct. (ER-36.) Thus, there was direct evidence of retaliatory intent in the record—even more than existed in *Index*.

In light of the countless incidents of unnecessary, indiscriminate, and excessive violence against people who posed no threat to law enforcement described in the unrebutted declarations and expert testimony, the direct proof of animus, and Defendants' failure to investigate any of these incidents, it was not wrong, much less clear error, to find that "Defendants do not—and cannot—proffer any innocent explanations for these incidents." (ER-32.)

Defendants offer two main arguments in response: (1) that the District Court erred by only relying on circumstantial evidence of intent and (2) that its findings on this point were unsupported. (AOB at 22.) Both arguments are incorrect.

---

[8] Mr. Kerlikowske also noted that DHS officers "have had extensive marksmanship training, and if an officer is firing projectiles … they are likely to hit their targets," (3-SER-501), further supporting the District Court's findings of intent.

40

### 1. Defendants' Argument that the District Court Committed Error by Only Relying on Circumstantial Evidence Is Legally and Factually Incorrect

Defendants' argument regarding circumstantial evidence is incorrect for two reasons. As a matter of law, retaliatory intent can be shown by circumstantial evidence alone. *Index*, 977 F.3d at 827. Moreover, the District Court relied on numerous statements by Defendant Noem as direct evidence of a retaliatory motive as well as an "avalanche" of circumstantial evidence. (ER-35–36 ("Moreover, the avalanche of evidence before the Court—*along with federal officials' statements*—suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." (emphasis added).)

### 2. The District Court Did Not Commit Clear Error in Finding Retaliatory Intent

Defendants fail to prove that the District Court's finding of retaliatory intent was wrong, much less clear error. Against all the evidence in the record, Defendants argue—without having done any investigation—that maybe "alternative explanations" account for DHS's excessive and indiscriminate use of force against Plaintiffs and others (AOB at 22-25.)

This argument does not come close to meeting the clear error standard, and the factual basis for Defendants' speculation is incorrect. Defendants claim that Plaintiffs Beckner-Carmitchel and Mena may have been "incidentally struck"

41

because they were in close proximity to crowds who were legitimate targets for pepper spray and tear gas. (AOB at 24-25.) However, Mr. Beckner-Carmitchel's unrebutted declaration establishes that he and Plaintiff Mena observed officers firing "less lethal" munitions at a group of protesters and then actively sought safety at least 20 feet away from the protesters that the officers were attacking. (ER-183.) Mr. Beckner-Carmitchel is a seasoned reporter who has been covering protests for many years and who understands how to position himself to observe law enforcement responses to protests while avoiding being hit with munitions. (*Id*.) He was nevertheless shot in the head, centimeters from his eye, with a tear gas canister while filming the encounter between officers and protesters. (*Id*.)

Mr. Beckner-Carmitchel's declaration is entirely consistent with Ms. Mena's declaration, in which she reports that she was with Mr. Beckner-Carmitchel when she too was hit in the head with a "less lethal" projectile fired by DHS officers that left her with a concussion. (ER-193–95.) Like Mr. Beckner-Carmitchel, Ms. Mena has covered many protests and has experience moving to places where she can safely observe confrontations between protesters and law enforcement while avoiding being hit by law enforcement munitions. (ER-190.) But, like Mr. Beckner-Carmitchel, Ms. Mena's best efforts to remain safe were futile even though she was clearly identifiable as a journalist, wearing multiple visible press credentials, writing notes in a notebook, and standing far from the protesters DHS

was firing upon when she was shot in Paramount. (ER-193–94.) Moreover, Ms. Mena and Mr. Beckner-Carmitchel were both shot by DHS on multiple occasions. (*See id*.; Er-190–92, 4-SER-663–64.) Under these circumstances, along with other evidence establishing a pattern of unnecessary violence (ER-35), the District Court did not commit clear error in not crediting Defendants' claim that they repeatedly and inadvertently shot these two Plaintiffs.

Even if this Court concludes that there was evidence in record to support Defendants' assertions that there are plausible "innocent" explanations for the multiple instances when Defendants hit experienced journalists with less lethal munitions while they were clearly identifiable as journalists and standing well away from protesters, that conclusion would not provide a valid basis for this Court to reweigh the evidence and conclude the District Court's findings were clear error. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.")

