No. 25-5975

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

LOS ANGELES PRESS CLUB, *et al*.,

*Plaintiffs and Appellees*,

v.

KRISTI NOEM, *et al*.,

*Defendants and Appellants.*

_____

**On Appeal from the United States District Court
for the Central District of California**
No. 2:25-cv-05563
Hon. Hernán D. Vera, District Judge

_____

**BRIEF FOR STATES OF CALIFORNIA, COLORADO, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

_____

ROB BONTA
*Attorney General of California*
MICHAEL NEWMAN
*Senior Assistant Attorney General*

MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy Attorneys General*
JESSE BASBAUM
BRENDAN HAMME
*Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1515 Clay Street
Oakland, CA 94612
Telephone: (510) 879-0280
Jesse.Basbaum@doj.ca.gov

(*Additional counsel listed on signature page*)

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTERESTS OF AMICI CURIAE ...................... 1

ARGUMENT ................................................................................. 4

    I.     The District Court Correctly Recognized that Crowd-
Control Munitions Should Not Be Deployed
Indiscriminately or Prematurely .................................. 5

          A.    Crowd management is a complex, fast-moving, and
specialized form of policing .......................................... 5

          B.    Crowd-control munitions can pose a substantial
danger to human health and may unintentionally
escalate, rather than abate, public unrest ........................ 8

          C.    Crowd-control munitions should be used in narrow
circumstances and only after alternative measures
have been exhausted ...................................................... 12

          D.    The district court's preliminary injunction is
consistent with best practices ....................................... 13

    II.    The District Court's Order Provides Essential Protections
for Members of the Media ............................................... 15

          A.    Law enforcement must protect the freedom of the
press during civil unrest ............................................... 15

          B.    Media should be provided access to protests ................ 17

          C.    Members of the media should not be subject to
indiscriminate crowd-control measures or
intentional assaults ...................................................... 20

          D.    The district court's approach to identifying
journalists is consistent with best practices and case
law ............................................................................... 21

    III.    Defendants' Tactics Extend Beyond Los Angeles and
Threaten Harm to Protesters and Journalists Across the
Nation .......................................................................... 24

CONCLUSION ............................................................................ 27

# TABLE OF AUTHORITIES

**Page**

CASES

*Askins v. U.S. Dep't of Homeland Sec.*
899 F.3d 1035 (9th Cir. 2018) ......................................................15

*City & Cnty. of S.F. v. USCIS*
981 F.3d 742 (9th Cir. 2020) ...........................................................4

*Cox Broad. Corp. v. Cohn*
420 U.S. 469 (1975)........................................................................15

*Earth Island Inst. v. Elliott*
290 F. Supp. 3d 1102 (E.D. Cal. 2017) ...........................................4

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*
512 F.3d 1112 (9th Cir. 2008) .........................................................4

*Illinois v. Trump*
155 F.4th 929 (7th Cir. 2025) ........................................................27

*Index Newspapers LLC v. City of Portland*
480 F.Supp.3d 1120 (D. Or. 2020) ...........................................21, 22

*Index Newspapers LLC v. United States Marshals Serv.*
977 F.3d 817 (9th Cir. 2020) .............................................18, 20, 24

*Leigh v. Salazar*
677 F.3d 892 (9th Cir. 2012) .........................................................18

*Leiserson v. City of San Diego*
184 Cal.App.3d 41 (1986) .............................................................19

*Oregon v. Trump*
No. 3:25-cv-1756-IM, 2025 WL 3126773 (D. Or., Nov. 7,
2025) ...........................................................................................7, 27

*Police Dept. of City of Chicago v. Mosley*
408 U.S. 92 (1972)..........................................................................17

ii

*Rosenberger v. Rector and Visitors of University of Virginia*
    515 U.S. 819 (1995)................................................................17

*Stormans, Inc. v. Selecky*
    586 F.3d 1109 (9th Cir. 2009) ................................................4

*UFW v. Noem*
    785 F. Supp. 3d 672 (E.D. Cal. 2025) ....................................25

*Washington v. United States Food & Drug Admin.*
    668 F. Supp. 3d 1125 (E.D. Wash. 2023).................................4

*Winter v. Nat. Res. Def. Council*
    555 U.S. 7 (2008)...................................................................4

**STATUTES**

555 Code of Mass. Regs. 6.08 .................................................13, 14

Cal. Penal Code
    § 409.5........................................................................................19
    § 409.7........................................................................18, 19, 23
    § 409.7(a)(1) ............................................................................18
    § 409.7(a)(2) ............................................................................20
    § 409.7(a)(3) ............................................................................19
    § 13652(b)......................................................................12, 14, 15
    § 13652(b)(1)-(10) ..................................................................12
    § 13652(b)(2) ..........................................................................15
    § 13652(b)(5) ..........................................................................12

Mass. G.L. c. 6E, § 14(e) .........................................................13, 14

Or. Rev. Stat. § 181A.708.....................................................13, 14, 15

**COURT RULES**

Federal Rule of Appellate Procedure 29(a)(2)..................................2

**OTHER AUTHORITIES**

67 Ops. Cal. Atty. Gen. 535 (Dec. 26, 1984).................................23

iii

Cal. Comm'n on Peace Officer Standards & Training, *Basic Workbook Series, Handling Disputes / Crowd Control* (revised July 2025) ................................................................... 6

Cal. Comm'n on Peace Officer Standards & Training, *POST Guidelines, Crowd Management, Intervention and Control* (Feb. 2022) ..................................................................... *passim*

Cal. Sen. Bill 98 ........................................................................ 19

California Dep't of Justice, *Information Bulletin: Legal Rights of the Public During Protests, Demonstrations, and Gatherings* (Oct. 20, 2023) ...................................................... 7, 13

Chicago Police Department, General Order G02-02(IX)(F), *First Amendment Rights* (Aug. 8, 2024) ................................... 20

Chicago Police Department, *Special Order S06-06: Response to Crowds, First Amendment Assemblies, and Civil Disturbances* (Aug. 8, 2024) ......................................... 7, 11

Donald J. Trump, Truth Social (Jun. 15, 2025) ...................... 24

Edward R. Maguire, *New Directions in Protest Policing*, St. Louis Univ. Public Law Rev. Vo. 35, No. 1 (2015) ......... 10

