

**Southern California**

March 12, 2026

Molly C. Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119

RE:     *Los Angeles Press Club, et al. v. Kristi Noem, et al.*, Case No. 25-5975 – Federal Rule of
        Appellate Procedure 28(j)

Dear Ms. Dwyer:

Plaintiffs-Appellees notify the Court of the preliminary injunction opinion following a three-day evidentiary hearing in *Dickinson v. Trump*, Case No. 3:25-cv-2170-SI (D. Or.) ("Op."), which is relevant for numerous reasons.

First, the court found that an injunction closely similar to the one in this case is safe and workable, relying on live testimony from plaintiffs' expert, Gil Kerlikowske (also Plaintiffs' expert in this case), two commanders from the Portland Police Bureau, and an Oregon State Police Captain, all of whom testified to the workability of the injunction as experts in Public Order Policing. (Op.12.) The court also found that DHS had been able to comply with the same terms under its TRO for 28 days with no "indication of problem or prejudice, let alone irreparable harm," and that the injunction "largely mirrors the requirements imposed by [Defendants'] own Use-of-Force policies." (Op.33.)

Second, the court held that "strong circumstantial evidence" established "Defendants' intent to punish [protesters] for their expression," citing the same things as the District Court here: videos and numerous declarations showing Defendants repeatedly misusing crowd control weapons and firing on nonviolent individuals. (Op.20–23.) In concluding that there was "more than enough evidence" to establish Plaintiffs' likelihood of success on the merits, the court cited, without relying upon, "[a]dditional evidence … that Defendants have engaged in similar conduct in Los Angeles, Chicago, and Minneapolis." (Op.23 (citing this case).)

Third, the court found a custom or policy of retaliation, crediting Mr. Kerlikowske's opinion that DHS's failure to recognize violations of its policies was a "clue" demonstrating the existence of a "contrary, 'unwritten' policy," and noting, like the District Court here, that "[r]ather than reprimanding DHS violence against protesters, senior officials have publicly condoned it." (Op.13, 23; ER-36.)

Finally, the court determined the injunction's scope was "necessary and appropriate to ensure 'complete relief' even if just to the named Plaintiffs," because Defendants' attacks against other nonviolent protesters "would continue to chill Plaintiffs' First Amendment rights"—just as

Molly C. Dwyer, Clerk of Court
March 12, 2026                                                                     Page 2

Defendants' attacks against others in the Central District chill this case's named Plaintiffs. (Op.28 (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025)).)

Respectfully submitted,

Jonathan Markovitz
Counsel for Plaintiffs-Appellees

Molly C. Dwyer, Clerk of Court
March 12, 2026                                                                                          Page 3

### CERTIFICATE OF COMPLIANCE

This letter complies with Federal Rule of Appellate Procedure 28(j) and Circuit Rule 28-6 because the body contains 350 words.


Respectfully submitted,


*Jonathan Markovitz*

Jonathan Markovitz
Counsel for Plaintiffs-Appellees

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JACK DICKINSON, *also known as "the Portland Chicken"*; **LAURIE ECKMAN**; **RICHARD ECKMAN; MASON LAKE**; and **HUGO RIOS**, *on behalf of themselves and those similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP**, *President of the United States, in his official capacity*; **KRISTI NOEM**, *Secretary, U.S. Department of Homeland Security (DHS), in her official capacity*; and **U.S. DEPARTMENT OF HOMELAND SECURITY**,<br><br>Defendants. | Case No. 3:25-cv-2170-SI<br><br>**OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION** |

Kelly Simon and Eri Andriola, ACLU FOUNDATION OF OREGON, PO Box 40585, Portland, OR 97240; J. Ashlee Albies, ALBIES & STARK LLC, 1500 SW First Avenue, Suite 1000, Portland OR 97201; Jane L. Moisan, PEOPLE'S LAW PROJECT, 1500 SW First Avenue, Suite 1000, Portland OR 97201; Matthew Borden and Hadley Rood, BRAUNHAGEY & BORDEN LLP, 747 Front Street, Fourth Floor, San Francisco, CA 94111; Marissa R. Benavides, BRAUNHAGEY & BORDEN LLP, 200 Madison Avenue, 23rd Floor, New York, NY 10016; Kimberly S. Hutchison, Liam Barrett, Taylor Marrinan, Mark F. Fleming, and Diana Lucy Hallet, SINGLETON SCHREIBER LLP, 591 Camino de la Reina, Suite 1025, San Diego, CA 92108; and Zachary Pangares, SINGLETON SCHREIBER LLP, 1050 SW Sixth Avenue, Suite 1100, Portland, OR 97204. Of Attorneys for Plaintiffs.

Brett A. Shumate, Assistant Attorney General, Civil Division; Eric Hamilton, Deputy Assistant Attorney General, Civil Division; John Bailey, Counsel to the Assistant Attorney General, Civil Division; Andrew I. Warden, Assistant Director, Federal Programs Branch, Civil Division; Brad P. Rosenberg, Special Counsel, Federal Programs Branch, Civil Division; Michael B. Bruns, Pierce J. Anon, and Alexander J. Yun, Trial Attorneys, Federal Programs Branch, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, 950 Pennsylvania Avenue, NW, Washington, DC 20530. Of Attorneys for Defendants.

Dan Rayfield, Oregon Attorney General; Scott Kennedy, Jacob Reisberg, Samuel Kubernick, and Leanne Hartmann, Senior Assistant Attorneys General; and Derek Olson, Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for *Amicus Curiae* State of Oregon.

Naomi Sheffield, Chief Deputy City Attorney; and Elizabeth C. Woodard, Caroline Turco, and Denis M. Vannier, Senior Deputy City Attorneys, PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for *Amicus Curiae* City of Portland, Oregon.

**Michael H. Simon, District Judge.**

In a well-functioning constitutional democratic republic, free speech, courageous newsgathering, and nonviolent protest are all permitted, respected, and even celebrated. In an authoritarian regime, that is not the case. Indeed, a democracy is only as strong as its tolerance for dissent. As Benjamin Franklin wrote:

> Freedom of speech is a principal pillar of a free government; when this support is taken away, the constitution of a free society is dissolved, and tyranny is erected on its ruins.[1]

Our nation is now at a crossroads. We have been here before and have previously returned to the right path, notwithstanding an occasional detour. In helping our nation find its constitutional compass, an impartial and independent judiciary, operating under the rule of law, has a responsibility that it may not shirk.

---

[1] Benjamin Franklin, "On Freedom of Speech and the Press," *Pennsylvania Gazette*, Nov. 17, 1737. Fifteen years earlier, Dr. Franklin wrote: "Whoever would overthrow the Liberty of a Nation, must begin by subduing the Freedom of Speech." Benjamin Franklin, *Silence Dogood*, No. 8, as printed in *The New England Courant*, July 9, 1722.

In this provisionally certified class action, Plaintiffs have sued the President of the United States, the Secretary of the U.S. Department of Homeland Security ("DHS"), and DHS, acting through three of its subsidiary agencies: the Federal Protective Service ("FPS"); U.S. Immigration and Customs Enforcement ("ICE"); and U.S. Customs and Border Protection ("CBP"). The Class Representatives and all class members seek to protect and exercise their First Amendment rights to speak, gather news, or protest peacefully and nonviolently at and around the ICE facility located at 4310 S. Macadam Avenue, near the corner of Southwest Moody Avenue and Southwest Bancroft Street in Portland, Oregon ("Portland ICE Building"). Plaintiffs' first claim alleges that Defendants have unconstitutionally chilled Plaintiffs' First Amendment rights to dissent and document dissent, through an unwritten policy, pattern, and practice of engaging in excessive force using less lethal munitions, including a variety of chemical irritants, against peaceful and nonviolent protesters at and in the vicinity of the Portland ICE Building.