### 3. Defendants' Repeated Violations of Their Own Written Policies Are Only Further Evidence of Intent

Defendants also mistakenly argue that the district court committed clear error in finding that Defendants' pattern of retaliation was anything other than the actions of a few bad apples, because their written policies "expressly forbid officers from using excessive force." (AOB at 25.) As the District Court rightly

held, "Defendants may not avoid liability by pointing to a pristine set of policies." (ER-35 (citing *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) (quotations omitted)).)[9] That Defendants are repeatedly violating their own policies is only further evidence of retaliatory intent.

Defendants claim that the District Court pointed to only "a handful of isolated episodes," of possible retaliatory acts that could not amount to such a policy. (AOB at 19.) That is inaccurate. In rejecting Defendants' argument, the Court relied on "detailed and credible declarations from nearly 50 journalists, legal observers, and protesters averring that federal law enforcement agents used rubber bullets, pepper balls, tear gas, and other crowd control weapons on them at protests from June 6 through July 10, 2025" to conclude that unconstitutional uses of force by Defendants were "anything but isolated" and instead suggested that "federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protesters." (ER-4, ER-35, ER-39.)

The Court also properly concluded that "Defendant Noem ratified Defendants' practice of meeting First Amendment protected activities with force"

---

[9] Defendants concede Plaintiffs can prevail on their retaliation claims by establishing an unwritten policy of "officially sanctioned" retaliation. (AOB at 18 (citing *Nordstrom*, 762 F.3d at 911 (9th Cir. 2014) (quoting *LaDuke*, 762 F.2d at 1324.)).)

despite Defendants' assertion that this finding lacked support. (ER-36; AOB at 19.) To reach this conclusion, the Court relied on statements from the Secretary encouraging ICE officers to "come after" protesters for acts of "violence," which include "videotaping" officers performing their duties in public. (ER-36 n.28.) Defendants offer no way of interpreting these statements as anything other than endorsement of violent retaliation for protected First Amendment activity.

Moreover, while DHS may have policies on the books that prohibit using force to retaliate against people who are exercising their First Amendment rights, as Defendants say (AOB at 18), DHS offered no evidence that it assessed or investigated the actions of any of the officers who violated these policies, and the District Court rightly found that "'the absence of evidence that [] officers were discharged or reprimanded' for retaliatory actions'" can give rise to an inference of a "policy or custom of retaliation." (ER-36 (quoting *Menotti*, 409 F. 3d at 1148)). *See also Gomez*, 255 F.3d at 1127 (refusal to discipline officers who retaliated against people exercising First Amendment rights is "evidence of a policy or custom").

### 4. That Defendants' Conduct Also Violates the Fourth Amendment Does Not Preclude a First Amendment Retaliation Claim

Finally, contrary to Defendants' arguments (AOB at 2, 12, 26), simply because Defendants' unnecessary and excessive force violates the Fourth

Amendment does not preclude the District Court's determination that DHS used force as a method of First Amendment retaliation. In the context of a protest, misuse of force becomes a way to punish and deter protected speech. (ER-35); *see also Sanderlin*, 116 F.4th at 911-14 (shooting protester without justification sufficient to establish retaliatory intent for First Amendment violation); *Lozman v. Riviera Beach,* 585 U.S. 87 (2018) (unlawful seizure flowing from official retaliatory policy is basis for retaliation claim). As in *Index*, DHS's repeated use of excessive force on nonviolent individuals is strong circumstantial evidence of retaliation. *See* 977 F.3d at 827-28.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

The District Court correctly concluded that Plaintiffs will suffer irreparable injury in the absence of a preliminary injunction. As the Court found, Defendants' actions cause severe, lasting physical injuries and trauma. (ER-31.) Moreover, because the loss of First Amendment freedoms, "even for minimal periods of time, unquestionably constitutes irreparable injury," a party "can establish irreparable injury sufficient to merit the grant of [injunctive] relief by demonstrating the existence of a colorable First Amendment claim." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005). *See also Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009); *Index*, 977 F.3d at 837-38. The Court's extensive findings easily satisfy this requirement.

The Court found, based on careful review of declarations submitted by Plaintiffs and dozens of others, that Defendants' conduct was chilling the First Amendment exercise of Plaintiffs and other journalists, protesters, and legal observers. (ER-5, ER-28, ER-31.) "This chill on [Plaintiffs'] free speech rights…constitutes irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

The District Court recognized the nature of this harm when it concluded "that federal agents' indiscriminate use of force—targeting journalists standing far from any protest activity, launching scorching-hot tear gas canisters directly at people, and shooting projectiles at protestors attempting to comply with dispersal orders—will undoubtedly chill the media's efforts to cover these public events and protestors seeking to express peacefully their views on national policies." (ER-5.) The Court's careful review of the record left no room for doubt that DHS's "use of less-lethal, crowd control weapons have surely chilled speech" and would create irreparable harm in the absence of an injunction. *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1213 (W.D. Wash. 2020).