Hannah Meisel, *Judge calls feds 'unreliable,' temporarily blocks National Guard deployment to Illinois*, Capital News Illinois (Oct. 9, 2025) ......................................................... 26

Jack Glaser & May Lim, *Review of Research on Policing Demonstrations*, Goldman School of Public Policy, University of California, Berkeley (July 28, 2020) ............................ 11

Julia Angwin & Abbie Nehring, *Hotter Than Lava*, The Atlantic (Jan. 12, 2015) ....................................................... 9

LASD Manual of Policies and Procedures, *5-06/030.12 - Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations* .................. 20

Liz Szabo, *Police Using Rubber Bullets On Protesters That Can Kill, Blind Or Maim For Life*, KFF News (June 2, 2020) .......... 9

Logan P. Kennedy, *Policing Protests: An Exploratory Analysis of Crowd Management Policies*, UNLV Theses, Dissertations, Professional Papers, and Capstones, Aug. 2019 .............................................5

Los Angeles Press Club, *Definition of Protected Journalist for Penal Code Section 409.7(a)* (Feb. 7, 2022) ...............................................22

Maggie Koerth & Jamiles Lartey, *Why So Many Police Are Handling the Protests Wrong*, The Marshall Project (June 1, 2020) ..................................................................................................8

Physicians for Human Rights, *Health Impacts of Crowd-Control Weapons: Acoustic Weapons* (Oct. 27, 2020) .............................................11

Police Executive Research Forum, *Police-Media Interactions during Mass Demonstrations: Practical, Actionable Recommendations* (2024) .........................................................16, 17, 22, 23

Portland Police Bureau, *Directive 0635.10: Portland Police Bureau Response to Public Order Events* (Nov. 15, 2024).........................7

Portland Police Bureau, *Directive 0635.10, Portland Police Bureau Response to Public Order Events* 11.2.2 .......................................23

State of California, Commission on Peace Officer Standards and Training, *About POST*...................................................................................3

State of California, Commission on Peace Officer Standards and Training, *The POST Commission* ................................................................3

State of California, Commission on Peace Officer Standards and Training, *This is POST*...................................................................................3

Steve Inskeep & Christopher Thomas, *Trump promised the 'largest deportation' in U.S. history. Here's how he might start*, NPR (Nov. 14, 2024).........................................................................24

Tim Sullivan, *U.S. Citizen Wrongfully Detained Twice in Alabama Workplace Raids Sues Immigration Authorities*, PBS News (Oct. 1, 2025).................................................................................25

U.S. Centers for Disease Control and Prevention, *Chemical Fact Sheet: Riot Control Agents* (Sept. 6, 2024) .................................................9

U.S. Dep't of Interior, Nat'l Park Service, U.S. Park Police,
*General Order 2301 (Demonstrations and Special Events)*
(June 9, 2022)......................................................................13

U.S. Dep't of Justice, Office of Community Oriented Policing
Services, *After-Action Assessment of the Police Response to
the August 2014 Demonstrations in Ferguson, Missouri* 48
(2015).........................................................................1, 8, 11

U.S. Dep't of Justice, *Investigation of the City of Minneapolis
and the Minneapolis Police Department* (June 16, 2023)...........................6

Will Stone & Carrie Feibel, *From "Flash Bangs" To "Rubber"
Bullets: The Very Real Risks of "Riot Control Agents,"* NPR
(June 6, 2020)......................................................................9

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

In 2015, the U.S. Department of Justice published guidance stressing that "[g]reat restraint of police powers should be used to protect the rights of lawful demonstrators."[1] The report emphasized that "[t]he use of force via less-lethal weapons should be a last resort to maintain order," deployed only "after alternatives have been reasonably exhausted, after multiple warnings have been given to demonstrators, and in situations when the threat to the safety of persons and protection of property are in imminent jeopardy."[2] This guidance was informed by the lessons learned after mass demonstrations in Ferguson, Missouri following the shooting of Michael Brown in August 2014.

Just ten years later, federal agents in Los Angeles, California have brushed aside these core principles of crowd management and control. The district court found that, instead of exercising "[g]reat restraint," defendants deployed tear gas, pepper balls, rubber bullets, and other dangerous weapons "indiscriminately and with surprising savagery." ER-4. As a result, peaceful protesters, legal observers, and journalists have been severely injured, and their First Amendment rights have

---

[1] U.S. Dep't of Justice, Office of Community Oriented Policing Services, *After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri* 48 (2015), https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p317-pub.pdf (hereinafter, "Ferguson After-Action Assessment").

[2] *Id*.

1

been infringed and chilled. In granting a preliminary injunction, the district court imposed the kind of reasonable restraint that defendants failed to implement on their own.

California and the Amici States[3] have a profound interest in these proceedings. Defendants are not only deploying dangerous projectiles in our communities and neighborhoods, against our residents and members of the press, but they are restricting the core rights to protest and chronicle government conduct and are undermining Amici States' police powers. Indeed, Amici States collectively exercise authority over hundreds of state and local police departments and thus have expertise in the complexities and challenges of public order policing. Amici States also have learned hard lessons over the years through efforts to address numerous mass protests. Most notably, after the George Floyd protests of 2020, many Amici States recognized that existing guidelines and state laws did not properly balance their interests in policing unlawful conduct while protecting First Amendment rights, nor did they recognize that aggressive tactics can often inflame rather than quell public unrest. Many States thus adopted new policies that are in

---

[3] "Amici States" are California, Colorado, Delaware, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, the Commonwealth of Massachusetts, and the District of Columbia. This brief is filed pursuant to Federal Rule of Appellate Procedure 29(a)(2).

keeping with the U.S. Department of Justice report issued in 2015, which have since helped protect both public safety and First Amendment rights.

Amici States submit this brief to describe federal and statewide guidance, state and local laws and policies, and model standards promulgated by leading professional associations, with a particular focus on the directives of the California Commission on Peace Officer Standards and Training (POST).[4] Together, these laws and guidelines reflect an emerging consensus on the best practices in crowd-control policing: that crowd-control munitions should typically only be used to address a threat to life or serious bodily injury. In this way, these best practices attempt to ensure public safety and order while at the same time protecting the First Amendment rights of the public and members of the press.