On February 3, 2026, the Court entered a temporary restraining order ("TRO") in this matter. Nine days later, Plaintiffs moved for a preliminary injunction, asking the Court to convert the TRO into a preliminary injunction that would last until the entry of final judgment. Plaintiffs also asked the Court to require all DHS agents performing law enforcement duties at and in the vicinity of the Portland ICE Building to wear and conspicuously display their agency affiliation and unique identification numbers. On February 28, 2026, Plaintiffs moved for provisional certification of a class consisting of "[a]ll people who, since the beginning of Operation Skip Jack, have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." *See* ECF 130 at 13; ECF 131 at 13. On March 2, 2026, the Court began an evidentiary hearing that lasted for three days. For the reasons explained in a separate

PAGE 3 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

concurrently filed Opinion and Order, the Court granted Plaintiffs' Motion for Provisional Class Certification. For the reasons stated below, the Court hereby grants Plaintiffs' Motion for Preliminary Injunction, the specific terms of which are stated in a separate concurrently filed Order of Preliminary Injunction.

## EVIDENCE RECEIVED

Before the Court began its evidentiary hearing, Plaintiffs filed sworn declarations from 62 percipient nonviolent protester witnesses.[2] Plaintiffs also filed sworn declarations from the following dual-role expert witnesses: Portland Police Bureau ("PPB") Commanders Franz Schoening and Craig Dobson, both of whom have expertise in Public Order Policing; Oregon State Police ("OSP") Captain Cameron Bailey, who has expertise in Public Order Policing; Dr. Rohini Haar, a medical doctor specializing in Emergency Medicine and an adjunct professor at the University of California, Berkeley, School of Public Health, with expertise in the effects of crowd control weapons, including chemical irritants; and Gil Kerlikowske, who previously was a Commissioner of CBP and, before that, was Chief of Police in Seattle, Washington, with expertise in Public Order Policing.[3] Defendants filed four sworn declarations from: Roberto

---

[2] The 62 percipient witness declarants have all nonviolently and peacefully attended protest gatherings at the Portland ICE Building. They are: Anika Ades; Lucas Angell-Atchison; Casey Baker; Teressa Barssoti; Helena Bartowski; Randall Blazak; Lynsea Coy; Mollie DeCost; Seth Denlinger; Christopher DeWalt; Jack Dickinson; Laurie Eckman; Richard Eckman; Anna Edelmann; Joy Edwards; Tyler Ehrlich; Calley Ekberg; Christopher (Tyler) Fellini; Kevin Foster; Blake Goud; Marilyn Hall; Stephen Hall; Bennett Haselton; Vincent Hawkins; Heather Hellman; Jennifer Kerns-Robison; Andrew Kihn; Evelyn Kocher; Mason Lake; Casey Leger; Matthew Lembo; Chad Lucero; Rigoberto Martinez; Amie McAlpine; Jeffrey Miller; Kathleen Minde; Lucille Moody; Kimberly Nachbur; Mindan Ocon; Maria Petrella; Paul Reardon; Mark Remy; Adina Rimes; Hugo Rios; Adrian Rodriguez; Frances Romero; Teresa Roque; Brian Rudiger; Moira Ryan; Greg Scott; Cliff Shaw; Anna Shepherd; Marvin Simmons; Aaron Smith; Alexander Sorrell; Justin Stevens; Mason Thomas; Lane Toensmeier; Jed Vankrieken; Ashley Ward; Maria Weyne; and Sarah Yonally.

[3] As explained by the law enforcement and former law enforcement declarants, "public order policing" essentially is the effective and constitutional policing and crowd control at large

Cantu, Deputy Director of FPS, Region 10 (which includes Oregon); CBP Chief Patrol Agent Timothy Sullivan; ICE Course Developer and Instructor Jason Clearman; and ICE Supervisory Special Agent Daniel Gleckman. Both sides also filed legal memoranda, videos, and other documents. *Amici curiae* State of Oregon and City of Portland each filed separate legal briefs discussing how Defendants' actions adversely affected them and the relationships between their law enforcement agencies and the public generally.

During the three-day evidentiary hearing, only Plaintiffs called live witnesses. The Court heard testimony from PPB Commander Franz Schoening, PPB Commander Craig Dobson, OSP Captain Cameron Bailey, Laurie Eckman, Richard Eckman, Teressa Barsotti, Hugo Rios, Jack Dickinson, Helena Bartkowski, Mason Lake, Heather Hellman, Brian Rudiger, and Gil Kerlikowske. Plaintiffs also offered numerous documents, videos, and deposition transcripts. As noted, Defendants called no live witnesses but offered documents, videos, and deposition transcripts. In addition to live testimony, the Court received in evidence all declarations, videos, and other documents the parties offered. The Court finds the facts recited below by a preponderance of the evidence.

---

public events. *See generally* Bernd Bürger, Tamara D. Herold, and Ryan Lee, eds., PUBLIC ORDER POLICING: A PROFESSIONAL'S GUIDE TO INTERNATIONAL THEORIES, CASE STUDIES, AND BEST PRACTICES (2023) (explaining in descriptive blurb that "[s]uccessful public order management is critical to upholding democracy and maintaining the rule of law" and that "[n]egative police-public interactions during assemblies can impact the safety and well-being of citizens and officers, as well as local and international perceptions of police legitimacy"); *see also* Clifford Stott and Edward R. Maguire, POLICING THE CROWD (2026) (explaining in descriptive blub that "[c]rowds are among the most visible expressions of democracy—whether in celebration, protest, or tragedy—but they are also moments of tension, where rights, safety, and authority collide").

PAGE 5 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

## BACKGROUND

In June 2025, DHS assigned federal officers from around the nation working for FPS, ICE, and CBP to the Portland ICE Building in a deployment known as "Operation Skip Jack." The ostensible purpose of this operation was to increase the protection of the Portland ICE Building and DHS officers, where protests were occurring on a regular, sometimes daily, basis. The protection of the Portland ICE Building is under the unified command of FPS, and federal agents from ICE and CBP were cross-designated as FPS officers, pursuant to 40 U.S.C. § 1315.

One percipient nonviolent protester witness, Class Representative Jack Dickinson, participated in about 150 protests at the Portland ICE Building, typically attending four or five protests per week. Since June 2025, Mr. Dickinson began attending protest gatherings at the Portland ICE Building wearing a "chicken" costume with an American flag draped over his shoulders, like a cape. Mr. Dickinson never engaged in violence or any threatening behavior. Between June and September 2025, Mr. Dickinson saw new groups of officers arrive about every two weeks, and their use of force looked to him mostly like "training exercises." On one occasion in mid-August, a DHS officer fired less lethal munitions that struck Mr. Dickinson in the head.

Mr. Dickinson repeatedly witnessed and has been subjected to violence by DHS officers who used chemical munitions against him on multiple occasions. On another occasion, Mr. Dickinson was standing on the public sidewalk side of the driveway (*i.e.*, not trespassing) when federal agents shoved him with so much force that he stumbled approximately 15 to 20 feet through the street. When he stood up and started to walk away, a federal agent standing on the roof of the building shot him in the back with less lethal munitions. On still another occasion, Mr. Dickinson sat on the edge of the driveway near the gate of the Portland ICE Building. He sat silently and did not block the ability of vehicles to enter or exit, although he likely was

PAGE 6 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

trespassing. Rather than order him to leave, or even cite or arrest him, DHS officers fired multiple barrages of pepper balls at the seated protesters, and pepper sprayed Mr. Dickinson directly in the face twice with Oleoresin Capsicum ("OC") Spray, a chemical irritant. On another occasion, Mr. Dickinson picked up a sign and waved it, trying to diffuse the noxious gas permeating the air. He was then hit in the ankle by a volley of DHS munitions.