## III. THE BALANCE OF EQUITIES FAVORS PLAINTIFFS

The District Court correctly held that when, as is this case, Plaintiffs raise "serious First Amendment questions, . . . the balance of hardships tips sharply in

[their] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (citation omitted). (ER-40.) The District Court's holding is consistent with numerous holdings from this Court affirming the importance of preventing violations of First Amendment rights to protect the public interest. For example, this Court has repeatedly made clear that "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023)) (emphasis added); *see, e.g.*, *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). It has also "consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation omitted). And specific to the issues in this case, this Court has repeatedly recognized that the public's interest in protecting the First Amendment rights of reporters and protesters is especially strong. *See, e.g., Index*, 977 F.3d at 831; *Leigh*, 677 F.3d at 900; *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996). The District Court rightly relied on this line of cases to conclude that the balance of equities favors Plaintiffs. (ER-48.)

## IV. THE INJUNCTION DID NOT EXCEED THE DISTRICT COURT'S AUTHORITY

"A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction, and appellate review of those terms is correspondingly narrow." *Washington v. Trump*, 145 F.4th 1013, 1037-38 (9th Cir.

48

2025) (internal quotations omitted). That is because "[c]rafting a preliminary injunction is 'an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017)).

Defendants nevertheless argue that the injunction is "too broad" (AOB at 33), without offering a narrower version to the District Court (or this Court) that would provide complete relief to Plaintiffs. Merely speculating about harms they may suffer from the injunction's breadth without suggesting any alternative remedy is itself fatal to Defendants' challenge to the scope of the injunction the District Court issued. *Washington*, 145 F.4th at 1038 (rejecting challenge to injunction because Defendants failed to propose a narrower one).

In issuing the preliminary injunction, the District Court carefully weighed the evidence and arguments presented by both sides and issued a narrowed version of the injunction requested by Plaintiffs: the narrowest injunction that could provide them complete relief.[10] Defendants fail to show that the Court abused its discretion in crafting a tailored injunction that restrains Defendants only from

---

[10] In denying Defendants' motion for a stay, the District Court again carefully considered the evidence and the equities and further clarified its order to address Defendants' concerns. (1-SER-7–19.)

repeating the same actions that harmed Plaintiffs, and only within the geographic area where the named Plaintiffs' press coverage overlaps with the zone of DHS enforcement where Defendants are engaged in the specific pattern of official conduct that repeatedly injured Plaintiffs.

Defendants cite *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), in which the Supreme Court held that district courts may not issue "universal injunctions," but then tack on various workability arguments that have nothing to do with *CASA*. (AOB at 33-41.) Defendants' *CASA* argument is legally incorrect because the District Court did not issue a universal injunction, but rather an injunction tailored to provide relief to the named plaintiffs, and they fail to prove that the District Court committed clear error in finding that the injunction—which simply requires Defendants to follow their own use-of-force policies and access protections approved by this Court and safely adopted by jurisdictions across the country— was workable and safe.

## A. The District Court Issued an Injunction Tailored to Provide Plaintiffs Complete Relief

Defendants argue that the District Court violated CASA by failing to issue "a narrow injunction directing DHS to stop retaliating against those plaintiffs who

could establish their Article III standing." (AOB at 33.) [11] Article III standing is already addressed above, so what is left of Defendants' argument is that the injunction should have been limited to the named plaintiffs. [12] Defendants are incorrect because the injunction *is* tailored to specifically stop violations of the named plaintiffs' First Amendment rights, and their argument ignores this Court's holding in *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996).

The District Court exactly tailored the injunction to the harms Plaintiffs are suffering. Paragraph 1 prevents Defendants from unlawfully infringing the access rights of the press organization plaintiffs' members, and the named journalist and legal observer plaintiffs. Paragraphs 2 through 6 prevent Defendants from engaging in the precise type of retaliation documented in the record—subjecting Plaintiffs to unjustified violence and misusing crowd control weaponry through officially sanctioned patterns of conduct that violate DHS's own policies. (*See supra* p.46 (discussing *Sanderlin*, 116 F.4th at 911 and *Lozman*, 585 U.S. at 98-100).)

---

[11] Defendants mistakenly argue Plaintiffs' standing is based solely on retaliation claims. (AOB at 33.) As the District Court acknowledged, and Defendants fail to address, Plaintiffs also have standing to assert right-of-access claims—and the injunction provides relief tailored to those claims.