Based on the facts found by the district court, defendants contravened those standards. The district court's order properly requires the federal government to

---

[4] The POST Commission is one of the foremost authorities on policing in the country. It has, since 1959, set minimum selection and training standards for California law enforcement. *See* State of California, Commission on Peace Officer Standards and Training, *About POST*, https://post.ca.gov/About-Us (as of Nov. 19, 2025). With more than 600 participating agencies, it is one of the largest statewide law enforcement bodies in the country. *Id*.; *see also* State of California, Commission on Peace Officer Standards and Training, *This is POST*, https://post.ca.gov/video-overview-of-post (as of Nov. 19, 2025). The Commission is made up of city and county administrators, law enforcement professionals, educators, members of the public, and the Attorney General as an ex-officio member. State of California, Commission on Peace Officer Standards and Training, *The POST Commission,* https://tinyurl.com/2dz4bzb6 (as of Nov. 19, 2025).

cease its practice of deploying crowd-control munitions either indiscriminately at crowds or intentionally at single individuals posing no threat of harm, and thus appropriately protects the First Amendment rights of protesters and the press.

## ARGUMENT

Amici States file this brief in support of the district court's preliminary injunction. We focus here on one of the four factors at issue: whether the public interest weighs in favor of preliminary relief.[5] The public interest is particularly relevant where the impact of the dispute reaches beyond the parties and carries the potential for public consequences.[6] Third-party harms, including public health and public safety harms, are relevant to the public interest analysis.[7]

As discussed below, the public interest supports the district court's order. Defendants' tactics were contrary to best practices because they (1) deployed crowd-control munitions indiscriminately and, according to the district court's findings, without sufficient effort to minimize harm to the public, and (2) failed to adequately protect the First Amendment rights of journalists and other members of

---

[5] *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

[6] *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009); *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126–27 (9th Cir. 2008).

[7] *Washington v. United States Food & Drug Admin.*, 668 F. Supp. 3d 1125, 1142 (E.D. Wash. 2023), *opinion clarified,* 669 F. Supp. 3d 1057 (E.D. Wash. 2023); *City & Cnty. of S.F. v. USCIS*, 981 F.3d 742, 762 (9th Cir. 2020); *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1125-26 (E.D. Cal. 2017).

the press. The resulting harms to free speech, public health, and public safety all weigh in favor of affirmance.

## I. THE DISTRICT COURT CORRECTLY RECOGNIZED THAT CROWD-CONTROL MUNITIONS SHOULD NOT BE DEPLOYED INDISCRIMINATELY OR PREMATURELY

### A. Crowd management is a complex, fast-moving, and specialized form of policing

Crowd management and control is unlike any other form of policing because of the critical need to protect First Amendment rights while safely addressing unlawful behavior.[8] This form of policing is particularly complex because unlawful conduct—when present—is typically interspersed with lawful conduct, and group dynamics can range from peaceful gathering to expressive demonstrators to riotous conduct.[9] The dynamics of a crowd can shift rapidly and in response to myriad provocations, including aggressive law enforcement

---

[8] Many Amici States distinguish between "crowd management" and "crowd control." "Crowd management refers to the ability to effectively organize and facilitate crowd movements, instead of simply responding to crowd violence using coercive measures." Logan P. Kennedy, *Policing Protests: An Exploratory Analysis of Crowd Management Policies*, UNLV Theses, Dissertations, Professional Papers, and Capstones, Aug. 2019, at 4, https://oasis.library.unlv.edu/cgi/viewcontent.cgi?article=4735&context=thesesdissertations.

[9] Cal. Comm'n on Peace Officer Standards & Training, *POST Guidelines, Crowd Management, Intervention and Control* at 13 (Feb. 2022), https://post.ca.gov/Portals/0/post_docs/publications/Crowd_Management.pdf (hereinafter, "POST Guidelines").

tactics.[10] Various "group psychological factors" influence crowd conduct, including group identity, cohesiveness, and group-induced anonymity.[11] Law enforcement tactics must take into account all of these factors.

One of the foremost objectives of crowd management is to protect the First Amendment rights of participants. According to California's POST Commission, "Public safety agencies should seek to facilitate lawful expression by groups who are present even when unlawful activity occurs. The goal should be to protect lawful activity while identifying and addressing unlawful behavior."[12] When feasible, "law enforcement should identify, isolate and attempt to surgically remove unlawful behavior in an effort to protect lawful assemblies."[13] The California Department of Justice has recognized that "[a]ctions by law enforcement to stop or prevent speech activity before illegal activity has occurred or a clear and present danger of violence is presented are presumed to violate the

---

[10] *Id.* at 62.

[11] Cal. Comm'n on Peace Officer Standards & Training, *Basic Workbook Series, Handling Disputes / Crowd Control* at 4-9 (revised July 2025), https://post.ca.gov/portals/0/post_docs/basic_course_resources/workbooks/LD_24-V5.0.pdf (hereafter, "POST Workbook").

[12] POST Guidelines, *supra*, note 9 at 2.

[13] *Id.* at 13; *see also* U.S. Dep't of Justice, *Investigation of the City of Minneapolis and the Minneapolis Police Department* at 49 (June 16, 2023) (stating that, when unlawful conduct is interspersed with peaceful protest, "the proper response is to address 'those who actually engage in such conduct,' and not 'suppress legitimate First Amendment conduct as a prophylactic measure.'") (quoting *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996)), https://www.justice.gov/d9/2023-06/minneapolis_findings_report.pdf.

First Amendment."[14] Amici States and their cities have promulgated similar policies.[15]

Crowd management requires a multi-dimensional approach that includes, among other things: information gathering; maximizing communication with the crowd and its leaders; facility protection; and nimble deployment of teams to address unlawful conduct.[16] For example, in recent litigation challenging deployment of soldiers to Portland, Oregon, in response to protests there, another district court concluded that the Portland Police Bureau (PPB) had effectively managed the unrest, highlighting that PPB had employed "'a layered approach' to public order by using dialogue officers, bike officers, undercover officers and a dedicated 'hard squad' as needed to de-escalate crowd tension."[17] Relationship-building and de-escalation must occur early in the process. As one veteran police monitor put it: "Trying to find folks at the last minute that you can put out there in

---

[14] California Dep't of Justice, *Information Bulletin: Legal Rights of the Public During Protests, Demonstrations, and Gatherings* at 3 (Oct. 20, 2023), https://oag.ca.gov/sites/default/files/2023-DLE-09%20Information%20Bulletin.pdf (hereinafter, "Legal Rights of the Public").