As several witnesses described, in late September 2025, President Trump, using the social media site Truth Social, labeled Portland, Oregon a "war ravaged" city controlled by "domestic terrorists" and announced the deployment of National Guard troops to protect federal ICE facilities, including in Portland.[4] Shortly thereafter, the use of violence by DHS officers against mostly peaceful and nonviolent protesters increased. Mr. Dickinson explained that before President Trump's social media post about "war ravaged" Portland, audible warnings using DHS's Long Range Acoustic Devices ("LRAD") had been regularly given before DHS officers would fire tear gas and pepper-ball munitions, but afterward, there were fewer audible warnings and the use of tear gas and pepper-ball munitions against nonviolent and peaceful protestors became more frequent but also more unpredictable.

In addition, on several occasions Mr. Dickinson observed several right-wing counter-protesters, wearing Make America Great Again ("MAGA") hats and "anti-Antifa" pins. They

---

[4] On October 4, 2025, U.S. District Judge Karin J. Immergut issued a temporary restraining order, enjoining the federalization and deployment to Portland of the Oregon National Guard. In her written order, Judge Immergut noted: "Despite the 'minimal activity' outside the Portland ICE facility in the days preceding September 27, 2025, President Trump directed Secretary Hegseth 'to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists.'" Judge Immergut added: "The President's determination was simply untethered to the facts." *Oregon v. Trump*, 802 F. Supp. 3d 1277, 1292 (D. Or.), *reh'g en banc granted, opinion vacated*, 159 F.4th 1159 (9th Cir. 2025), and *reh'g en banc granted, opinion vacated*, 165 F.4th 1158 (9th Cir. 2025), *appeal dismissed*, No. 25-6268, 2026 WL 443722 (9th Cir. Feb. 17, 2026).

PAGE 7 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

would try to lure, or goad, protesters "over the line" to trespass onto federal property. Mr. Dickinson also saw camera crews on the roof of the Portland ICE Building, including some crew members whom Mr. Dickinson knew to be right-wing internet content-creators or influencers. One time in early October, DHS agents were outside the facility, and Mr. Dickinson saw a DHS officer drop a cannister near the officer's own feet that soon released red smoke. At first, Mr. Dickinson thought that was an accident. Then, officers came out of the Portland ICE Building and did it again. This time, however, Mr. Dickinson observed cameras on the roof filming DHS officers in full gear walking through the red smoke. Finally, Mr. Dickinson testified that after the Court issued its TRO on February 3, 2026, Mr. Dickson continued to attend protests, observed no violations of the Court's order, and saw no interference with federal agents doing their job.

Attending the protest gatherings were peaceful journalists and protesters of all ages, from young children (accompanied by their parents) to senior citizens. Class Representative Laurie Eckman is 84 years old, and her husband Class Representative Richard Eckman is 83. On January 31, 2026, they attended the "No Kings" march that walked to the Portland ICE Building. While lawfully standing among other peaceful protesters (*i.e.*, not trespassing), Mrs. Eckman proudly held a sign that read "No Kings" on one side and "Will Swap 10,000 Immigrants for one Little King Donald" on the other. While she was peacefully holding her sign, DHS officers hit Mrs. Eckman in the head with a chemical impact munition, likely a pepper-ball projectile. She walked home slowly while soaked in blood. Later that evening, she was treated in an emergency room, where she was diagnosed with a concussion.

At that gathering, DHS officers opened fire on the crowd with chemical munitions. The crowd began to leave but tear gas was lobbed over the crowd and behind them, requiring many

PAGE 8 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

nonviolent and peaceful protesters to walk through a cloud of chemical irritants. At the time, Mr. Eckman was wearing a hat that identified him as a Viet Nam War veteran, to show his patriotism. As he walked by a DHS officer, Mr. Eckman pointed at his hat to show the officer that he is a vet. When Mr. Eckman was about six to eight feet in front of the officer, the officer shot pepper balls at Mr. Eckman's feet, which hit his walker.

Class Representative Mason Lake is a Portland resident who is a freelance video journalist and filmmaker who has covered protests in Portland since approximately 2020. He specializes in documenting protests in Portland through high quality visual media, and his video footage of protests has been aired on national news networks. Each time Mr. Lake documents a protest, he wears a vest that has conspicuous insignias reading "PRESS" on the front and the back, a helmet that says "PRESS" on the front, back, and sides, and a 3"x7" press badge around his neck. Mr. Lake has observed DHS officers repeatedly using tear gas and projectile munitions. During one protest, a DHS officer shot Mr. Lake in the groin with less lethal munitions, likely pepper balls, causing bruises, despite Mr. Lake wearing protective gear. On another occasion, DHS officers trained a laser directly on Mr. Lake, and, later, another DHS officer sprayed OC Spray directly into the face of Mr. Lake and on his video-recording equipment. Mr. Lake also observed that as time went on, the use of less lethal weapons, including tear gas, pepper balls, and OC Spray against nonviolent and peaceful protesters became more unpredictable. In addition, Mr. Lake saw MAGA and ICE-supportive internet content creators being allowed by DHS officers to enter the Portland ICE Building and go to its roof.

Class Representative Hugo Rios is a freelance photojournalist who covers protest gatherings at the Portland ICE Building. Mr. Rios wears a conspicuous Velcro tag labeled "PRESS" across his chest. During one protest, Mr. Rios watched DHS officers leave the Portland

ICE Building to shoot pepper balls and throw tear gas canisters at nonviolent protestors who were merely dancing. The officers gave no warning. When Mr. Rios was photographing what was occurring, a DHS officer pushed Mr. Rios from behind. Other DHS officers then shoved Mr. Rios from the front several times and hit his camera until it stopped working. Mr. Rios said to a DHS officer that he was "just filming;" the officer responded, "I don't care." Although Mr. Rios was standing without anyone else in his immediate vicinity, a DHS officer fired a tear gas cannister at the feet of Mr. Rios and then shot him with pepper balls approximately 20 times.

Aaron Smith, who is not a Class Representative but is a class member, is a videographer who on many occasions has documented protests at the Portland ICE Building. On one occasion, Mr. Smith observed DHS officers rush out of the building and, without warning, shoot munitions repeatedly into a crowd that was dancing. At other times, he observed DHS officers targeting press, legal observers, and medics. On one occasion, Mr. Smith was standing without anyone else in his immediate vicinity, and a DHS officer fired a tear gas cannister that struck Mr. Smith directly in the leg. Mr. Smith promptly was taken to an emergency room, where he required stitches. Although concerned about his own safety, Mr. Smith considers his filming these protests to be important in combatting false narratives.

Similarly, class member Teressa Barsotti testified at the evidentiary hearing. She attended the January 31, 2026 "No Kings" march with her 13-year-old daughter and her 76-year-old father. All three suffer from asthma and were seriously harmed by the indiscriminate use of tear gas and pepper spray by DHS officers.

Class member Helena Bartkowski has been attending protests at the Portland ICE Building since June 2025. On one occasion, she was sitting on a wall, not blocking the driveway, but likely trespassing. A DHS officer ordered her to leave; she left, but sometime later sat back

PAGE 10 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

down on the wall. A DHS officer again ordered Ms. Bartkowski to leave; she stood up, but officers exited the Portland ICE Building to detain her. An officer cited Ms. Bartkowski for failing to obey a lawful order from a law enforcement officer but told her that a judge might "throw out" the citation. Ms. Bartowski asked why the citation was being issued if it likely would be dismissed. The DHS officer responded, "it is just to encourage you not to come back." On another occasion, Ms. Bartkowski saw a DHS officer give a "Nazi salute" to the crowd, and another time she heard a DHS officer say to a protester, "I'll see you tonight."