[12] Plaintiffs have filed an amended complaint asserting class-action claims. *See A.A.R.P. v. Trump*, 605 U.S. 91, 97 (2025) (per curium).

The injunction is also expressly limited to the press "coverage area of the individual journalist Plaintiffs and the organizational Plaintiffs" (ER-47), and only to the extent that their coverage area falls within the Central District of California, where the evidence shows Defendants' immigration raid operations, protests of those raids, and Defendants' violations of Plaintiffs' First Amendment rights are focused. (*Id.*) This scope is no broader than necessary to provide the named plaintiffs complete relief, because those plaintiffs and their members are undisputedly pursuing the First Amendment activities at issue across this coverage area (3-SER-448–49), and the District Court found Defendants were repeating the same pattern of injurious conduct against them across that area. (ER-25–26; *see also* ER-6–19.)

The District Court did not abuse its discretion in issuing an injunction that covered Defendants' conduct in the press coverage areas of named plaintiffs falling within the zone of the challenged pattern of conduct, rather than tailoring it to prevent repetition of harm to the named plaintiffs in some other way. This Court has held that it is permissible for a district court to issue a tailored injunction that is not limited to the plaintiffs by name, when defendants will likely be unable to determine whether a person is a named plaintiff or a member of an organizational plaintiff before taking action that would violate the injunction and injure them. *See Easyriders*, 92 F.3d at 1496.

Such is obviously the case here. LAPC has roughly 1,000 members and NewsGuild has roughly 26,000 members. (3-SER-528, 4-SER-621.) It would be impossible for DHS officers to determine whether a protester, legal observer, or journalist is a named plaintiff—or a member of LAPC or NewsGuild—before firing tear gas or shooting projectiles from a distance or indiscriminately into a crowd, which is the pattern of conduct that repeatedly harmed Plaintiffs and their members. By contrast, in *CASA,* the government could determine whether someone was a named plaintiff before deciding to deny a benefit or initiate immigration proceedings on the basis they fell within the scope of the Executive Order restricting birthright citizenship. Thus, an injunction that is tailored by geography, circumstances, and remedy rather than by name is necessary in this case to "provide complete relief to the named plaintiffs," and therefore is not an abuse of discretion. *Easyriders*, 92 F.3d at 1501.

### B. The District Court Did Not Commit Clear Error in Finding The Scope of the Injunction Workable

Defendants take issue with the workability of the injunction's terms but have not shown any abuse of discretion. They ignore that the injunction merely requires them to (1) follow the same terms this Court upheld in *Index* and (2) comply with their own use-of-force policies. They repeat arguments this Court rejected in *Index*, relying entirely on unsupported speculation by their own employees. That fails to carry their burden of proving that the District Court committed clear error in

53

finding, based on careful review of all the evidence, that the injunction's terms are safe and workable, or that it abused its discretion in the scope of relief that it ordered.

**1.  The District Court's Finding That The Injunctive Terms from *Index* Are Workable Is Not Clearly Erroneous**

The first paragraph of the injunction "mirrors the district court's injunction in *Index*[]." (ER-42.) Yet Defendants repeat the argument this Court rejected in *Index*, that in the heat of a protest, officers will be endangered by trying to figure out who qualifies as a journalist. (AOB at 35.)[13] They attempt to support this argument with speculation by federal agents, who lack experience in policing urban unrest (ER-22 n.8), but fail to prove the District Court committed clear error by making contrary findings based on Plaintiffs' expert's credible testimony and the absence of evidence supporting Defendants' speculative contentions. (ER-38–39; 1-SER-20; 1-SER-17–18.)

---

[13] *See* 977 F.3d at 834-36 (rejecting arguments that injunction was unworkable because it would "force federal officers to make snap judgments to distinguish journalists and legal observers from protesters," "hinder their ability to safely protect federal property and people on federal property, [or] generally place them in the untenable position of having to choose between risking their safety and violating the preliminary injunction," based on lack of evidence showing defendants suffered harm while operating under same TRO terms "or that the alleged confusion in distinguishing between protestors and plaintiffs resulted in any injury"; fact that Portland safely complied with similar terms; Mr. Kerlikowske's testimony; and the District Court's findings).