[15] *See, e.g.*, Chicago Police Department, *Special Order S06-06: Response to Crowds, First Amendment Assemblies, and Civil Disturbances* § III.D. (Aug. 8, 2024), https://directives.chicagopolice.org/#directive/public/6318; Portland Police Bureau, *Directive 0635.10: Portland Police Bureau Response to Public Order Events* § 7 (Nov. 15, 2024), https://www.portland.gov/policies/police-directives/field-operations-0600/063510-portland-police-bureau-response-public.

[16] POST Guidelines, *supra*, note 9 at 33-35.

[17] *Oregon v. Trump*, No. 3:25-cv-1756-IM, 2025 WL 3126773, ECF No. 146 at 19 (D. Or., Nov. 7, 2025) (quoting trial transcript).

soft clothes and talk to people, frankly and in my opinion, wouldn't work that well. You've got to till the soil before you can grow the beans."[18]

In light of the complexities associated with crowd management and control, Amici States recognize the need for specialized training. For example, California's POST Commission requires agencies to conduct trainings on crowd management and control that "include the actual stress of incident management to ensure that critical thinking can be applied during real events."[19] The Commission has also stressed the "need for reality-based scenario training that mimics, as much as possible, the 'fog' encountered during critical event management."[20]

**B. Crowd-control munitions can pose a substantial danger to human health and may unintentionally escalate, rather than abate, public unrest**

Crowd-control munitions are dangerous and blunt tools that can unnecessarily restrict First Amendment rights, cause serious injury to both perpetrators and innocent bystanders, and inflame unrest. Tear gas and pepper sprays induce a "cascade of symptoms" that may include a burning sensation in the eyes, difficulty

---

[18] Maggie Koerth & Jamiles Lartey, *Why So Many Police Are Handling the Protests Wrong*, The Marshall Project (June 1, 2020), https://www.themarshallproject.org/2020/06/01/why-so-many-police-are-handling-the-protests-wrong; *see also* Ferguson After-Action Assessment, *supra*, note 1 at xiv, xvii (noting that effective crowd management is proactive rather than reactive).

[19] POST Guidelines, *supra*, note 9 at 19-20.

[20] *Id.* at 19.

breathing, blisters, rashes, or chemical burns.[21] The Centers for Disease Control and Prevention describes tear gas exposure as a "chemical emergency," and notes that the injuries—which can include blindness, respiratory failure, and "immediate death"—depend on the "level of poisoning."[22] Flash bangs, in turn, are explosive devices that "temporarily blind or deafen people."[23] They can also cause significant harm: since 2000, dozens of Americans have been seriously injured, maimed, or killed by flash bangs.[24] Rubber bullets are potentially even more dangerous, as "five decades of evidence shows such weapons can disable, disfigure and even kill."[25]

Crowd-control munitions are not only dangerous, but under certain circumstances they can also escalate the very protests they are meant to quell. Decades of experience and research have shown that escalating force in response

---

[21] Will Stone & Carrie Feibel, *From "Flash Bangs" To "Rubber" Bullets: The Very Real Risks of "Riot Control Agents,"* NPR (June 6, 2020), https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

[22] U.S. Centers for Disease Control and Prevention, *Chemical Fact Sheet: Riot Control Agents* (Sept. 6, 2024), https://www.cdc.gov/chemical-emergencies/chemical-fact-sheets/riot-control-agents.html.

[23] Stone & Feibel, *supra,* note 21.

[24] Julia Angwin & Abbie Nehring, *Hotter Than Lava*, The Atlantic (Jan. 12, 2015), https://www.theatlantic.com/national/archive/2015/01/hotter-than-lava/384423/.

[25] Liz Szabo, *Police Using Rubber Bullets On Protesters That Can Kill, Blind Or Maim For Life*, KFF News (June 2, 2020), https://kffhealthnews.org/news/police-use-rubber-bullets-on-protesters-that-can-kill-blind-or-maim-for-life/.

to protests—including the use of projectiles—can sometimes "create feedback loops, where protesters escalate against police, police escalate even further, and both sides become increasingly angry and afraid."[26] Crowd psychologists have likewise found that "[w]hen police treat entire crowds as if they are dangerous and indiscriminately deny participants the opportunity to express themselves, the police may inadvertently lead moderate members of the crowd to align with more radical members against the police."[27]

California's POST Guidelines reflect these concerns and advise: "Don't increase crowd tension or change crowd focus to law enforcement by unnecessary aggressive appearance or behavior."[28] The Guidelines also caution that "[t]actics used may evoke a positive or negative response (*e.g.*, a strong show of force may calm and disperse a crowd or incite them)."[29] The Chicago Police Department similarly cautions that officers' "demeanor and the manner in which they act can

---

[26] Koerth & Lartey, *supra,* note 18.

[27] Edward R. Maguire, *New Directions in Protest Policing*, St. Louis Univ. Public Law Rev. Vo. 35, No. 1 at 94 (2015), https://scholarship.law.slu.edu/cgi/viewcontent.cgi?article=1028&context=plr.

[28] POST Guidelines, *supra*, note 9 at 62.

[29] *Id.* at 31; *see also* POST Workbook, *supra*, note 11 at 5-6 ("An otherwise peaceful group can become enraged by inappropriate peace officer conduct such as individual peace officers engaging in verbal disputes with members of the crowd or by peace officers showing contempt for the crowd or its beliefs.")

10

serve to increase or reduce tensions during any response to crowds" and thus requires, among other things, the use of de-escalation techniques when feasible.[30]

In a comprehensive review of the law enforcement response to the 2014 protests in Ferguson, Missouri, officials at the U.S. Department of Justice found that overly-aggressive tactics—which included deployment of LRADs,[31] tear gas, and other less-lethal projectiles—had the "unintended consequence of escalating rather than diminishing tensions."[32] And in a 2020 review of research on policing demonstrations, the authors determined that "[d]eploying weapons (e.g., batons, kinetic impact projectiles, chemical irritants) can, in addition to causing injuries and even death, rapidly escalate conflict."[33]

---

[30] *See, e.g.*, Chicago Police Department, *Special Order S06-06: Response to Crowds, First Amendment Assemblies, and Civil Disturbances* § III.F. (Aug. 8, 2024), https://directives.chicagopolice.org/#directive/public/6318.