During a gathering on January 24, 2026, class member Heather Hellman noticed a handful of counter-protestors standing outside the Portland ICE Building. What caught her attention was that they all suddenly looked at their mobile phones at about the same time. Almost immediately after, they all left at the same time and, within a minute or so, DHS officers fired quantities of chemical munitions directly into the crowd.

These occurrences and reports are not infrequent, and they appear to have been escalating in frequency until the Court issued its TRO. Some of the reported incidents at the Portland ICE Building go back to June 2025 but most occurred later that year and into January 2026. Their frequency increased but so did their randomness. Plaintiffs provided numerous videos, which were received in evidence and unambiguously show DHS officers spraying OC Spray directly into the faces of peaceful and nonviolent protesters engaged in, at most, passive resistance and discharging tear gas and firing pepper-ball munitions into crowds of peaceful and nonviolent protestors.[5]

---

[5] If Defendants appeal the Court's Order of Preliminary Injunction, the Court recommends that the appellate panel review this video evidence. The videos are both unambiguous and disturbing.

PAGE 11 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

At the evidentiary hearing, the Court also heard testimony from PPB Commander Schoening, PPB Commander Dobson, OSP Captain Bailey, and Mr. Kerlikowske. Commander Schoening teaches Public Order Policing and was part of a group that wrote national standards on that subject. He described incidents and videos related to him by PPB Officers attending protest gatherings at the Portland ICE Building. He explained that the force often used by DHS officers at that facility adversely affected the positive relationships that PPB has been building with the community, which is essential for effective and legitimate law enforcement. Commander Dobson also teaches Public Order Policing and crowd control. He stated that the last time that PPB used tear gas in a Public Order Policing context was in 2020. He added that he personally observed instances at the Portland ICE Building when the DHS officers' uses of tear gas and other less lethal munitions against peaceful and nonviolent protesters were inappropriate and disproportionate. Captain Bailey similarly is an instructor in crowd control. He described an instance on June 14, 2025, when PPB declared a riot and appropriately made several arrests later that evening. All three witnesses testified as to the workability of the TRO but noted where a specific improvement could be made. The Court has incorporated that suggested improvement into the Order of Preliminary Injunction that accompanies this Opinion and Order.

Finally, the Court heard testimony from Plaintiff's expert witness Gil Kerlikowske, a national expert on Public Order Policing. Mr. Kerlikowske explained and supported his opinion that DHS officers have been using excessive and unnecessary force at the Portland ICE Building from June 2025 through the date of the Court's TRO. He bases his conclusions on a pattern of excessive force as shown by sworn declarations from percipient witnesses, Commanders Schoening and Dobson, and Captain Bailey, and by videos, use-of-force reports, and insufficient training and leadership. Mr. Kerlikowske noted that DHS has "written policies" that prohibit

PAGE 12 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

excessive force and First Amendment retaliation, but DHS's actions reveal an "unwritten policy" to do something else. He has seen many violations of DHS's written policies, both in the videos and in the use-of-force reports but saw no corrective action being taken. Indeed, FPS Deputy Director Cantu said that he saw no violations of DHS policy, and that was another "clue" for Mr. Kerlikowski, showing that there was a contrary "unwritten" policy. In addition, Mr. Kerlikowski explained that the requested injunction is safe for law enforcement, workable, and indeed quite close to FPS's own use-of-force written policies. Mr. Kerlikowske also endorsed the improvement suggested by the witnesses from PPB and OSP, which, as noted, the Court has accepted.

### STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction). *See also Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1122-23 (9th Cir. 2024) (quoting *Winter* ). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"The first factor—likelihood of success on the merits—is 'the most important.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1049 (9th Cir. 2024) (quoting *Garcia v. Google,*

PAGE 13 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

*Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). The preliminary injunction factors are evaluated on a "sliding scale," however, such that "a stronger showing of one element may offset a weaker showing of another." *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). "Alternatively, a preliminary injunction may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Id.* (quoting *All. for the Wild Rockies*, 632 F.3d at 1135).

Finally, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## STANDING

Article III of the U.S. Constitution confers authority on the federal courts to hear cases or controversies brought by plaintiffs who have a "personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up). To demonstrate standing, a plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent;[6] (ii) that the injury was likely caused by the defendant;

---

[6] An injury is "concrete" if it is "de facto; that is, it must actually exist," meaning that it is "real and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (cleaned up). "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.* An injury is "particularized" if it "'affect[s] the plaintiff in a personal and individual way.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).

and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).[7]

Plaintiffs must also "demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). For injunctive relief, plaintiffs must allege "either 'continuing, present adverse effects due to [their] exposure to defendants' past illegal conduct or 'a sufficient likelihood that [plaintiffs] will again be wronged in a similar way." *Villa v. Maricopa County*, 865 F.3d 1224, 1229 (9th Cir. 2017) (cleaned up) (first quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974), then quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); *see also DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024) (explaining that "[p]ast exposure to harmful or illegal conduct" may confer standing when the plaintiff "continue[s] to suffer adverse effects" and that the "plaintiff must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged" (quotations omitted)). Plaintiffs can demonstrate that their injuries are likely to recur in "at least two ways": by showing that their injuries stem from the defendants' written policies, or that their injuries resulted from "a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' rights.'" *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (brackets omitted) (first quoting *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001), then quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985)).

If federal courts are too quick to close the courthouse doors on First Amendment claims, "free expression—of transcendent value to all society, and not merely to those exercising their

---

[7] The standing "inquiry in the [First Amendment] retaliation context focuses directly on the[se] three elements that form the 'irreducible constitutional minimum' of Article III standing." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560).

rights—might be the loser." *See Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)). Thus, courts apply the requirements of "standing less stringently in the context of First Amendment claims." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173-74 (9th Cir. 2022) (quotations omitted). "In the First Amendment context, 'the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id.* at 1174 (quoting *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021)).

Here, Plaintiffs have sufficiently alleged standing. Defendants challenge the standing of all Class Representatives other than Mr. Dickinson and Mr. Lake. Defendants argue that the other Class Representatives do not satisfy the injury-in-fact requirement. Defendants assert that because Mr. Rios and Mr. and Mrs. Eckman have only once been assaulted by federal agents, they have demonstrated a mere "past exposure to illegal conduct," which is insufficient to show an active case or controversy. *See Lyons*, 461 U.S. at 102. According to Defendants, "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (brackets omitted) (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Plaintiffs, however, have sufficiently alleged a specific present constitutional injury and a threat of specific future harm.

All Class Representatives currently are suffering First Amendment chill. *See Garcia v. County of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025). "A chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Id.* (brackets omitted) (quoting *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022)). Chill is an objective inquiry; the question is whether Defendants' actions "would chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (cleaned up). Defendants' conduct—physically harming protestors and journalists without prior

PAGE 16 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

dispersal warnings—is objectively chilling. Indeed, Mr. and Mrs. Eckman are now afraid to protest at the Portland ICE Building and have modified their "speech and behavior" to avoid being assaulted. *Garcia*, 150 F.4th at 1229 (quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)). Mr. Rios, too, now only covers the Portland ICE Building from a distance, even though it compromises the quality and detail of his journalism. Newsgathering "is a predicate for, and thus inextricably intertwined with," protected speech. *See id.* at 1231. Mr. Rios's "self-censorship" is hampering his newsgathering and "is sufficient to satisfy the injury-in-fact requirement," as is Mr. and Mrs. Eckman's self-censorship in avoiding protests they would otherwise attend. *See id.* at 1229 (cleaned up).