The Court correctly rejected Defendants' recycled workability theories for at least three reasons: First, Mr. Kerlikowske repeatedly oversaw protests in Seattle exceeding 50,000 people, where police did not disperse reporters or legal observers, and this practice did not endanger officers. (ER-19–20, ER-36 (citing 2-SER-112; 3-SER-468.) He opined that complying with the injunction should be safe for trained personnel. (*Id.*; 3-SER-456–57.) His testimony defeats speculation about what might happen by DHS employees whom Mr. Kerlikowske used to command, who lack such experience. (ER-22 n.8, ER-38; 2-SER-107.)

Second, Portland followed the same injunction for more than a year—including during 100 consecutive days of large, volatile protests in 2020—before adopting the terms of the injunction as law. (ER-38–39; 3-SER-503; 3-SER-468.) A California statute and many other courts have imposed similar requirements. (ER-43.) This unrebutted evidence, too, refutes Defendants' speculation.

Third, DHS, itself, operated safely under the same injunctive terms applying to reporters and legal observers. (2-SER-57.) In rejecting DHS's same arguments, this Court credited Mr. Kerlikowske's opinions that this injunction is "safe and workable for law enforcement," that "dispersing press and legal observers is not necessary to protect public safety, and … that trained and experienced law enforcement personnel can differentiate press from protesters in the heat of crowd control." *Index*, 977 F.3d at 836. As the District Court correctly found, and

Defendants do not dispute, they failed to offer any evidence that the injunction harmed any federal agent after it was issued. (1-SER-20.) Nor did they ever offer any evidence that any law enforcement officer was somehow injured by the injunction in *Index*. 977 F.3d at 836 (noting absence of evidence of such harm arising under substantially same terms of TRO).

Defendants postulate about hypothetical situations that have never occurred. For example, they argue that someone *might* use false press credentials or use journalists or legal observers as human shields. (AOB at 36.) But the District Court found there was no proof anyone actually did this, or that such hypothetical person ever harmed any federal agent during the pendency of the injunction now, or when DHS was under it in *Index*. (1-SER-17–18.) Moreover, the injunction would not restrain Defendants from arresting such a person and using reasonable force to do so, including less-lethal weapons, if the person posed an imminent threat of harm. (ER-45; 1-SER-17.)[14]

---

[14] Mr. Kerlikowske explained: "It appears that there were a few incidents where someone at the protest was engaged in a crime, but there is nothing in the proposed preliminary injunction to prevent such an individual from being arrested and charged." (3-SER-477.)

**2.     The District Court Did Not Commit Clear Error In Finding That Requiring Defendants to Comply with Their Own Policies Is Workable**

After reviewing all the evidence, including Plaintiffs' expert declarations, the declarations of DHS officials, and DHS's own policies, the District Court found that the specific practices barred by the preliminary injunction are "not necessary to restrain violent protestors," (ER-32; ER-33 n.23), or to protect federal property and public safety. (ER-38; *see also* 3-SER-454–86). It found, rather, that the enjoined practices "risk[] escalating tensions and further endangering both law enforcement and the public." (ER-42 n.31.) It found that the injunction's restrictions on the use of crowd control weapons are based on Defendants' own use of force policies (ER-42–3 (citing 2-SER-194, 196–98, 236) and that numerous major cities have issued similar restrictions on the use of crowd control weapons. (ER-42; *see also* Cal. Penal Code § 13652.) Defendants fail to show the District Court abused its "considerable discretion" by issuing a preliminary injunction based on these carefully considered findings. *Washington*, 145 F.4th at 1038.

Though Defendants argue that the injunction requires micromanagement or invites legal disputes, they fail to dispute that it simply requires them to act in accordance with their own policies and controlling constitutional law.[15] In other

---

[15] Defendants do not appear to challenge here the injunction's prohibition against shooting people in the head when deadly force would not be warranted.

words, though Defendants argue the injunction imposes "granular preconditions" on their use of crowd control weapons that interferes with their agents' ability to "act decisively" (AOB at 40), the injunction does not require agents to weigh considerations that they are not already bound by law and policy to consider when using force.[16]

For example, Defendants do not dispute that their own policies require them to give warnings "when feasible, prior to the application of force." (2-SER-182, 207.) Consistent with this policy, the injunction generally requires warnings before Defendants apply the types of force they have used to injure Plaintiffs—but not when there is a threat "so serious and imminent that a warning is infeasible." (ER-45.) Restraining Defendants' use of force in a manner consistent with their own policies was not an abuse of discretion because Plaintiffs aver they did not hear any warnings before Defendants attacked them (ER-12 (citing 3-SER-538–42, ER-188–200; 3-SER-522–27); ER-18–19 (citing ER-135–45)), and the District Court