[31] "LRAD" stands for Long-Range Acoustic Device, which has been described as an "acoustic weapon" that is sometimes used for crowd control. Physicians for Human Rights, *Health Impacts of Crowd-Control Weapons: Acoustic Weapons* (Oct. 27, 2020), https://phr.org/our-work/resources/health-impacts-of-crowd-control-weapons-acoustic-weapons/.

[32] Ferguson After-Action Assessment, *supra,* note 1 at xiv, 59, 60.

[33] Jack Glaser & May Lim, *Review of Research on Policing Demonstrations*, Goldman School of Public Policy, University of California, Berkeley at 2 (July 28, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/10/Policing-and-Protests-Recommendations.pdf.

**C. Crowd-control munitions should be used in narrow circumstances and only after alternative measures have been exhausted**

In light of these substantial risks and complications, many Amici States prohibit the use of crowd-control munitions except in rare circumstances. For example, in California such devices may only be used "if the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control."[34] Even then, deployment is only authorized if several other prerequisites are met, including: (1) attempted de-escalation or other alternative measures; (2) repeated and detailed warnings; and (3) efforts to ensure that projectiles only impact persons engaged in violent acts and are not used indiscriminately.[35] California law also directs that projectiles may be "used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable."[36] California's POST Guidelines further clarify that crowd-control projectiles can only be used "where, absent intervention, there is an imminent threat under the totality of the circumstances to overtake and/or exceed law enforcement capabilities and on-

---

[34] Cal. Penal Code § 13652(b).
[35] Cal. Penal Code § 13652(b)(1)-(10).
[36] Cal. Penal Code § 13652(b)(5).

12

scene resources."[37] Several Amici States, including, for example, Oregon and Massachusetts, have imposed analogous restrictions on the use of tear gas and other crowd-control munitions.[38]

In keeping with these principles, the California Department of Justice has explained that "'General disorder' or 'tumultuous circumstances' cannot justify the use of force against non-violent, nonthreatening, and non-resistive individuals."[39] The guidance also cautions that "'the desire to [quickly disperse individuals], in the absence of any actual exigency, cannot legitimize the application of force when it is not otherwise justified.'"[40]

### D. The district court's preliminary injunction is consistent with best practices

In this case, the district court found credible evidence that—contrary to the best practices described above—defendants had deployed munitions in a disproportionate manner and without due regard for the dangers of such devices.

---

[37] POST Guidelines, *supra*, note 9 at 43.

[38] *See, e.g.,* Or. Rev. Stat. § 181A.708; Mass. G.L. c. 6E, section 14(e); 555 Code of Mass. Regs. 6.08; *see also* U.S. Dep't of Interior, Nat'l Park Service, U.S. Park Police, *General Order 2301 (Demonstrations and Special Events)* at VIII.C. (June 9, 2022) (requiring Incident Commander, when reasonable and safe to do so, to employ de-escalation tactics and techniques "while promoting the safety of officers and the public while also minimizing the need to employ force and the risk of unintended injury or serious property damage")

[39] Legal Rights of the Public, *supra*, note 14 at 5, (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006)).

[40] *Id*.

13

According to the court, the use of crowd-control devices was "excessive and indiscriminate" because, among other things, it targeted individuals that were "far from any protestors or bad actors." ER-31–ER-32. Defendants also deployed projectiles against groups that were dispersing or trying to disperse, and in some instances fired tear gas and pepper balls "directly *at* people." ER-33 (emphasis in original). The district court also noted "multiple instances where officers' use of crowd control weapons appeared to escalate tensions between law enforcement and protestors." ER-42 n.31. Defendants' tactics are therefore starkly at odds with the state laws and best practices discussed above. Projectiles were used recklessly instead of judiciously, and as a first option rather than a last resort. And based on the court's findings, defendants bypassed the kind of proactive, de-escalatory, and alternative measures that Amici States typically expect of their own officers.

To address these violations, the district court issued an injunction that is in keeping with Amici States' own standards regarding use of force. The order prohibits, among other things, the use of crowd-control munitions against individuals who are not themselves posing a threat of imminent harm to a law enforcement officer or another person and contains an exception for incidental exposure. ER-45–ER-46.[41] The order also forbids, except in very limited

---

[41] *See, e.g.*, Cal. Penal Code § 13652(b); POST Guidelines, *supra*, note 9 at 43; Or. Rev. Stat. § 181A.708; Mass. G.L. c. 6E, section 14(e); 555 Code of Mass.

(continued…)

circumstances, the firing of certain crowd-control munitions at the head, neck, groin, back, or other sensitive areas. ER-45.[42] Finally, the order requires at least two separate warnings prior to the use of crowd-control projectiles. ER-45.[43]

## II. THE DISTRICT COURT'S ORDER PROVIDES ESSENTIAL PROTECTIONS FOR MEMBERS OF THE MEDIA

### A. Law enforcement must protect the freedom of the press during civil unrest

The media plays a vital role in our society. "Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally."[44] The First Amendment thus affords significant protection to media, including "the right to photograph and record matters of public interest."[45] The district court reasoned that the role of the media is all the more critical today, as the federal government engages in aggressive immigration enforcement efforts "which

---

Regs. 6.08; *In Re: New York City Policing During Summer 2020 Demonstrations*, No. 20-cv-08921, Doc. 1166-1 at ¶ 64(f) (S.D.N.Y. April 16, 2024) (forbidding use of certain forms of pepper spray "against peaceful protestors or those engaging in passive resistance")

[42] *See, e.g.*, Cal. Penal Code § 13652(b); POST Guidelines, *supra* note 9 at 47, 49; Or. Rev. Stat. § 181A.708; *In Re: New York City Policing*, No. 20-cv-08921 at ¶ 65 (S.D.N.Y. April 16, 2024).