A plaintiff may not "bring a First Amendment claim 'by nakedly asserting that his or her speech was chilled.'" *Twitter*, 56 F.4th at 1174 (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)). *See also Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) ("Mere allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." (cleaned up)). The Class Representatives, however, have shown an objective chill caused by Defendants' acts in physically assaulting nonviolent and peaceful protestors and journalists. Plaintiffs have presented "concrete evidence to substantiate their fears" that Defendants' conduct will continue, which is enough to show a non-speculative risk of future injury. *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020) (quoting *Clapper*, 568 U.S. at 420). Although "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief *if unaccompanied by any continuing, present adverse effects*," *id.* (cleaned up; emphasis in original) (quoting *Lyons*, 461 U.S. at 102), here, Plaintiffs have shown continuing, present adverse effects.

Based on the evidence received, Defendants have continued to fire less lethal munitions, tear gas, pepper balls, and flash bangs into protestor crowds without warning. This is "powerful evidence of the . . . ongoing, sustained pattern of conduct that resulted in numerous injuries to members of the press" and peaceful protestors after "the complaint was filed." *Id.* at 826. Some protestors also have been injured "more than once." As the Ninth Circuit reaffirmed in *Index Newspapers*, findings like these are "compelling because 'the possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.'" *Id.* (quoting *Thomas v. County of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992)). Thus, Plaintiffs have suffered injury-in-fact and have standing to sue.

## DISCUSSION

In their First Amended Class Action Complaint, Plaintiffs assert seven separate claims. First, Plaintiffs allege First Amendment retaliation. Second, Plaintiffs allege that Defendants have violated Plaintiffs' First Amendment rights by engaging in viewpoint discrimination and unlawfully interfering with Plaintiffs' exercise of speech, press, and assembly. Third, Plaintiffs Lake and Rios, and a subclass, allege that Defendants have violated their First Amendment right of access and their protected acts of newsgathering in a place historically open to the public and press. Fourth, Plaintiffs allege that Defendants have violated Plaintiffs' Fourth Amendment rights by engaging in excessive force against them. Fifth, Plaintiffs allege that Defendants have violated Plaintiffs' Fifth Amendment right to due process by engaging in violent conduct that shocks the conscience, acting with deliberate indifference to the risk of injury to Plaintiffs, and acting with the purpose to harm Plaintiffs. Sixth, Plaintiffs allege that Defendants have violated the Administrative Procedure Act, 5 U.S.C. §§ 551-559. Seventh, Plaintiffs seek a declaration of their rights, pursuant to 28 U.S.C. § 2201. In their pending motion for a preliminary injunction, however, Plaintiffs rely only on their first claim, alleging First Amendment retaliation.

## A. Likelihood of Success on the Merits

To prevail on a First Amendment retaliation claim, Plaintiffs must show that: (1) they were engaged in a constitutionally protected activity; (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the Defendants' conduct. *Index Newspapers*, 977 F.3d at 827; *see also Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (describing the third element as whether "there was a nexus between the defendant's actions and an intent to chill speech").

Regarding the first element, there can be no dispute that the First Amendment protects political protests in public forums like public sidewalks. *See, e.g., Index Newspapers*, 977 F.3d at 830 ("Public demonstrations and protests are clearly protected by the First Amendment"); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment."). Further, speech critical of public officials is "high in the hierarchy of First Amendment values." *See Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (citing *Connick v. Meyers*, 461 U.S. 138, 145 (1983)). The First Amendment also "protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (explaining that yelling obscenities and threats at a police officer is still protected under the First Amendment). Moreover, "there is a strong First Amendment interest in protecting the right of citizens to gather in traditional public forum locations that are critical to the content of their message, just as there is a strong interest in protecting speakers seeking to reach a particular audience." *Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004). So too are "newsgathering and reporting activities" protected by the First Amendment. *See Garcia*, 150 F.4th at 1230-32 (collecting cases). Here,

there is more than enough evidence to show that Plaintiffs were engaged in constitutionally protected activities.

As for the second element, the "ordinary firmness" test is an objective one. *See O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016) ("The test is generic and objective. Whether O'Brien himself was, or would have been, chilled is not the test."); *see also Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . . ."). Here, there is more than enough evidence to show that Defendants' persistent, excessive, and targeted violence has chilled some protesters and journalists from returning to the Portland ICE Building.

Regarding the third element, Plaintiffs may prove that their protected activity was a substantial or motivating factor by "either direct or circumstantial evidence." *Index Newspapers*, 977 F.3d at 827. That element, the Ninth Circuit has said, "involves questions of fact that normally should be left for trial." *Id.* (citing *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002)). Defendants argue, however, that they were merely enforcing the law and protecting federal property. Defendants' argument fails for at least four reasons.

First, several protesters and press have described being directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a driveway obstruction. Other protesters and press describe being targeted in a variety of ways, including being shot while standing apart from others, being attacked after verbally engaging with officers, or having their cameras or recording equipment hit directly by officers. In *Index Newspapers*, the Ninth Circuit stated that this type of evidence was "exceptionally strong evidentiary support" for retaliatory intent. 977 F.3d at 829.

PAGE 20 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

Second, that some protesters, like those who sat on the driveway at the Portland ICE Building, may have engaged in criminal or non-criminal violations will not insulate Defendants' actions from First Amendment liability. A law enforcement officer may lawfully arrest a person when there is probable cause to believe that person has violated the law, assuming that the arrest is not a mere pretext for an improper retaliatory purpose. But "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012). Several protestors describe DHS officers shooting into nonviolent crowds from dangerous angles like the roof of the Portland ICE Building. This is strong circumstantial evidence of Defendants' intent to punish the crowd for their expression.

The pattern Plaintiffs illuminate stands in stark contrast to a case like *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024). *Puente* involved a single protest event, as opposed to a systematic and sustained pattern of escalating violence over a period of months. In contrast, *Index Newspapers* rested on evidence of 45 instances of unwarned and significant uses of force over the course of two weeks. 977 F.3d at 827-28 (referring to the record established by plaintiffs as a "strong showing" of likelihood of success and providing "robust support" for the district court's conclusion of the same). Here, Plaintiffs have submitted 62 declarations from percipient witnesses describing events that have occurred during a period of months.

Third, Plaintiffs present strong evidence from both law enforcement and former law enforcement experts. PPB Commander Franz Schoening testified that it was his impression that the amount of force used by federal officers at the Portland ICE Building is not a good indication of the level of violence or unrest caused by protests at that location. Commander Schoening called the DHS force used on one specific occasion that he personally observed "startling" and

PAGE 21 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

remarked that it certainly departed from what he would describe as best practice or legal. Commander Schoening also described another occasion when PPB Officers were struck by munitions fired by federal officers despite Commander Schoening not seeing any violent conduct or behavior that would have otherwise precipitated that use of force.

Plaintiffs also provided testimony and two sworn declarations from Gil Kerlikowske, a former CBP Commissioner and a former Chief of Police in Seattle, Washington. Mr. Kerlikowske opines that DHS has shown a repeated pattern of excessive force against those present at the Portland ICE Building, including against Portland Police Officers. He has identified a myriad of misuses of crowd control munitions at the Portland ICE Building, including federal officers using tear gas on a peaceful crowd, shooting munitions from a roof into a crowd, using munitions on persons who posed no threat, using munitions or non-trivial force on people who were not actively resisting, using volleys of munitions in a grossly disproportionate manner, failing to provide warnings and failing to engage in de-escalation approaches before using force, shooting pepper balls or tear gas at people directly, targeting a person in the head (which, he noted, can be lethal), shooting at people across long distances (which, he noted, is dangerous due to loss of accuracy), and using munitions to retaliate against First Amendment activity. Indeed, Mr. Kerlikowske explained that law enforcement crowd control tools should be used only when there is "active" resistance and that this rule is consistent with DHS's Use of Force Policy.