---

[16] The preliminary injunction's terms are modeled on rules from case law and DHS policies that restrict officers' actions generally against all persons, including, but not limited to, journalists, legal observers, and protesters. Thus, the injunction does not require agents to determine whether an individual is a journalist, legal observer, or protester, as Defendants spuriously suggest (AOB at 35), before complying with its terms. In any case, Defendants can avoid any ambiguity about who is protected by simply instructing "DHS officers responding to a protest" to comply with the injunction's restrictions—which is precisely what the District Court ordered (ER-47), and what Defendants already did. (4-SER-736.)  Defendants produced no evidence in the stay proceedings showing these instructions proved unworkable.

found that such warnings are necessary to give Plaintiffs a reasonable opportunity to distinguish themselves from any "rioters," as Defendants demand they do. (ER-43.)

Similarly, Defendants complain that the injunction "drastically restricts" officers' ability to deploy crowd-control weapons when doing so could injure innocent journalists and peaceful protesters like Plaintiffs (AOB at 35-36), but fail to acknowledge that their own policies require them to consider collateral harm to bystanders, and to refrain from using force that could unreasonably endanger them. (2-SER-184, 207 (requiring DHS agents to use "safe tactics" to "minimize the risk of unintended injury"); *see also* 2-SER-196–98 (prohibiting use of crowd control weapons and requiring agents to consider other force options when vulnerable subjects such as children or elderly people are present).) They argue, instead, that they should not be constrained from using crowd control weapons to disperse or push back people engaged in speech they want to suppress, or from shooting nonthreatening people. (AOB at 37-38.) This failure to disavow conduct that violates clearly established law explains why injunctive relief is necessary and appropriate. *See Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) (police cannot shoot individuals with pepper balls for ignoring dispersal orders); *Sanderlin*, 116 F.4th at 911-15. Their arguments also contradict their own policies, which—like the preliminary injunction—limit use of the restricted crowd control

weapons to subjects engaged in aggressive or violent behavior likely to cause injury. (ER-40 (citing CBP policy).)

Defendants suggest that the injunction's restrictions on the particularly dangerous tactics they have wielded against Plaintiffs will invite "wanton destruction of federal property" and other crimes that do not involve threats against persons (AOB at 38), but the District Court rightly rejected this argument, holding: "[T]he PI Order does not prohibit Defendants from otherwise lawfully arresting anyone and using otherwise lawful force in effectuating that arrest if they have probable cause to believe a crime is being committed." (1-SER-17 (citing *Index*, 977 F.3d at 823, 835; *Collins,* 110 F.3d at 1373).)[17] As this Court has recognized, and Plaintiffs' expert testified, "the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Collins*, 110 F.3d at 1372 (citing *Cox v. Louisiana*, 379 U.S. 536, 551 (1965)). (1-SER-15; 3-SER-462.)

---

[17]*See also* 1-SER-17 ("the PI Order [does] not outright *forbid* the use of crowd control weapons; [it] permit[s] them to be deployed under certain circumstances and against certain individuals"); 3-SER-499 ("An individual who is the threat from hurling objects, or using fireworks as weapon, should be specifically identified. Any less-lethal projectile should be directed to them and not fired generally into the crowd.")

## V.    THE INJUNCTION IS IN THE PUBLIC INTEREST

In the context of preliminary injunctions, courts have "consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press*, 682 F.3d at 826 (quotation marks omitted); *Index*, 977 F.3d at 837-38.

Moreover, this Court has repeatedly emphasized the importance of protests and the press in our constitutional democracy. *Collins*, 110 F.3d at 1372 ("Courts have many times emphasized the importance of government's permitting the public to engage in spontaneous First Amendment activity, such as demonstrations, in response to controversial events."); *id.* at 1371 ("A function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.") (cleaned up); *Leigh*, 677 F.3d at 900 ("The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press.").

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm the District Court's order granting a preliminary injunction as modified in its order denying Defendants' motion for a stay.

Dated: November 18, 2025        Respectfully submitted,

**BRAUNHAGEY & BORDEN LLP**

By: _/s/   Matthew Borden_
          Matthew Borden

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 27(d)(2)(A) and 32(a)(5)-(6), and Circuit Rules 27-1(d) and 32-3, the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and contains 13,981 words.

Dated: November 18, 2025                Respectfully submitted,

**BRAUNHAGEY & BORDEN LLP**

By: */s/   Matthew Borden*
       Matthew Borden

*Attorneys for Plaintiffs-Appellees*