[43] *See, e.g.*, Cal. Penal Code § 13652(b)(2); POST Guidelines, *supra*, note 9 at 43; Or. Rev. Stat. § 181A.708.

[44] *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975).

[45] *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018).

the public has limited opportunity to observe firsthand and so must 'rel[y] necessarily upon the press to bring to [it] in convenient form the facts of those operations.'" ER-37.

In addressing episodes of civil unrest, law enforcement must both respect the rights of and maintain an effective relationship with the media. These relationships should be approached with a commitment to cooperation and transparency.[46] To effectively accomplish this task, California's POST Guidelines and other best practices direct law enforcement to collaborate with community stakeholders when planning for and responding to protest activity, including, where practicable, having meetings with stakeholders in advance.[47] Members of the media are among these important stakeholder groups.[48] Incident and event planning should include planning for contact with the media, such as establishing procedures for disseminating information, identification of public information officers, creating

---

[46] POST Guidelines, *supra*, note 9 at 53; *see also* Police Executive Research Forum, *Police-Media Interactions during Mass Demonstrations: Practical, Actionable Recommendations* (2024) at 7-9, https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-r1167-pub.pdf. (Boston Police Department: "The relationship between the police and the news organizations in a democratic society is based upon complementary rather than conflicting interests.") (hereinafter, "Police-Media Interactions during Mass Demonstrations").

[47] POST Guidelines, *supra*, note 9 at 8.

[48] *Id*. at 4; Police-Media Interactions during Mass Demonstrations*, supra*, note 46 at 15 ("Police should provide journalists and editors with pre-event briefings so they are aware of the police agency's plan, expectations for journalists' actions, and what may occur during a demonstration.")

procedures for media access, and establishing staging areas where media can voluntarily congregate.[49] The POST Commission and others also strongly encourage law enforcement to consider designating public safety liaisons for these purposes.[50] Finally, in all of its engagement with the media, law enforcement must treat journalists alike regardless of the subjects they (or their outlets) cover or the viewpoints expressed in their reporting.[51] This includes coverage of law enforcement activity and viewpoints that are critical of law enforcement.[52]

### B. Media should be provided access to protests

To fulfill their important role, media must be able to observe the events they are covering. As such, courts in this circuit have noted, "the Supreme Court has

---

[49] POST Guidelines, *supra*, note 9 at 9-10; *see also* Police-Media Interactions during Mass Demonstrations, *supra*, note 46 at 16 ("Police agencies may want to coordinate with news outlets to designate safe locations for members of the media to cover an event. Reporters still have the right to report from elsewhere if they choose, but they should recognize that this choice might reduce police officers' ability to keep them safe.")

[50] POST Guidelines, *supra*, note 9 at 21; Police-Media Interactions during Mass Demonstrations, *supra*, note 46 at 16 ("Police should provide a point of contact for members of the media during an event.").

[51] *See Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 831 (1995).

[52] Recognition of press passes, access to public spaces, law enforcement tactics (including use of force and arrests), and other practices of law enforcement agencies must be consistent and enforced without regard to the journalist, the outlet or their reporting. *See, e.g.*, *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) ("[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.").

long recognized a qualified right of access for the press and public to observe government activities."[53] Under the First Amendment, journalists must be afforded the ability to access any places that have been historically open to the press and public and where "public access plays a significant positive role," unless it is found that closure of the area is necessary to serve an overriding interest and the action is narrowly tailored to serve that interest.[54] Common examples of such public spaces include, but are not limited to, public streets and sidewalks,[55] where many of these protests took place.

California law goes even further, highlighting the reasonableness of the district court's ruling. Under Penal Code section 409.7, any "duly authorized representative of any news service, online news service, newspaper, or radio or television station or network" must be afforded access to "the immediate area surrounding any emergency field command post or any other command post," police lines, and/or rolling closures at a demonstration, march, protest, or rally.[56] The access of authorized representatives to these areas must be unrestricted, "unless [law enforcement] personnel at the scene reasonably determine that such unrestricted access will interfere with" law enforcement operations. If it is

---

[53] *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012).
[54] *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 829-831 (9th Cir. 2020).
[55] *Id.*
[56] Cal. Penal Code, § 409.7(a)(1).

determined that unrestricted access will interfere, "the restrictions on media access may be imposed for only so long and only to such an extent as is necessary to prevent actual interference."[57] Members of the press must be afforded "the maximum access possible under the circumstances."[58]

Similarly, in many circumstances exemptions for the press from orders to disperse are both workable and in the public interest. As plaintiffs' expert opined, dispersing journalists is rarely necessary to ensure public safety, even during an unlawful assembly. ER-38. Indeed, California law explicitly exempts duly authorized media representatives from orders to disperse. Authorized media representatives may "not be cited for the failure to disperse, a violation of a curfew" or for resisting, delaying, or obstructing public officers when "gathering, receiving, or processing information."[59] Both the Chicago and New York City Police Departments similarly provide exemptions from dispersal orders for

---

[57] *See Leiserson v. City of San Diego,* 184 Cal.App.3d 41, 51 (1986). While *Leiserson* addressed access to emergency and disaster sites under Penal Code Section 409.5, the intention of the legislature in passing Section 409.7 was to "achieve parity in the access and protections for journalists and news media as those established pursuant to Section 409.5 of the Penal Code." (Cal. Sen. Bill 98, section 1.)

[58] *Id.*; *see also In Re: New York City Policing*, No. 20-cv-08921 at ¶ 89(c) (S.D.N.Y. April 16, 2024) ("primary goal of maximizing access to observe and record police activity").

[59] Cal. Penal Code § 409.7(a)(3).

members of the media.[60] Finally, cities have regularly complied with equivalent court orders. The City of Portland, for example, complied with court orders permitting journalists to remain when orders to disperse were issued at protests in Oregon.[61]

### C. Members of the media should not be subject to indiscriminate crowd-control measures or intentional assaults

Any uses of force that includes crowd-control measures must plan for the safety of the media and bystanders.[62] Law enforcement must take steps to minimize the potential impact of kinetic energy weapons and chemical agents on journalists and other unintended targets.[63] California statutory law also plainly prohibits law enforcement from intentionally assaulting journalists.[64] Law enforcement agencies throughout the state have adopted these requirements into their policies.[65]

---

[60] Chicago Police Department, General Order G02-02(IX)(F), *First Amendment Rights*, (Aug. 8, 2024), https://tinyurl.com/dcdz7yy8; *In Re: New York City Policing*, No. 20-cv-08921 at ¶ 89(g) (S.D.N.Y. April 16, 2024)

[61] *Index Newspapers,* 977 F.3d at 835.