Fourth, a policy or custom of retaliation "may be inferred [from] 'widespread practices of evidence of repeated constitutional violations' and the absence of evidence that [ ] officers were discharged or reprimanded" for retaliatory actions. *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005) (quoting *Nadell v. L.V. Metro. Police Dep't*, 268 F.3d 924, 929 (9th

PAGE 22 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

Cir. 2001), *abrogated on other grounds as recognized in Beck v. City of Upland*, 527 F.3d 853, 862 n.8 (9th Cir. 2008)). Rather than reprimanding DHS violence against protesters, senior officials have publicly condoned it. There are clear instances of excessive force, including a use of force incident recorded by ICE's own cameras and deemed "inappropriate" and "not reasonable" by the FPS Deputy Regional Director. Yet the agents involved were not put on leave and do not appear to have been held accountable in any way. This allows them and others to continue to use excessive force without correction. For all these reasons, there is more than enough evidence to show that the Plaintiffs' protected activities were at least a substantial or motivating factor in Defendants' conduct at issue. Thus, there also is more than enough evidence for the Court's conclusion that Plaintiffs have shown a likelihood of success on the merits of their claim of First Amendment retaliation.[8]

**B.  Irreparable Harm**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In the Ninth Circuit, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (quoting *Sammartano v. First Jud. Dist. Court*, 303 F.3d 959, 973- 74 (9th

---

[8] Additional evidence can also be found in the fact that Defendants have engaged in similar conduct in Los Angeles, Chicago, and Minneapolis. *See L.A. Press Club, et al. v. Noem, et al.*, C. D. Cal. Case No. 2:25-cv-05563 (discussing similar conduct in Los Angeles, California); *Chicago Headline Club, et al. v. Noem, et al.*, N.D. Ill. Case No. 1:25-cv 12173 (discussing similar conduct in Chicago, Illinois); *Tichner, et al. v. Noem*, D. Minn. Case No. 0:25-cv-04669 (discussing similar conduct in Minneapolis, Minnesota). To be conservative, however, the Court does not rely on any of Defendants' actions in those three cities to reach its conclusion here that Plaintiffs have shown a likelihood of success on the merits.

Cir. 2002)). Because constitutional violations often cannot be adequately remedied through damages, the Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

To justify preliminary injunctive relief, "a plaintiff must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (cleaned up). The Ninth Circuit instructs that, when "predicting the likelihood of future violations," courts should consider, in addition to the commission of past illegal conduct:

> the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations.

*Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989).

The Court finds that the repeated teargassing and use of OC Spray and other less lethal munitions against nonviolent protesters engaging in, at most, passive resistance at the Portland ICE Building will likely keep recurring against Plaintiffs and the members of the class. Defendants' violence is in no way isolated. Similarly, statements made by DHS officials and senior federal executives show that the culture of the agency and its employees is to celebrate violent responses over fair and diplomatic ones.

Further, although some "fully chilled" protesters who do not return to the Portland ICE Building may be unlikely to be imminently harmed, their ability to establish a likelihood of irreparable injury is no less available. Their legal injury is a complete loss of their First Amendment freedom to protest and report news at the Portland ICE Building, and this injury recurs daily. *See Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (noting that when "First Amendment rights [are] being chilled daily, the need for

PAGE 24 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's

great importance"); *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013)

("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is,

itself, a constitutionally sufficient injury.").

## C. Balance of Equities and Public Interest

As previously noted, when the government is a party, the last two factors, balancing the

equities and assessing the public interest, merge. *See Nken*, 556 U.S. at 435; *E. Bay Sanctuary

Covenant*, 993 F.3d at 668. Further, "[i]t is always in the public interest to prevent the violation

of a party's constitutional rights." *Index Newspapers*, 977 F.3d at 838 (citation omitted). In

addition, as discussed more fully below, the requested relief would not unreasonably burden

Defendants. They will still be free to cite or even arrest a person when the law permits. As

Mr. Kerlikowske, a recognized expert in this field, explains:

> Most of the events that I have seen have been small and peaceful
> protests in which anyone who endangers law enforcement could be
> easily identified and arrested. However, I have policed, supervised
> operations for, and been involved in developing strategies for,
> massive, chaotic and much more violent protests. At these types of
> events, individuals sometimes may commit crimes. If the protests
> at the Portland ICE Building somehow grew to that size, there is
> nothing in the proposed injunction that would prevent [law
> enforcement officers] from arresting and charging such an
> individual. It is quite common in some larger protests for violators
> to commit a criminal act and then use the anonymity of the crowd
> to blend back in, but those are just the general nature of some
> protests.

ECF 34 ¶ 71. He adds that if DHS needs to clear a path for vehicular traffic or wants to clear the

driveway to the Portland ICE Building, which has been a focal point in several protests, the

appropriate method is to ask people to clear the way for the car with clear instructions as to

where to go and that failing to move or engaging in even passive resistance may result in arrest.

His testimony during the evidentiary hearing further supports this conclusion.

PAGE 25 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

The public interest in protecting First Amendment rights cannot be overemphasized. Freedom of speech, including through political protest, is "one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (cleaned up). As the Ninth Circuit has recognized, "robust political discourse within a traditional public forum is the lifeblood of a democracy." *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008); *see also Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009) ("Political speech is . . . critical to the functioning of our democratic system."). The government's power to restrict speech in public forums is "very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983). Protest particularly serves this core democratic function "when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello*, 337 U.S. at 4. Indeed, the First Amendment tolerates societal "trouble" caused by protest because "our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508-09 (1969) (cleaned up).

## D. Scope of Relief

### 1. Plaintiffs

Defendants argue that if the Court decides to issue any preliminary injunctive relief it should be limited to, at most, the five named Plaintiffs. Anything else, Defendants argue, would amount to an improper "universal injunction."[9] For three independent and alternative bases, the Court rejects Defendants' argument.

---

[9] Typically, a "universal" injunction, which is often called a "national" or "nationwide" injunction, is an order by a federal district court that enjoins the federal government from taking certain actions on a nationwide basis. Central among its drawbacks is the prevention of percolation of analyses among the various district and circuit courts before a decision is made by

PAGE 26 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

First, Plaintiffs originally filed this lawsuit as a putative class action, and that was its status when Plaintiffs moved for preliminary injunctive relief on February 12, 2026. On February 28, 2026, two days before the evidentiary hearing began, Plaintiffs moved for provisional class certification. That motion has been fully briefed and argued, and in a separate Opinion and Order filed concurrently herewith, the Court provisionally certified a class consisting of: "All people who, since the beginning of Operation Skip Jack, have engaged in nonviolent protests at or near, or nonviolently reported about protests occurring at or near, the Portland ICE Building." Thus, it is appropriate to include within the Court's scope of relief all certified class members, including the five named Plaintiffs.

Second, even if the Court disregards the filed and granted motion for provisional class certification and treats the lawsuit as simply a putative class, it is entirely appropriate to afford preliminary injunctive relief to a putative class. As the Supreme Court has noted, federal district courts "may issue temporary relief to a putative class." *AARP v. Trump*, 605 U.S. 91, 98 (2025).[10] Here, the Court finds that to avoid causing irreparable constitutional injury to absent class members, preliminary injunctive relief in the form granted is necessary and appropriate.

---

the Supreme Court. *See generally* Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 HARV. L. REV. 920 (2020). This consideration plays no role here, where the Court's preliminary injunction concerns only what DHS may and may not do at one specific location in Portland, Oregon. The accompanying Order of Preliminary Injunction does not legally restrict what DHS may or may not do anywhere other than at and in the vicinity of the Portland ICE Building.