[62] POST Guidelines, *supra*, note 9 at 44.

[63] *Id*. at 46.

[64] Cal. Penal Code § 409.7(a)(2).

[65] *See, e.g.* LASD Manual of Policies and Procedures, *5-06/030.12 - Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations*, https://tinyurl.com/4v54wm3n ("Department members shall minimize the possible incidental impact of their use of [kinetic weapons and chemical agents] on bystanders, medical personnel, journalists, or other unintended targets.").

The district court's order is consistent with these principles, as is the conclusion of plaintiffs' expert, who opined that using force against journalists and others "standing to the side, not interfering with law enforcement" is not necessary to address violence. ER-32. The order, therefore, properly prohibits "[f]iring kinetic impact projectiles or flash-bang grenades at identified targets, if doing so could foreseeably result in injury to the press, legal observers, or protesters who are not posing a threat of imminent harm to a law enforcement officer or another person, unless such force is necessary." ER-45. The district court's prohibition on "[d]ispersing, threatening, or assaulting any person whom [Defendants] know or reasonably should know is a Journalist or Legal Observer [] unless Defendants have probable cause to believe that the individual has committed a crime unrelated to failing to obey a dispersal order" likewise complies with these best practices as reflected in the state guidance and local police policies discussed above. ER-45.

**D.    The district court's approach to identifying journalists is consistent with best practices and case law**

Distinguishing journalists from protesters can be difficult, particularly in the sometimes chaotic environment of a protest. To identify journalists, the court in *Index Newspapers LLC v. City of Portland*, for example, instructed law enforcement to consider:

- Visual identification as a member of the press, such as carrying a professional or authorized press pass or badge, or other official credential.

- Carrying professional gear, such as professional photography equipment.

- Wearing distinctive clothing that identifies the wearer as a member of the press.

- Whether the person is standing off to the side of a protest, not engaging in protest activities, and/or not intermixed with persons engaged in protest activities.[66]

Law enforcement may also consider letters of assignment, credentials for journalism students, business cards or other forms of employee identification, previous publications or reports, or membership in a professional organization for journalists.[67] These indicators, however, should not be considered exhaustive and law enforcement should "err on the side of inclusiveness," defining media to include "both credentialed press from established media outlets and noncredentialed individuals who are acting as reporters in their function and behavior."[68]

For purposes of Penal Code section 409.7, although law enforcement is permitted to ask a person to affirm that they are a "duly authorized representative"

---

[66] *Index Newspapers LLC v. City of Portland*, 480 F.Supp.3d 1120, 1156 (D. Or. 2020); *see also In Re: New York City Policing*, No. 20-cv-08921 at ¶ 89(d), n.4 (S.D.N.Y. April 16, 2024) (providing similar).

[67] Los Angeles Press Club, *Definition of Protected Journalist for Penal Code Section 409.7(a)* (Feb. 7, 2022), https://lapressclub.org/definition-protected-journalist-penal-code-section-409-7a/.

[68] Police-Media Interactions during Mass Demonstrations, *supra*, note 46 at 7.

within the meaning of that law to gain access to closed areas, a person should not be required to present any particular badge or credential.[69] Law enforcement may not restrict access to only those individuals who are authorized or recognized as journalists by the law enforcement agency itself.[70] Self-identification as a "duly authorized representative," without any additional documentation, should be permitted unless circumstances, such as the person's behavior, cast doubt on that assertion.[71]

The district court's order regarding the identification of journalists is, therefore, consistent with existing case law and the best practices discussed above. Indeed, the order closely tracks the indicia laid out by this Court in *Index*

---

[69] Free-lance journalists, like staff writers, can be duly authorized representatives. *See also In Re: New York City Policing*, No. 20-cv-08921 at ¶ 89(d) (S.D.N.Y. April 16, 2024) ("Government-issued press passes from jurisdictions or government agencies other than New York City must be acknowledged as valid but not exclusive indicia of an individual being a member of the press."); *id*. at fn. 4 ("including but not limited to an employee of a newsgathering organization, independent contractor, freelancer, or a self-employed person.").

[70] 67 Ops. Cal. Atty. Gen. 535, (Dec. 26, 1984), https://oag.ca.gov/system/files/opinions/pdfs/84-802_0.pdf .

[71] *See* Police-Media Interactions during Mass Demonstrations*, supra*, note 46 at 8, 13 ("the lack of a credential does not mean an individual is not—or should not be considered—a member of the media, and constitutional protections for the press do not depend on the possession of a credential."); Portland Police Bureau, *Directive 0635.10, Portland Police Bureau Response to Public Order Events* 11.2.2 ("Members shall consider anyone identifying themselves as a member of the media, journalist, broadcaster, or legal observer, or displaying any indicia of the aforementioned, to be an authorized legal observer or member of the media.").

23

*Newspapers*, including visual identification as a member of the press, carrying professional gear, distinctive clothing, standing off to the side of a protest, and not engaging in or intermixing with people engaged in protest related activities.

### III. DEFENDANTS' TACTICS EXTEND BEYOND LOS ANGELES AND THREATEN HARM TO PROTESTERS AND JOURNALISTS ACROSS THE NATION

The DHS conduct at issue in this litigation is not isolated. It is part of a broader pattern of unlawful, nationwide actions that stem from the current Administration's immigration enforcement operations. Prior to his election, then-candidate Donald Trump promised an aggressive mass deportation program that would be "the largest deportation program … in the history of America."[72] Since the first days of this Administration, federal immigration agents have conducted sweeping raids—targeted in Democratic-led cities and states[73]—that have not only shattered the rhythms of everyday life but also, according to several courts,

---

[72] Steve Inskeep & Christopher Thomas, *Trump promised the 'largest deportation' in U.S. history. Here's how he might start*, NPR (Nov. 14, 2024), https://www.npr.org/2024/11/12/nx-s1-5181962/trump-promises-a-mass-deportation-on-day-1-what-might-that-look-like.