[10] Elsewhere in *AARP*, the Supreme Court stated that the "Court may properly issue temporary injunctive relief to the putative class in order to preserve [its] jurisdiction pending appeal." 605 U.S. at 97. The Ninth Circuit has cited *AARP* for the same proposition. *See Vasquez Perdomo v. Noem*, 148 F.4th 656, 688 n.15 (9th Cir. 2025) ("[T]he Supreme Court recently held that even before a class is certified—'provisionally' or otherwise—courts 'may properly issue temporary injunctive relief to the putative class in order to preserve [their] jurisdiction pending appeal.'" (quoting *AARP*, 605 U.S. at 97)).

Third, preliminary injunctive relief in the form granted is necessary and appropriate to ensure "complete relief" even if just to the named Plaintiffs. "The equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties." *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (cleaned up). This is known as the "complete-relief principle." The relevant question under the complete-relief principle "is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at 852 (emphases in original). In *CASA*, the Supreme Court explained that the narrow injunction issued in that case was of the proper scope because it would "give that plaintiff complete relief," whereas "[e]xtending the injunction to cover all other similarly situated individuals would not render *her* relief any more complete." *Id.* at 852-53 (emphasis in original). Here, by contrast, the Court must extend the preliminary injunction to cover the entire class (whether putative or certified) to give the named Plaintiffs complete relief. If the Court were to prohibit Defendants from teargassing or otherwise firing less lethal munitions only against the named Plaintiffs, airborne chemicals from

---

Nothing in *AARP* or *Vasquez Perdomo*, however, require that a court must be acting to protect its jurisdiction to grant temporary relief to a putative class. On the contrary, *AARP*'s recognition that "courts may issue temporary relief to a putative class" embraces the general principle that some classwide benefits inure as soon as a class suit has been filed. 605 U.S. at 98 (citing 2 W. Rubenstein, NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 4:30 (6th ed. 2022 & Supp. 2024)). For example, the statute of limitations for all putative class members is tolled upon the mere *filing* of a class suit. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 551 (1974) ("[T]he commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs."). Putative class members also receive the benefit of a plaintiff counsel's duty of loyalty to the class as a whole upon the filing of a class suit. *See* Fed. R. Civ. P. 23(g) & advisory committee's note to 2003 amendment ("[A]n attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole."). At the minimum, "Rule 23 is not designed to afford class action representation only to those who are active participants in or even aware of the proceedings in the suit prior to the order that the suit shall or shall not proceed as a class action." *Am. Pipe*, 414 U.S. at 552.

PAGE 28 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

Defendants' use of tear gas against other nonviolent protestors, for example, would continue to chill Plaintiffs' First Amendment rights.[11]

## 2. Defendants

In their motion for preliminary injunction, Plaintiffs ask the Court, among other things, to convert the Court's TRO into a preliminary injunction until final judgment. As previously noted, the Court entered its TRO against all Defendants, including President Trump. In their opposition to the pending motion for preliminary injunction, Defendants argue that it is both inappropriate and unnecessary for the Court directly to enjoin the President of the United States. Here, the Court agrees with Defendants.

To avoid constitutional tension at odds with the principle of separation of powers among the three coequal branches of our federal government, the Court declines to issue an injunction directly against the President himself. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 500 (1866) ("Neither [the Congress nor the President] can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance."); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-803 (1992) (a plurality of the Supreme Court observing that a "grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows").

> On the other side of the scale, of course, is the bedrock principle
> that our system of government is founded on the rule of law, and it
> is sometimes a necessary function of the judiciary to determine if
> the executive branch is abiding by the terms of legislative

---

[11] Defendants also urge the Court to limit the injunction only to the named Plaintiffs, citing the Ninth Circuit's decision in *L.A. Press Club, et al. v. Noem, et al.*, Case No. 25-5975, ECF 66 (9th Cir. Dec. 18, 2025). There, the court stayed the injunction "to the extent that [it] appl[ied] to protestors who [were] not parties to this litigation." *Id.* at 1. The plaintiffs in *L.A. Press Club*, however, did not seek classwide relief before the Court issued its preliminary injunction, so *AARP*'s rule authorizing temporary relief to putative class members did not apply to the then-pending motion before the district court. *See* C. D. Cal. Case No. 2:25-cv-05563.

enactments. In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.

*Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). That is the case here. The injury at issue can be sufficiently remedied by injunctive relief against the Secretary of the U.S. Department of Homeland Security and all agents and employees of that Department, including all persons acting under the direction or in active concert or participation with the Secretary of the U.S. Department of Homeland Security or any of its agents or employees.

### 3. Mandatory Injunctive Relief

In their motion for preliminary injunction, Plaintiffs ask the Court, among other things, to require all agents policing the Portland ICE Building to wear visible identification numbers with their agency affiliation displayed. Unlike the other relief requested by Plaintiffs, which seeks only a prohibitory injunction, in this request Plaintiffs seek mandatory injunctive relief that would alter the status quo.

The already high standard for granting a preliminary injunction is further heightened when the type of relief sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original). As explained by the Ninth Circuit:

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction orders a

PAGE 30 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

> responsible party to take action. A mandatory injunction goes well
> beyond simply maintaining the status quo [p]endente lite [and] is
> particularly disfavored. In general, mandatory injunctions are not
> granted unless extreme or very serious damage will result and are
> not issued in doubtful cases or where the injury complained of is
> capable of compensation in damages.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (quotation marks and citation omitted) (alterations in original).

Defendants present evidence that DHS officers from some of the agencies involved do wear identifying information, but that information does not appear in the videos to be particularly conspicuous. In addition, several of the percipient witnesses testified or declared that they did not see any identifying information. Accordingly, the Court will order the parties to confer regarding how the DHS officers deployed to the Portland ICE Building can place conspicuous and unique identifying markings on their uniforms, vests, and/or helmets so that they can be easily identified at a reasonable distance and without unreasonably interfering with the legitimate law enforcement needs of these personnel.

## E. Defendants' Request that Plaintiffs Post a Bond

Defendants have requested that if the Court enters a preliminary injunction, the Court require Plaintiffs to post a bond or other security, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. Rule 65(c) provides that a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Ninth Circuit, however, has held that a "district court retains discretion as to the amount of security required, *if any*." *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (holding that the district court properly invoked its discretion not to require a bond and quoting *Johnson v.*

*Couturier*, 572 F.3d 1067, 1086 (9th Cir.2009) (quotation marks and citations omitted) (emphasis in the original)).

Here, several factors weigh against requiring Plaintiffs to post a bond. First, there is no realistic likelihood of harm to Defendants. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."). The Court's TRO was in place for 28 days, and Defendants have complied with its provisions with no indication of problem or prejudice, let alone irreparable harm. Further, the injunction largely mirrors the requirements imposed by the FPS's own Use-of-Force policies. Second, the balance of equities weighs overwhelmingly in favor of Plaintiffs. *See Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) ("Where the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement."). Plaintiffs seek to protect their constitutional rights to free speech and freedom of the press, while Defendants, essentially, simply must comply with FPS's own Use-of-Force policies. And third, for all the reasons discussed above, Plaintiffs have shown a strong likelihood of success on the merits, which also supports the Court waiving the bond requirement. *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (holding that a "strong likelihood of success on the merits" supports the exercise of a district court's discretion not to require the posting of a bond).