[73] Donald J. Trump, Truth Social (Jun. 15, 2025), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731 ("we must expand efforts to detain and deport Illegal Aliens in America's largest Cities, such as Los Angeles, Chicago, and New York, where Millions upon Millions of Illegal Aliens reside. These, and other such Cities, are the core of the Democrat Power Center . . . .").

violated the Fourth and/or Fifth Amendments and other federal laws.[74] For example, the Eastern District of California found that federal agents in the Central Valley of California had engaged in a pattern and practice of performing detentive stops without reasonable suspicion and warrantless arrests without legally-required flight risk assessments.[75] Similar rulings have issued in the Central District of California and the Northern District of Illinois.[76]

Unsurprisingly, concerned community members have gathered to protest these tactics; the press, in turn, has sought to cover the demonstrations and the underlying enforcement operations. Yet, as shown in this matter and others, the federal response to these protests has itself violated core Constitutional protections. In Chicago, for example, the Northern District of Illinois held that federal agents'

---

[74] *UFW v. Noem*, 785 F. Supp. 3d 672 (E.D. Cal. 2025) (pattern and practice of detentive stops without reasonable suspicion), *appeal docketed*, No. 25-4047 (9th Cir. June 30, 2025); *Nava v. DHS*, No. 18-cv-3757, ECF No. 214 (N.D. Ill. Oct. 7, 2025) (finding that 22 warrantless ICE arrests failed to comply with 8 U.S.C. § 1357(a)(2), in violation of a prior settlement agreement), *administrative stay granted in Nava v. DHS*, No. 25-3050, Doc. 13 (7th Cir. Nov. 20, 2025); *see also* Tim Sullivan, *U.S. Citizen Wrongfully Detained Twice in Alabama Workplace Raids Sues Immigration Authorities*, PBS News (Oct. 1, 2025), https://tinyurl.com/56cxpac8.
[75] *UFW*, 785 F. Supp. at 735 (E.D. Cal. 2025) (pattern and practice of detentive stops without reasonable suspicion).
[76] *Vasquez Perdomo v. Noem*, No. 25-cv-05605-MEMF, ECF. No. 256 (C.D. Cal. Nov. 13, 2025) (holding that defendants violated immigration detainees Fifth Amendment right to counsel); *Nava v. DHS*, No. 18-cv-3757, ECF No. 214 (N.D. Ill. Oct. 7, 2025) *administrative stay granted in Nava v. DHS*, No. 25-3050, Doc. 13 (7th Cir. Nov. 20, 2025).

crackdown on peaceful protesters, journalists, and religious practitioners violated the First and Fourth Amendments, as well as the Religious Freedom Restoration Act.[77] That court also found that federal law enforcement leaders lied about their conduct, and noted "a growing body of evidence that DHS' version of events are unreliable."[78] In Portland, federal agents have repeatedly deployed tear gas and pepper balls at protesters without apparent need or provocation, which has often inflamed the unrest.[79] Indeed, local police in Portland have been gassed by federal agents, and at least one police officer has been struck by a projectile.[80]

The compounding illegality has extended to President Trump's attempted deployment of federalized National Guard troops to the sites of protests, purportedly to protect federal functions, property, and personnel. These efforts have also been deemed, in Portland and Chicago, to violate the Tenth Amendment

---

[77] *Chicago Headline Club v. Noem*, No. 25-cv-12173, ECF No. 42 (N.D. Ill. Oct. 9, 2025). The Seventh Circuit recently stayed the court's subsequent preliminary injunction. However, that ruling turned on the overbreadth of the injunction itself, did not address any factual findings (which the Seventh Circuit noted are "voluminous and robust"), and stated "we have not concluded that preliminary relief is precluded." *Chicago Headline Club v. Noem*, No. 25-3023, Doc. 28 (7th Cir. Nov. 19, 2025).

[78] Hannah Meisel, *Judge calls feds 'unreliable,' temporarily blocks National Guard deployment to Illinois*, Capital News Illinois (Oct. 9, 2025), https://capitolnewsillinois.com/news/judge-blocks-national-guard-deployment-to-illinois/.

[79] Plaintiffs' Trial Brief, *Oregon et al. v. Trump et al.*, No. 3:25-cv-01756-IM, ECF No. 113 at 18 (D. Or., Oct. 27, 2025).

[80] *Id*.

and other applicable law.[81] And once deployed, the federalized troops in Southern California have—like federal agents in this matter—escalated rather than abated the civil unrest.[82]

## CONCLUSION

The preliminary injunction should be affirmed.

Dated: November 25, 2025      Respectfully submitted,

*/s/ Jesse Basbaum*

ROB BONTA
*Attorney General of California*
MICHAEL NEWMAN
*Senior Assistant Attorney General*
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy Attorneys General*
JESSE BASBAUM
BRENDAN HAMME
*Deputy Attorneys General*

(*Counsel listing continues on next page*)

---

[81] *Illinois v. Trump*, 155 F.4th 929 (7th Cir. 2025); *Oregon v. Trump*, No. 3:25-cv-1756-IM, ECF No. 146 at 48 (D. Or. Nov. 7, 2025).

[82] *See, e.g.*, Brief for Amici States, *District of Columbia v. Trump*, No. 25-cv-03005, Doc. No. 17 at 15-16 (D.C. Cir. Sept. 15, 2025) (explaining how "the President's deployment of troops escalates tensions in communities and harms a State's . . . interest in maintaining stable communities"); *Oregon v. Trump*, No. 3:25-cv-1756-IM, ECF No. 146 at 19 (D. Or., Nov. 7, 2025) (summarizing trial testimony indicating that "National Guardsmen generally have no obligation to retreat or de-escalate and will skip 'rungs of a ladder' of force escalation if need be, though rules for the use of force are ultimately determined by the commander").

PHIL WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

BRIAN SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 S. LaSalle St.
Chicago, IL 60603

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333-0006

KEITH ELLISON
*Attorney General*
*State of Minnesota*
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General*
*State of New York*
The Capitol
Albany NY 12224-0341

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

(*Counsel listing continues on next page*)

28

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

29

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated                .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                              **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                     *Rev. 12/01/22*