## F. Defendants' Request for Stay or Administrative Stay Pending Appeal

Finally, Defendants have requested that if the Court enters a preliminary injunction, the Court stay that relief pending the disposition of an appeal or at least administratively stay the relief for seven days to allow Defendants to consider seeking that relief from the Court of Appeals. The Supreme Court has explained the four traditional factors to be weighed when

PAGE 32 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

considering a request to stay a lower court's decision pending resolution of an appeal. Those factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 762 (2021) (per curiam) (vacating stay and quoting *Nken*, 556 U.S. at 434)); *see also Mirabelli v. Bonta*, No. 25A810, 2026 WL 575049, at *2 (U.S. Mar. 2, 2026) (vacating stay and citing *Alabama Ass'n of Realtors* and *Nken*).

Here, none of the factors support granting a stay. First, Defendants have not made a "strong showing" that they are likely to succeed on the merits. Second, Defendants have not shown a likelihood that they will be irreparably injured absent a stay. The Court's TRO was in place for 28 days, and, as stated above, Defendants have complied with its provisions without any indication of problem or prejudice, let alone irreparable harm. In addition, the injunction largely mirrors the requirements imposed by FPS's own Use-of-Force policies. Third, as discussed, Plaintiffs' constitutional rights under the First Amendment were violated every day before the Court entered its TRO. *See Libertarian Party of L.A. Cty.*, 709 F.3d at 870 ("a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury"). Fourth, and finally, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers*, 977 F.3d at 838 (citation omitted). For these reasons, the Court denies Defendants' request for a stay pending appeal, including an administrative brief.

## CONCLUSION

The Court GRANTS Plaintiffs' Motion for Preliminary Injunction, ECF 106 (sealed); ECF 94 (unsealed and redacted), the specific terms of which are stated in a separate concurrently filed Order of Preliminary Injunction. The Court DENIES Defendants' request for a stay pending

PAGE 33 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

appeal, including Defendants' request for an administrative stay, because there simply is no likelihood of irreparable damage to Defendants during the pendency of any appeal of the Court's Order of Preliminary Injunction. Defendants have complied with the Court's Temporary Restraining Order for 28 days without problem or prejudice, let alone any risk of irreparable harm. Finally, in a separate concurrently filed Opinion and Order, the Court GRANTS Plaintiffs' Motion for Provisional Class Certification. ECF 130 (sealed); ECF 131 (unsealed and redacted).

**IT IS SO ORDERED**.

DATED this 9th day of March, 2026.

Michael H. Simon
United States District Judge

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JACK DICKINSON, *also known as "the Portland Chicken"*; **LAURIE ECKMAN**; **RICHARD ECKMAN; MASON LAKE**; and **HUGO RIOS**, *on behalf of themselves and those similarly situated*, | Case No. 3:25-cv-2170-SI |
| | **ORDER OF PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | |
| **DONALD TRUMP**, *President of the United States, in his official capacity*; **KRISTI NOEM**, *Secretary, U.S. Department of Homeland Security (DHS), in her official capacity*; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

**Michael H. Simon, District Judge.**

This matter comes before the Court on Plaintiffs' motion for preliminary injunctive relief. After considering the legal memoranda and written evidence submitted by Plaintiffs and Defendants, reviewing the legal memoranda submitted by *amici curiae* State of Oregon and City of Portland, and holding a three-day evidentiary hearing, for the reasons explained in the Opinion and Order Granting Preliminary Injunction and the separate Opinion and Order Granting

PAGE 1 – ORDER OF PRELIMINARY INJUNCTION

Provisional Class Certification filed concurrently herewith, the Court grants Plaintiffs' motion for preliminary injunctive relief. Accordingly, until such time as the parties agree in writing to amend, supersede, or terminate this Order of Preliminary Injunction or until this Court orders otherwise, it is HEREBY ORDERED THAT:

1.      The Secretary of the U.S. Department of Homeland Security and all agents and employees of that Department, including all persons acting under the direction of or in active concert or participation with the Secretary of the U.S. Department of Homeland Security or any of its agents or employees (collectively, the "Enjoined Persons") are hereby prohibited and enjoined from engaging in, directing, or encouraging others to engage in or direct any of the following actions at or in the vicinity of the Immigration and Customs Enforcement ("ICE") building located at 4310 S. Macadam Avenue, near the corner of Southwest Moody Avenue and Southwest Bancroft Street in Portland, Oregon ("Portland ICE Building"):

a.      No Enjoined Person may direct or use chemical or projectile munitions, including but not limited to kinetic impact projectiles, pepper ball or paintball guns, tear gas or other chemical irritants, soft nose rounds, 40mm or 37mm launchers, less lethal shotguns, and flashbang, Stinger, or rubber ball grenades, unless the specific target of such a weapon or device poses an imminent threat of physical harm to a law enforcement officer or other person.

b.      No Enjoined Person may fire any munitions or use any weapons described in subsection (a) at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person.

c.      No Enjoined Person may use pepper spray, oleoresin capsicum spray, or other aerosol restraint spray (collectively, "OC Spray"), unless the specific target of that weapon exhibits, at a minimum, active resistance. For purposes of this Order, and by way of example and

PAGE 2 – ORDER OF PRELIMINARY INJUNCTION

illustration only, trespassing, refusing to move, refusing to obey an order to disperse, and "going limp" (or "going dead weight") are merely acts of passive resistance, not active resistance. In addition, no Enjoined Person may use OC Spray indiscriminately against groups of people where bystanders foreseeably would be affected. OC Spray, however, may be used against specific individuals actively engaged in violent unlawful conduct, actively resisting arrest, or as reasonably necessary in a defensive capacity.

2.      Nothing in this Order shall prevent an Enjoined Person from making an otherwise lawful arrest if there is probable cause to believe that a crime has been committed and that the person being arrested has committed that crime.

3.      Nothing in this Order shall prevent an Enjoined Person from using proportional force, including less lethal weapons, on any individual who poses an imminent threat of physical harm to a law enforcement officer or other person.

4.      Defendants shall not be liable for violating this Preliminary Injunction if a person is incidentally exposed to a crowd-control device, provided that such a device is deployed in a manner that is fully consistent with this Order of Preliminary Injunction.

5.      The parties shall promptly confer regarding how the Enjoined Persons who perform duties at or in the vicinity of the Portland ICE Building can place conspicuous and unique identifying markings (using numbers and/or letters) on the uniforms, vests, and/or helmets of the officers and agents deployed at the Portland ICE Building so that they can be identified at a reasonable distance and without unreasonably interfering with the legitimate law enforcement needs of these personnel. If the parties agree on a method of marking, they shall submit the terms of their agreement in writing to the Court, and the Court will then issue a Supplemental Order of Preliminary Injunction that incorporates the parties' agreement. If the

PAGE 3 – ORDER OF PRELIMINARY INJUNCTION

parties cannot reach agreement within 21 days, each party may submit its own proposal, and each side may respond to any other party's proposal within 14 days thereafter. The Court will then resolve any disputes on this issue and appropriately supplement this Order of Preliminary Injunction.

6.      In the interest of justice, Plaintiffs need not provide any security, and the Court waives all requirements under Rule 65(c) of the Federal Rules of Civil Procedure.

7.      Defendants shall promptly provide individual copies of this Order of Preliminary Injunction to each Enjoined Person who currently is assigned duties at or in the vicinity of the Portland ICE Building. Within 28 days of the date of this Order of Preliminary Injunction, Defendants shall file with the Court written confirmation of their compliance with this provision. In addition, Defendants shall promptly provide individual copies of this Order of Preliminary Injunction to each Enjoined Person who in the future is assigned duties at or in the vicinity of the Portland ICE Building.

**IT IS SO ORDERED**.

DATED this 9th day of March, 2026.

Michael H. Simon
United States District Judge

PAGE 4 – ORDER OF PRELIMINARY INJUNCTION